ACCEPTED
04-14-00802-CV
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
1/28/2015 6:59:36 PM
KEITH HOTTLE
CLERK

EXHIBIT A

544 S.W.2d 367 (Tex. 1976)

Nanci Adams HOLLEY, Petitioner,

v.

David E. ADAMS, Respondent.

No. B--5880.

Supreme Court of Texas.

December 1, 1976

Orr & Davis, Stephen M. Orr, Austin, for petitioner.

Rogan B. Giles, Austin, for respondent.

SAM D. JOHNSON, Justice.

David Adams instituted this suit for termination of the parent-child relationship between his former wife, Nanci Adams Holley, and their son. The trial court ordered termination under Section 15.02 of the Texas Family Code Annotated [1] on the grounds

that Nanci Holley had failed to support her child (Section 15.02(1)(E)), that her conduct endangered the emotional well-being of the child (Section 15.02(1)(D)), and that the termination of the parent-child relationship was in the best interest of the child (Section 15.02(2)). The court of civil appeals affirmed. 532 S.W.2d 694. We reverse and render judgment denying termination of the parent-child relationship.

David and Nanci Holley were married in 1965. The only child of their marriage, David Christopher, was born the following year. The couple separated in 1968 and subsequently Nanci Holley filed a suit for divorce which was granted in 1969. During the pendency of the divorce action Nanci Holley voluntarily delivered the child to his father in Austin, Texas where he has remained at all times pertinent to this action.

Nanci Holley did not object to or contest the divorce decree awarding custody of the child to David Adams. The court decree did not require Nanci to pay child support. The court order did, however, designate David Adams as managing conservator and he has continuously retained custody and control of his son since Nanci Holley voluntarily delivered the child to him.

David married his present wife, Sharon, in 1970. The trial court found that David Christopher enjoyed a happy relationship with his father and stepmother. His health was good, he attended school regularly, made good

grades, and engaged in athletic activities.

Shortly after the divorce Nanci Holley was arrested and jailed for a traffic offense. She was also committed to the Austin State Hospital by her mother during June and July of 1969 for treatment of mental illness which Nanci described as a depressive condition caused by the divorce. In August 1969 she left Austin, Texas where her husband and child resided. She traveled in the company of three men and made what the court of civil appeals termed a 'rootless trek to the western states.' By the end of that month she had settled in Seattle, Washington where she has remained.

Nanci Holley remarried in 1970 and one child, a daughter, was born of this second union. This marriage ended in divorce in 1973 and Nanci Holley has retained custody of her daughter. During 1973 Nanci declared bankruptcy and in March 1974 she married her present husband, Ricky Holley, who was a student at the University of Washington.

After leaving Austin in 1969 Nanci Holley returned there to visit her son, David Christopher, on three occasions between 1971 and 1974. With respect to her relationship with and support of her son, Nanci Holley testified to the following: she often contacted him through her mother by numerous letters and telephone calls; there exists a loving parent-child relationship between them; the termination of that relationship would not be in the best interest of the child; her three offers to pay her son's air fare to and from Seattle were refused; between 1970 and 1975 she sent a total of approximately $100 in cash to her son or to David and Sharon Adams for his use and benefit; she maintained a health insurance policy covering him; and she sent various gifts and toys to her son. The trial court found that at least one of her gift packages was returned to her unopened. As to Nanci's financial situation between 1970 and 1975, the trial court found that: (1) for two years following her remarriage in 1970 she was a housewife without outside employment; (2) in 1972 she obtained employment as a program adviser at the University of Washington, which position she has continued

to hold; (3) she earned a gross income in excess of $500 per month from this employment; (4) she declared voluntary bankruptcy in 1973; (5) her marriage to Ricky Holley has not resulted in any children; (6) Ricky Holley received Veterans Administration education benefits in excess of $300 per month and worked part-time; (7) his tuition averaged $125 per month; and (8) $117 per month was deducted from Nanci's salary to repay loans. Nanci testified that she had not received the child support payments her second husband was ordered to make.

David Adams instituted the instant suit for termination of the parent-child relationship between his former wife, Nanci Adams Holley, and their son, asserting as the only grounds therefor that Nanci Holley had 'failed to support the child in accordance with her ability during a period of one year ending within six months of the date of filing of the petition, and she (had) emotionally and actually abandoned the child,' and that termination 'would be in the best interest of (the) child.'

The court appointed a guardian Ad litem to represent the child, David Christopher, and ordered the guardian Ad litem to investigate the circumstances and submit a written report to the court. Such report was submitted and is part of the record before this court.

David testified that he brought this suit for termination because if he should die it would be better for his son to be raised by Sharon Adams rather than by Nanci Holley. In describing the relationship between Nanci and David Christopher, David Adams testified as follows:

'Q . . . do you feel that it's in the best interest of Christopher that he not ever see his natural mother again?

'A No, no, sir, not--

'Q All right, sir. You feel that a--What is he now, nine years old, I believe--

'A Yes, sir.

'Q--last February?

'A Yes, sir.

'Q So--All right. So don't you agree with me, sir, that a young man of this age should--who--who has known his mother and who has visited with her in--and who has formed some affection for his mother should be allowed to continue seeing his mother?

'A Yes, but I--I believe the way--the child is happy the way he is and--

'Q I'm sorry. I didn't--

'A I do believe the child is happy the way he is. As far as--Yes. He enjoys going over to see Nanci whenever she comes to town because he gets gifts and, you know, lots of love and care which, you know, he gets in the home too, but he gets it every day when he only gets it one--once a year or whenever she comes to town.

'Q But you think he ought to continue to see Nanci, do you not?

'A Whenever she comes to town, yes.'

In its 'Conclusions of Law' the trial court found that:

1. '. . . (Nanci Adams Holley) has failed to support the child in accordance with her ability during a period of one year ending within six months of the date of filing of the petition, within the meaning of Article 15.02(1)(E) of the Texas Family Code';

2. 'By her conduct and virtual abandonment of the minor child, David Christopher Adams, for a period of six years, commencing some three to four months prior to her divorce from David E. Adams, Nanci Adams Holley has engaged in conduct which endangers the emotional well-being of the child within the meaning of Article 15.02(1)(E) of the Texas Family Code'; and

3. 'Termination of the parent-child relationship between the mother, Nanci Adams Holley, and the child, David Christopher Adams, is in the best interest of the minor child, David Christopher Adams . . ..'

The trial court decree ordered termination of the parent-child relationship. Additionally, it appointed David Adams managing conservator of his son. The court of civil appeals affirmed, holding that there was sufficient evidence to sustain the trial

**Page 370**

court's finding that Nanci Holley failed to support her son in keeping with her ability during a period of one year prior to the filing of this suit for termination (Section 15.02(1)(E)), and that termination of the parent-child relationship was in the best interest of the child. Having found evidence to support one of the provisions of Section 15.02(1) of the Family Code, namely, failure to support (Section 15.02(1)(E)), the court of civil appeals declined to consider the trial court's alternative finding that Nanci Holley had engaged in conduct which endangered the emotional well-being of her son (Section 15.02(1)(D)). The only issue before this court is the correctness of the termination order. There is no challenge of the appointment of David Adams as managing conservator.

As this case involves the right of the child to the benefit of the home and environment which will probably best promote its interest and the right of the parent to surround the child with proper influences, *Herrera v. Herrera,* 409 S.W.2d 395 (Tex.1966), *Legate v. Legate,* 87 Tex. 248, 28 S.W. 281 (1894), and as *Wiley v. Spratlan,* 543 S.W.2d 349 (Tex.1976), recognized the constitutional dimensions of these rights, this case must be strictly scrutinized.

TERMINATION MAY NOT BE BASED SOLELY ON DETERMINATION OF BEST

INTEREST UNDER SECTION 15.02

Under Section 15.02 termination of a parent-child relationship may not be based solely upon what the trial court determines to be the best interest of the child. In

Wiley v. Spratlan, supra, this court wrote:

'Involuntary termination of parental rights rests upon Section 15.02. Subdivision (1) of that Section lists several acts or omissions, one or more of which must be proved in a termination case. The list may not be an exclusive one, but so far as this case is concerned, the Welfare Unit relied only upon Section 15.02(1)(E). Subdivision (2) of the same Section requires proof of a second element, that the termination is in the best interest of the child. Both elements must be established and the requirements of Subdivision (1) are not excused because a court may be of the opinion that Subdivision (2) has been proved.' 543 S.W.2d 349 at 351. (Emphasis added.)

## CONDUCT WHICH ENDANGERS EMOTIONAL WELL-BEING

In affirming the trial court's decree terminating the parent-child relationship the court of civil appeals did not rely upon the trial court's finding that Nanci Holley's conduct endangered the emotional well-being of her child (Section 15.02(1)(D)). Although it is not clear that Section 15.02(1)(D) was properly pleaded by the recitation in the petition that Nanci Holley 'emotionally and actually abandoned the child,' it does not appear to be an issue between the parties before the court and this court will, for the purposes of this case, treat it as properly pleaded.

Nanci Holley contends that there is no evidence to support the trial court's finding that her conduct endangered the emotional well-being of her child (Section 15.02(1)(D)). With respect to this contention, this court in reviewing the record can only consider the evidence and the inferences tending to support the finding of the trial court and must disregard all evidence and inferences to the contrary. *Garza v. Alviar,* 395 S.W.2d 821 (Tex.1965).

We hold that there was No evidence to support the finding that Nanci Holley, by her conduct, endangered the emotional well-being of her child. The trial court's finding was apparently based in part upon the fact that she visited the child only three times during the five and one-half year period prior to the trial of this case. There was no evidence of any nature that the infrequency of the contacts endangered the child's emotional well-being in any way. Similarly, there was no evidence that Nanci's visits with her son endangered his emotional well-being in any way.

The trial court also may have based its conclusion that Nanci Holley endangered

**Page 371**

the emotional well-being of her child upon the conduct previously recited that appeared to cast doubt on her competency as a parent: her arrest in 1969 for a traffic offense; her commitment to the Austin State Hospital by

her mother for less than two months; her conduct while traveling to Seattle; her second divorce; and her voluntary declaration of bankruptcy. Again, however, there was no evidence of any nature that David Christopher's emotional well-being was endangered by this conduct in any way.

The foregoing is not to be understood as speaking to the quality of the testimony which might be required to establish that the emotional well-being of a child has been endangered. The instant record is merely devoid of any testimony or evidence of any nature which bears upon the bringing into danger or peril the emotional well-being of the child.

## FAILURE TO SUPPORT

Both the trial court and the court of civil appeals found that Nanci failed to support her son within the meaning of Section 15.02(1)(E). There is an adequate basis in the record to sustain the finding of the courts below that Naci Holley failed to support her child in accordance with her ability during a period of one year ending within six months of the date of the filing of this petition.

## THE FACTOR OF EXCUSE

Nanci Holley contends, however, that Section 15.02(1)(E) is rendered inapplicable where a parent's duty of support has been excused, and that her duty of support was excused in the instant case.

An analogous contention was before this court in the context of determining whether the consent of a parent was a necessary prerequisite to the adoption of his child under Article 46a(6)(a), Texas Revised Civil Statutes Annotated, [2] *Heard v. Bauman,* 443 S.W.2d 715 (Tex.1969). That statute provided that the consent of a parent to adoption of his child was not necessary where 'such parent or parents shall not have contributed substantially to the support of such child during such period of two (2) years commensurate with his financial ability.'

However the statutory scheme which was before this court in Heard v. Bauman, supra, is significantly different from Section 15.02 of the Texas Family Code and thus the case is not necessarily controlling. As noted in Wiley v. Spratlan, supra, the focus of the current termination proceeding is twofold; first, on the acts or omissions of the parent And, second, upon the best interest of the child. The emphasis of Article 46a(6)(a) was on whether the conduct of the parent justifies the waiver of the requirement that the parent consent to an adoption. This change demonstrates the intent of the Legislature to move from the concept that the parent cannot block the severance of the parent-child relationship through adoption when the parent has engaged in unexcused blameworthy conduct, to the idea that the parent cannot prevent termination (1) when there exist acts or omissions

by the parent which may indicate that the existing parent-child relationship is not a proper one, And (2) when termination is indeed in the best interest of the child. The interpretation of Section 15.02 which will best fulfill the intent of the Legislature is that any 'excuse' for the acts or omissions of the parent can be considered by the trial court only as one of the factors in determining the best interest of the child.

## BEST INTEREST OF THE CHILD

Nanci Holley next argues that there is no evidence that termination of the parentchild relationship was in the best interest of David Christopher. An extended number of factors have been considered by the courts in ascertaining the best interest of the child. Included among these are the

**Page 372**

following: (A) the desires of the child; [3] (B) the emotional and physical needs of the child now and in the future; [4] (C) the emotional and physical danger to the child now and in the future; [5] (D) the parental abilities of the individuals seeking custody; [6] (E) the programs available to assist these individuals to promote the best interest of the child; [7] (F) the plans for the child by these individuals or by the agency seeking custody; [8] (G) the stability of the home or proposed placement; [9] (H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (I) any excuse for the acts or omissions of the parent. [10] This listing is by no means exhaustive, but does indicate a number of considerations which either have been or would appear to be pertinent. Only a limited number of factors listed above appear from the record to have been presented here.

## ACTS OR OMISSIONS OF THE PARENT:

As stated earlier, the record does support the finding of the trial court and the court of civil appeals that Nanci failed to support her child in accordance with her ability and this failure to support is one of the factors that is to be considered in ascertaining the best interest of the child.

## EXCUSE OF ACTS OR OMISSIONS:

However, as previously noted, any excuse for this failure to support is to be considered under best interest. A comparison of the facts of this case to the circumstances of Heard v. Bauman, supra, leads to the conclusion that the failure to support was excused. In the instant case David Adams testified that Nanci Holley voluntarily agreed to give him custody of the child during the course of the divorce proceedings in order to assure that the child would be provided adequate financial support. Nanci Holley was never ordered to make support payments. It was undisputed that the child had been properly cared for while in his father's custody and that David Adams and his wife never sought or wanted any

fanancial support for the child from Nanci Holley. Therefore, Nanci Holley's duty to support her child was excused and the fact that the failure to support is excused is one of the factors to be considered in ascertaining the best interest of the child.

## EMOTIONAL NEEDS OF THE CHILD:

With respect to the emotional needs of the child, the previously noted testimony of both Nanci Holley and David Adams indicates that there does exist an emotional relationship between the child and his mother, and also an emotional relationship between the child and his maternal grandmother, and that these relationships should continue. Furthermore, the evidence demonstrates that there is an emotional relationship between the child and his father and stepmother.

Only two reasons were given by David Adams for termination; first, that it was his desire to adopt his wife's child at the same time his wife adopted his child and, second, that he was fearful of what would happen if he should die and the child's mother should take him.

Particularly compelling is the direct testimony on the best interest of the child.

**Page 373**

There is No testimony that the child's best interest would be served by termination of the child's relationship with his mother. The investigator's report gives no justification for termination and makes no suggestion that it would be in the child's best interest. On the other hand, the testimony of David Adams, the individual seeking termination here, clearly states that it would not be in the best interest of the child that he never see his mother again; that the best interest of the child would be served by continuing to see his mother.

A review of the factors presented in the record reveals only evidence that indicates that termination is not in the best interest of the child. There is no evidence that termination of the parent-child relationship is in the best interest of the child, David Christopher.

The judgments of the trial court and the court of civil appeals are reversed and judgment is hereby rendered denying termination of said parent-child relationship.

---------

Notes:

[1] Section 15.02, Texas Family Code Annotated, originally enacted in 1973, was amended effective September 1, 1975. The references herein to Section 15.02 pertain to the statute enacted in 1973. Section 15.02 provided in part:

'A petition requesting termination of the parent-child

relationship with respect to a parent who is not the petitioner my be granted if the court finds that:

'(1) the parent has:

'(D) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child; or

'(E) failed to support the child in accordance with his ability during a period of one year ending within six months of the date of the filing of the petition;

'. . . and

'(2) termination is in the best interest of the child.'

[2] Section 15.02(1)(E) was derived from Article 46a(6)(a) which was repealed effective January 1, 1974 upon the enactment of the new Family Code.

[3] See Herrera v. Herrera, supra; Tex. Family Code Ann. § 14.07(a).

[4] See Herrera v. Herrera, supra; Mumma v. Aguirre, 364 S.W.2d 220, 222 (Tex.1963); Porter v. Porter, 371 S.W.2d 607 (Tex.Civ.App.--Eastland 1963, writ ref'd n.r.e.).

[5] See Herrera v. Herrera, supra; Porter v. Porter, supra.

[6] See Mumma v. Aguirre, supra; Porter v. Porter, supra; Tex. Family Code Ann. § 14.07(b).

[7] See Tex. Family Code Ann. § 14.07(b).

[8] See Mumma v. Aguirre, supra; Tex. Family Code Ann. § 14.07(b).

[9] See Mumma v. Aguirre, supra; Tex. Family Code Ann. § 14.07(b).

[10] See Heard v. Bauman, supra.

---------

EXHIBIT B

685 S.W.2d 18 (Tex. 1985)

**Mable Jo David HOLICK, Petitioner,**

**v.**

**Danny Eugene SMITH Et ux., Respondents.**

Nos. C-3261, C-3262 [*].

Supreme Court of Texas.

February 6, 1985

Rehearing Denied March 13, 1985.

Thomas T. Tatum, Whitehouse, for petitioner.

Bain, Files, Allen & Caldwell, Jerry Bain, Tyler, for respondents.

SPEARS, Justice.

This case involves the involuntary termination of the parent-child relationship between Mable Jo Holick and two of her children. Mr. and Mrs. Danny Eugene Smith brought suit for termination and for adoption of the two Holick children. After a non-jury trial, the court ordered termination of the parent-child relationship and granted the adoption. The court of appeals, in an unpublished opinion, affirmed. We reverse the judgments of the courts below.

In early March 1982, Ms. Holick left the children with the Smith family. Ms. Holick had been unable to financially support herself or the children. Although she was able to keep them clothed and fed, they sometimes had no place to sleep but the car. The children were behind on their immunizations and had head lice when Ms. Holick's niece, Mrs. Smith, offered to take care of them until Mrs. Holick could get on her feet.

After leaving the children with the Smiths, Ms. Holick went to Dallas with her youngest child to live with her boyfriend. There, she obtained employment as a waitress. She sent no money to the Smiths, nor did they expect her to send money for the children's support. She did not visit or write the children for over six months, although she did call and talk to them once during that period.

The Smiths have two children of their own, are very active in the church, and are able to financially support the children. The social worker's report concludes that the Smiths are excellent role models, express love for the children, and appear to want to adopt them.

The issue presented on appeal is whether the Texas Family Code authorizes termination under these circumstances. We are

called upon to construe section 15.02 of the Family Code, which provides in part:

A petition requesting termination of the parent-child relationship with respect to a parent who is not the petitioner may be granted if the court finds that:

(1) the parent has:

(A) voluntarily left the child alone or in the possession of another not the parent and expressed an intent not to return; or

(B) voluntarily left the child alone or in the possession of another not the parent without expressing an intent to return, without providing for the adequate support of the child, and remained away for a period of at least three months; or

(C) voluntarily left the child alone or in the possession of another without providing adequate support of the child and remained away for a period of at least six months; or

(D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; or

(E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child; or

(F) failed to support the child in accordance with his ability during a period of one year ending within six months of the date of the filing of the petition;

* * *

* * *

and in addition, the court further finds that termination is in the best interest of the child.

Tex.Fam.Code Ann. § 15.02 (Vernon Supp.1984).

The trial court terminated the parent-child relationship based on subsection (1)(C). There are five requirements for termination under subsection (1)(C):

(1) voluntarily left the child,

(2) alone or in the possession of another,

(3) without providing adequate support of the child,

(4) remained away for at least six months, and

(5) termination is in the best interest of the child.

It is undisputed that Ms. Holick voluntarily placed the children in the possession of the Smiths and that she remained away for at least six months, even though she had expressed an intent to return for the children. It is undisputed that Ms. Holick made no support payments but was not expected to by the Smiths, and she did not contest the trial court's finding that the termination and adoption would be in the best interest of the children. She contends, however, that she was not required to actually support the children, but only make arrangements for their adequate support.

The natural right existing between parents and their children is of constitutional dimensions. *In re G.M.,* 596 S.W.2d 846, 846 (Tex.1980); *Wiley v. Spratlan,* 543 S.W.2d 349, 352 (Tex.1976). Indeed, "involuntary termination of parental rights involves fundamental constitutional rights." *In re G.M.,* 596 S.W.2d at 846. This natural parental right has been characterized as "essential," "a basic civil right of man," and "far more precious than property rights." See *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1976). A termination decree is complete, final, irrevocable and divests for all time that natural right as well as all legal rights, privileges, duties and powers with respect to each other except for the child's right to inherit. Wiley, 543 S.W.2d at 352; Tex.Fam.Code Ann. § 15.07 (Vernon 1975). Moreover, the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights. *Santosky v. Kramer,* 455 U.S. 745, 747, 102 S.Ct. 1388, 1391, 71 L.Ed.2d 599 (1980); *Richardson v. Green,* 677 S.W.2d 497, 500 (Tex.1984). Consequently, termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent. See Cawley

**Page 21**

v. Allums, 518 S.W.2d 790, 792 (Tex.1975); *Heard v. Bauman,* 443 S.W.2d 715, 719 (Tex.1969).

The Smiths seek a construction of subsection (1)(C) that would require Ms. Holick to have personally sent them "adequate support" for the children; however, they never expected such support. The Smiths took the children because Ms. Holick could not adequately support them. The Smiths, nevertheless, argue that the legislature intended to require parents to personally "provide adequate support" under (1)(C) because (1)(B) contains the language "provide for the adequate support."

In *Brokenleg v. Butts,* 559 S.W.2d 853 (Tex.Civ.App.--El Paso 1977, writ ref'd n.r.e.) cert. denied 442 U.S. 946, 99 S.Ct. 2894, 61 L.Ed.2d 318 (1979) the court construed subsection (1)(B), the three-month provision. The court held that subsection (1)(B) requires the parent to make arrangements for the adequate support of the child rather than personally send support.

We believe that subsection (1)(C) is capable of two interpretations. "Provide" is defined to mean "to furnish; supply" or "to fit out with means to an end." Webster's New International Dictionary (2nd ed. 1960). Thus, subsection (1)(C) is susceptible to an interpretation which would merely require that the parent make arrangements for adequate support rather than personally support the child.

The Smiths would have us adopt an interpretation which would allow the termination based on whether the parent is acutely indigent, not whether the parent intended to abandon the child nor whether the parent's conduct endangers the physical or emotional wellbeing of the child. Under such an interpretation a parent's rights could be terminated if he placed his child with another who promised to provide support, even though he expressed an intent to return as soon as he could get back on his feet. His rights could be terminated even if he sent every dime he could spare for that child's support, if what he sent were not enough to be termed "adequate." With the view that termination is such a drastic and grave measure that involuntary termination statutes are strictly construed in favor of the parent, we decline to adopt such an interpretation.

We hold that under § 15.02(1)(C) Ms. Holick was required to make arrangements for the adequate support rather than personally support the children. Termination was not authorized under these facts. Accordingly, we reverse the judgments of the courts below and render judgment that the termination is denied and the adoption is set aside.

Dissenting opinion by WALLACE, J., in which McGEE and KILGARLIN, JJ., join.

WALLACE, Justice, dissenting.

I respectfully dissent. The majority opinion clearly misconstrues both the obvious intent and the plain meaning of Tex.Fam.Code Ann. § 15.02 (Vernon Supp.1984). It is a rule of statutory construction that every word of a statute is presumed to have a specific purpose. Likewise, every word excluded from a statute must be presumed to have been excluded for a particular reason. *Cameron v. Terrell & Garrett, Inc.,* 618 S.W.2d 535 (Tex.1981).

We must presume the Legislature intended that termination of the parent-child relationship may be granted when: (1) the parent leaves the child with one not a parent ... without expressing an intent to return without

providing for the adequate support of the child and remains away three months; or, (2) the parent leaves the child with a parent, or another ... without providing adequate support of the child and remains away for at least six months. Tex.Fam.Code Ann. § 15.02(1)(B) and § 15.02(1)(C). The crucial words expressly adopted in the first instance are, "without expressing an intention to return" and "without providing for" the adequate support of the child; whereas, in the latter situation the language is "without providing adequate support."

**Page 22**

In comparing § 15.02(1)(A), (B) and (C), it will be noted that there is no time delay before suit is required if a parent leaves and expresses an intent not to return. Three months absence is required before termination where the child is left with someone other than a parent and no provision for support is made. The time period expands to six months even if the child is left with the other parent and no support is provided. The Tex.Fam.Code coordinates a progression of conduct with lengthened delays. The omission of "for" from § 15.02(1)(C) was logically intended.

These provisions do not authorize termination only in the case of the acutely indigent. Termination of the parent-child relationship is authorized in any situation where the parents meet the legislative requirements for termination through poverty, neglect, abuse or any other condition falling within these sections.

Denying termination in this instance ignores those situations where the best interest of the child is served by termination of the parent-child relationship. In this case, the trial court found that the best interest of the child would be served by the stable, loving environment of the Smiths. This finding was not contested by Ms. Holick. While it is true that the parent-child bond is very strong, it is not true that all parents provide for the best interest of their children.

A common thread running through the Tex.Fam.Code is protection of the "best interest of the child." The express language of the provisions regarding termination of the parent-child relationship should be followed when the trial court finds that to do so would be in the best interest of the child.

Accordingly, I would affirm the judgments of the courts below and render judgment that the termination and adoption be granted.

McGEE and KILGARLIN, JJ., join in this dissenting opinion.

---------

Notes:

[*] These are direct companion cases.

---------

EXHIBIT C

727 S.W.2d 531 (Tex. 1987)

TEXAS DEPARTMENT OF HUMAN SERVICES et al., Petitioner,

v.

William S. BOYD, Respondent.

No. C-5877.

Supreme Court of Texas.

April 8, 1987

Page 532

Richard L. Crozier and Ann S. Taylor, Hearne, Knolle, Lewallen, Livingston & Holcomb, J. Patrick Wiseman, Attorney General's Office, Don Kay, Texas Dept. of Human Services, from Austin, for petitioner.

R. Stephen Tompkins, Legal Aid Society of Central Texas, Austin, for respondent.

ROBERTSON, Justice.

This is an action to terminate the parent-child relationship between the biological father, William Swanson Boyd, and his minor child. Suit was instituted by the Texas Department of Human Resources after the child's natural mother, Barbara Arriola, signed an irrevocable affidavit of relinquishment of her parental rights. Boyd was served with process and entered an appearance in the case and cross-petitioned for legitimation. Prior to trial of this cause but after execution of the affidavit of relinquishment, Barbara Arriola consented to legitimation of the child as to Boyd. The trial court rendered its order legitimating the child, terminating the mother's parental rights based upon her execution of the irrevocable affidavit of relinquishment [1], and terminating the father's parental rights based upon a finding under section 15.02(1)(E), TEX. FAM. CODE ANN. (Vernon's 1986), that Boyd had engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the physical or emotional well-being of the child. [2] The court of appeals reversed the trial court and rendered judgment that the Texas Department of Human Resources take nothing by its suit seeking to terminate Boyd's parental rights. 715 S.W.2d 711. We reverse the judgment of the court of appeals and remand this cause to that court for further consideration.

Boyd and Arriola began living together in approximately February 1981 but were

never married. On April 4, 1982, Boyd was arrested and jailed for burglary. Two days later Arriola gave birth to a daughter. Boyd saw the child for the first time eight months later when he was paroled from his burglary conviction on December 23, 1982. After his parole, Boyd lived with Arriola until early June 1983, approximately five months. They then separated. In October 1983, Boyd was again arrested and jailed for burglary and he is currently serving a five-year sentence in the Texas Department of Corrections. During the short period of time that Boyd was out on parole, he intermittently held three different jobs. The evidence is vague, at best, as to the nature and amount of support he provided the child.

Barbara Arriola first contacted the Department of Human Resources in June 1983 concerning problems she was having caring for the child. No action was taken by the Department at that time. Barbara contacted the Department for the second time in January 1984 and indicated that she wished to place the child for adoption because she could no longer afford to take care of the child. At the time the child was taken into custody by the Department, she was experiencing emotional problems including sleep disorders, dietary and bed-wetting problems, and temper tantrums.

Under section 15.02, TEX. FAM. CODE ANN. (Vernon's 1986), termination of a parent-child relationship may not be based solely upon what the trial court determines to be the best interest of the child. Holley v. Adams, 544 S.W.2d 367 (Tex.1976). In Wiley v. Spratlin, 543 S.W.2d 349, 351 (Tex.1976), this court wrote:

Subdivision (1) of [section 15.02] lists several acts or omissions, one or more of which must be proved in a termination case.... Subdivision (2) of the same Section requires proof of a second element, that the termination is in the best interest of the child. Both elements must be established and the requirements of Subdivision (1) are not excused because a court may be of the opinion that Subdivision (2) has been proved.

Based upon its interpretation of section 15.02(1)(E), the court of appeals held that there was no evidence, or alternatively that the evidence was less than clear and convincing, that Boyd had endangered the emotional or physical well-being of the child. That section provides for termination of the parent-child relationship if the court finds that the parent has:

(E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child.

The court of appeals stated that the word "endanger"

as used in the statute actually meant "danger" and defined "danger" as an "actual and concrete threat of injury to the child's emotional or physical well-being." 715 S.W.2d at 715. The court of appeals further held that the " 'danger' must be established as an independent proposition and is not inferrable alone from parental misconduct." 715 S.W.2d 715. We decline to adopt the interpretation placed on section 15.02(1)(E) by the court of appeals and expressly disapprove both its definition of "danger" and its holding that danger cannot be inferred from parental misconduct. While we agree that "endanger" means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury. *Allred v. Harris County Child Welfare Unit,* 615 S.W.2d 803, 806 (Tex.Civ.App.--Houston [1st Dist.] 1980, writ ref'd n.r.e.). Rather, "endanger" means to expose to loss or injury; to jeopardize. Webster's New Twentieth Century Dictionary of the English Language 599 (1976), and imprisonment is certainly a factor to be considered by the trial court on the issue of endangerment.

Texas cases have considered the involuntary termination of the rights of an imprisoned parent, and have held that mere imprisonment will not, standing alone, constitute engaging in conduct which endangers the emotional or physical well-being of a child. See, e.g., *Wray v. Lenderman,*

*Page* 534

640 S.W.2d 68 (Tex.App.--Tyler 1982, writ ref'd n.r.e.); In the Interest of Guillory, 618 S.W.2d 948 (Tex.Civ.App.--Houston [1st Dist.] 1981, no writ); *Crawford v. Crawford,* 569 S.W.2d 505, 507 (Tex.Civ.App.--San Antonio 1978, no writ). It is at this point, however, that the courts of appeals part company on the effect of a parent's imprisonment. We hold that if the evidence, including the imprisonment, shows a course of conduct which has the effect of endangering the physical or emotional well-being of the child, a finding under section 15.02(1)(E) is supportable. Wray at 71.

Since we hold that the court of appeals incorrectly interpreted section 15.02(1)(E), we reverse the judgment of the court of appeals and remand this cause to that court for their determination of whether the State met its burden of proving by clear and convincing evidence that Boyd engaged in conduct which endangered the physical or emotional well-being of the child.

---------

Notes:

[1] The trial court's order terminating the mother's parental rights has not been appealed and that part of the order has become final.

[2] Section 15.02(1)(E) was the only provision of section 15.02 alleged against Boyd by the Department of Human Resources.

---------

EXHIBIT D

Page 256

96 S.W.3d 256 (Tex. 2002)

46 Tex. S.Ct. J. 328

In the Interest of J.F.C., A.B.C., and M.B.C., Minor Children.

No. 01-0571.

Supreme Court of Texas

December 31, 2002

Argued Sept. 4, 2002.

Rehearing Denied March 6, 2003.

Page 257

[Copyrighted Material Omitted]

Page 258

[Copyrighted Material Omitted]

Page 259

Idolina Garcia, Office of the Attorney General of Texas, Julie Caruthers Parsley, Office of the Solicitor General of Texas, Jeffrey S. Boyd, Office of the Attorney General, John Cornyn, Attorney General of the State of Texas, Howard G. Baldwin, First Assistant Attorney General, Austin, James Wiley, Assistant Criminal district Attorney, Amy Innmon Forrester and Thomas C. West, Waco, for Petitioners.

Nita C. Fanning, Kathryn J. Gilliam, Waco, L. T." Butch" Bradt, Houston, and Joseph M. Layman, Waco, for Respondent.

Justice OWEN delivered the opinion of the Court in which Chief Justice PHILLIPS, Justice HECHT, Justice JEFFERSON, and Justice SMITH joined.

After a jury trial, the trial court in this case rendered a judgment terminating the rights of both the mother and father to three of their children. A divided court of appeals reversed and remanded, holding that omission of an instruction that termination must be in the children's best interest from material parts of the jury charge was fundamental error that could be raised for the first time on appeal, and that the error probably caused rendition of an improper judgment. [1] We hold that:

1) although the trial court's charge was erroneous because it omitted the children's best interest as a prerequisite for termination in material parts of the charge, Texas Rule of Civil Procedure 279 requires us to supply the omitted finding in support of the judgment because there is either an express or deemed finding by the trial court that termination is in the children's best interest;

2) the concept of "fundamental error" cannot be used to circumvent the application of Rule 279 of our rules of procedure;

3) applying Rule 279 does not violate the due process clause of the United States Constitution or due course of law provision of the Texas Constitution;

4) because parental conduct on which termination could be based was conclusively established, we do not reach whether the trial court erred in failing to instruct the jury that the same ten jurors must agree that at least one statutorily described course of parental conduct occurred and that termination is in the best interest of the children; and

5) assuming, without deciding, that a judgment could be set aside in a parental

Page 260

termination case based on ineffective assistance of a parent's counsel, assistance of counsel in this case was not ineffective.

The factual sufficiency issues raised by the parents in the court of appeals pertain to a ground of termination that is unnecessary to the trial court's judgment. The remaining issues raised by the parents do not require reversal of the trial court's judgment terminating the parents' rights. Accordingly, we reverse the court of appeals' judgment and render judgment that the parent-child relationships are terminated.

I

Because we consider the record in this case in some detail later in this opinion, we include here only minimal facts and the procedural history. The three children who are the subject of this proceeding were removed from their parents' home by the Texas Department of Protective and Regulatory Services (DPRS) in October 1997. At that time, the children's respective ages were four years, two years, and seven months.

The children were initially removed without a court order. [2] The next day, the trial court held an emergency removal hearing and appointed the DPRS temporary managing conservator of the children. [3] Five days later, the court held an adversary hearing, continued the removal, and issued temporary orders appointing the DPRS temporary managing conservator. [4]

The trial court thereafter entered various orders

directing the parents to perform specific acts to avoid restriction or termination of their parental rights. After working with the family for six months following the children's removal, the DPRS amended its petition in the trial court to seek termination of both parents' rights. A jury trial was held in February 1999, and the trial court rendered judgment in March 1999 terminating the parent-child relationship between each parent and the three children who had been removed from the home seventeen months earlier, in October 1997. A fourth child had been born in January 1999 shortly before trial. That child was removed from the parents at birth but was not the subject of any of the proceedings in this case.

The parents appealed, and the court of appeals, with one justice dissenting, reversed the trial court's judgment and remanded the case for a new trial. The court of appeals concluded that the charge permitted the jury to find that the parents' respective rights should be terminated without finding that termination would be in the children's best interest. Although the parents had not objected to the charge on this basis, the court of appeals held that the omission went to a "core issue" in a termination case, and that failing to review the unpreserved error on appeal would violate "Fourteenth Amendment procedural due process" requirements under the United States Constitution. [5] The parents had also complained for the first time on appeal that it was error in a parental termination case to use broad-form submission because less than ten jurors could rely on one basis for termination while other jurors could rely on another basis. [6] The parents contended that there must be a separate finding with regard to each

**Page 261**

element necessary for termination. [7] The court of appeals rejected these arguments, concluding that broad-form submission was permissible. [8] The dissent would have affirmed the trial court's judgment on the basis that there was either an express or implied finding that termination of parental rights was in the children's best interest. [9]

**II**

We first consider the jury charge's submission of the best interest of the children. There is no indication in the record that the trial court or any counsel in the case was under any misapprehension that there are two prerequisites for termination of parental rights under section 161.001 of the Texas Family Code. Section 161.001 sets forth nineteen different courses of parental conduct, any one of which may satisfy the first prerequisite for termination. The second prerequisite under section 161.001 is that termination must be in the child's best interest. However, the written charge to the jury in this case omitted the children's best interest as an element in three material parts of the charge, perhaps because of a typographical error. The submission of the

termination issues was as follows:

With regards to [**THE MOTHER**], for the parent-child relationship to be terminated in this case, it must be proved by clear and convincing evidence that she has done at least one of the following:

1) Engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;

OR

2) Failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Protective and Regulatory Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for abuse or neglect of the child.

With regards to [**THE FATHER**], for the parent-child relationship to be terminated in this case, it must be proved by clear and convincing evidence that he has done at least one of the following:

· Knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children;

OR

· Failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Protective and Regulatory Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for abuse or neglect of the child. For the parent-child relationship to be terminated in this case, it must also be proved by clear and convincing evidence that termination of the parent-child relationship would be in the best interest of the children.

Some factors to consider in determining the best interest of the child are:

1. the desires of the child,

**Page 262**

2. the emotional and physical needs of the child now and in the future,

3. any emotional and physical danger to the child now and in the future,

4. the parenting ability of the individuals seeking

custody,

5. the programs available to assist those individuals to promote the best interest of the child,

6. the plans for the child by those individuals or by the agency seeking custody,

7. the stability of the home or proposed placement,

8. the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, and

9. any excuse for the acts or omissions of the parent.

QUESTION 1:

Should the parent-child relationship between [THE MOTHER] and [J.F.C.] be terminated?

Answer "Yes" or "No."

Answer:

[similar questions as to the other two children]

QUESTION 4:

Should the parent-child relationship between [THE FATHER] and [J.F.C.] be terminated?

Answer "Yes" or "No."

Answer:

[similar questions as to the other two children]

The charge would have accurately instructed the jury regarding the children's best interest if a hard return had been inserted in the instruction regarding the father just before the words "For the parent-child relationship to be terminated...." But as can be seen, the written instruction regarding the father's parental rights mentioned the best interest of the children only in connection with one of the two alternative descriptions of parental conduct. The jury was free to conclude that if the father had endangered the children, his rights could be terminated without any consideration of the children's best interest. Because of the way the written charge was structured, the factors the jury was to consider in determining the best interest of the children were referable only to whether the father had failed to comply with a court order establishing the actions necessary for return of the children.

The written instruction to the jury regarding the mother's parental rights omitted any reference to the best interest of the children. The jury was instructed that her rights could be terminated if there was clear and convincing evidence that she either engaged in conduct that endangered the children or failed to comply with a court order establishing the actions necessary for the return of her children.

Accordingly, the charge in this case omitted a statutorily prescribed element for parental termination. There was no objection to this omission.

**A**

Rule 279 of the Texas Rules of Civil Procedure prescribes the consequences for failing to object to the omission of an element of a ground of recovery. The current version of Rule 279, like its predecessor, embodies long-standing case law that when some but not all elements of a claim or cause of action are submitted to and found by a jury, and there is no request or objection with regard to the missing element, a trial court may expressly make a finding on the omitted element or, if it does not, the omitted element is deemed found by the court in a manner supporting the judgment if the deemed

**Page 263**

finding is supported by some evidence. [10] Rule 279 thus directs courts how to proceed when an element of a "ground of recovery or defense" is omitted from a jury charge. [11]

In this case, the trial court's judgment contains an express finding that termination is in the best interest of the children. It recites that

the Court having reviewed the said verdict of the Jury and the pleadings and the evidence herein is of the opinion that the Petitioners are entitled to the judgment of termination with regard to the children in whose interest this suit is brought, and that such judgment is in the best interest of the children in whose interest this suit is brought.

There is no indication in the record that this finding was made at the request of either party, or after notice and hearing before rendition of judgment, as Rule 279 contemplates. [12] However, there was no objection to the inclusion of this finding in the judgment.

But irrespective of whether that written finding satisfies Rule 279 regarding an express finding, the "omitted element or elements shall be deemed found by the court in such manner as to support the judgment" [13] if there is evidence to support such a finding. [14] Because the judgment terminated parental rights, we must determine whether there is evidence to support a deemed finding that termination is in the children's best interest.

Due process requires the application of the clear and convincing evidence standard of proof in parental termination cases. [15] This Court has looked to the United States Supreme Court in articulating what the "clear and convincing evidence" standard means. [16]

And, following

**Page 264**

this Court's decision in *In re G.M.,* 596 S.W.2d 846 (1980) the Legislature amended the Texas Family Code to change the burden of proof in termination cases from a preponderance of the evidence to clear and convincing evidence. [17] The Family Code defines clear and convincing evidence in the same manner that this Court has defined that burden of proof: " 'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." [18]

**B**

We have never considered how to apply the overlay of the clear and convincing evidence burden of proof onto our legal sufficiency, also known as our "no evidence," standard of review in cases other than defamation cases. [19] However, just recently, in a parental termination case, this Court was called upon to determine how the clear and convincing evidence standard must be applied in a factual sufficiency review. [20] We held in *In re C.H.,* 89 S.W.3d 17 (2002) "that the appellate standard for reviewing termination findings is whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." [21] We expressly "reject[ed] standards that retain the traditional factual sufficiency standard while attempting to accommodate the clear-and-convincing burden of proof." [22] We concluded that "the burden of proof at trial necessarily affects appellate review of the evidence." [23] We explained:

Under traditional factual sufficiency standards, a court determines if a finding is so against the great weight and preponderance of the evidence that it is manifestly unjust, shocks the conscience, or clearly demonstrates bias. But that standard is inadequate when evidence is more than a preponderance (more likely than not) but is not clear and convincing. As a matter of logic, a finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance. [24]

The same logic dictates the conclusion that our traditional legal sufficiency standard,

**Page 265**

which upholds a finding supported by "[a]nything more than a scintilla of evidence," [25] is inadequate when the United States Constitution requires proof by clear and convincing evidence. Requiring only "[a]nything more than" a mere scintilla of evidence does not equate to clear and convincing evidence.

We find support for this conclusion, by analogy, in the United States Supreme Court's decision in Jackson v. Virginia. [26] In the criminal, habeas corpus context, the Supreme Court held in Jackson that the "no evidence" test it had previously articulated in Thompson v. Louisville [27] was "simply inadequate to protect against misapplications of the constitutional standard of reasonable doubt" because " '[a] mere modicum of evidence may satisfy a 'no evidence' standard.' " [28] The Court defined a "mere modicum" of evidence to include "[a]ny evidence that is relevant--that has any tendency to make the existence of an element of a crime slightly more probable than it would be without the evidence." [29] The Court concluded that "it could not seriously be argued that such a 'modicum' of evidence could by itself rationally support a conviction beyond a reasonable doubt." [30] The Court explained further:

Application of the Thompson [no evidence] standard to assess the validity of a criminal conviction after Winship could lead to absurdly unjust results. Our cases have indicated that failure to instruct a jury on the necessity of proof of guilt beyond a reasonable doubt can never be harmless error. Thus, a defendant whose guilt was actually proved by overwhelming evidence would be denied due process if the jury was instructed that he could be found guilty on a mere preponderance of the evidence. Yet a defendant against whom there was but one slender bit of evidence would not be denied due process so long as the jury has been properly instructed on the prosecution's burden of proof beyond a reasonable doubt. Such results would be wholly faithless to the constitutional rationale of Winship. [31]

The availability of habeas review has since been limited by the United States Supreme Court, but a majority of the Court has not modified the Jackson standard of review when the merits of a habeas petition are reached. [32]

The reasoning in Jackson reinforces our conclusion that to apply our traditional no evidence standard of review in a parental termination case would not afford the protections inherent in the clear and convincing standard of proof. As the example in Jackson highlights, a parent's rights could be terminated based on "but one slender bit of evidence" as long as the jury was properly instructed on the clear and convincing evidence burden of proof. Our legal sufficiency review, therefore, must

**Page 266**

take into consideration whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the matter on which the State bears the burden of proof.

The distinction between legal and factual sufficiency when the burden of proof is clear and convincing evidence may be a fine one in some cases, but

there is a distinction in how the evidence is reviewed. In a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. This does not mean that a court must disregard all evidence that does not support the finding. Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.

If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient. [33] Rendition of judgment in favor of the parent would generally be required if there is legally insufficient evidence. [34]

In a factual sufficiency review, as we explained in In re C.H., a court of appeals must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. [35] We also explained in that opinion that the inquiry must be "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." [36] A court of appeals should consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. [37] A court of appeals should

**Page 267**

detail in its opinion why it has concluded that a reasonable factfinder could not have credited disputed evidence in favor of the finding.

A number of our courts of appeals held, prior to our decision in In re C.H., [38] that a legal sufficiency review in a case in which the burden of proof is clear and convincing evidence is the same as in a case in which the burden of proof is a preponderance of the evidence. [39] We disapprove of those decisions' articulation of the standard of review on appeal. At least five courts of appeals' decisions have concluded that a heightened standard of review applies when the burden of proof is clear and convincing evidence, [40] but the standards they articulated differ in varying degrees from our holdings in In re C.H. [41] and in this case today.

We note that the parents have not argued that the United States Constitution requires appellate courts to conduct a de novo review in parental termination cases like the de novo review that the United States Supreme Court has held is required in defamation cases [42] and for punitive damage awards. [43] The parents' only constitutional

**Page 268**

challenge regarding the best interest of the children is that violations of due process under the federal Constitution and of the due course of law provision in our state Constitution have occurred because there is no specific finding answered by the jury that termination is in the children's best interest. We consider this argument is section II.D. below. In the absence of any contention that the federal constitution requires a de novo review of the evidence, we leave open, as we did in In re C.H., whether the United States Constitution requires the type of review set forth by the United States Supreme Court in Harte-Hanks [44] and Bose, [45] and if so, whether the standards we have set forth above would comport with the de novo review required by those decisions.

Finally, we note that our decision in Garza v. Maverick Market, Inc. [46] is distinguishable. Garza concerned a wrongful death claim by an illegitimate child. This Court reaffirmed its prior holding in Brown v. Edwards Transfer Co. [47] that "[i]f paternity is questioned in a wrongful death action, the alleged child would have to prove by clear and convincing evidence that he is a filial descendant of the deceased." [48] Our Court had adopted the clear and convincing evidence standard in such cases to maintain consistency with the Legislature's choice of the clear and convincing evidence standard in connection with other legitimacy issues under the Probate Code and the Family Code. [49] The United States Supreme Court had not mandated a clear and convincing evidence burden of proof. Accordingly, this Court, not the federal constitution, imposed a clear and convincing burden of proof in Garza. The Court's statements in Garza that if there is "some evidence," the case must go to the jury, that "we 'consider all of the evidence in the light most favorable to the plaintiff, disregarding all contrary evidence and inferences,' " and that "[t]he question of whether the evidence clearly and convincingly prove[s paternity is] a question for the jury to determine," [50] do not control when, as here, we are considering a constitutionally mandated clear and convincing evidence burden of proof.

We turn to evidence in this case of whether termination is in the children's best interest.

C

In applying the standards set forth above, we consider the evidence that supports a deemed finding regarding best interest and the undisputed evidence. We do not consider evidence that a factfinder reasonably could have disbelieved.

Child Protective Services (CPS) began monitoring the parents and offering services on a continuing basis in March 1997. At that time, there were three children. J.F.C. was four years old, A.B.C. was two and one-half years old, and M.B.C. had just been born. The family lived on the campus of the Texas State Technical College.

The incident that gave rise to CPS's continual monitoring of this family was a report that the parents "had serious drug problems" and that they were physically abusive to one another. An investigator went to the home to meet with the parents

**Page 269**

and examine the children. After initially refusing to permit the investigator to see the three children, the parents ultimately allowed the investigator to examine the oldest child and the infant. The investigator did not see any indication of abuse or neglect of these two children and noted that J.F.C. seemed happy. However, the parents told the investigator that two-and one-half-year-old A.B.C. was with a babysitter and was therefore unavailable for examination. The CPS investigator went to the babysitter's home, but she denied having seen the child that day. CPS then contacted the Texas State Technical College police, who accompanied the CPS investigator back to the family's home. It was only then that the parents produced A.B.C., and the investigator learned that the mother had hit A.B.C., leaving dark bruises surrounding the outside of the child's eye.

In an interview shortly after CPS discovered that A.B.C. had been abused, the father told a CPS counselor that his wife (the children's mother) was "very physically violent" and physically attacked him. He also said he was concerned for the safety of his children because their mother brought other men home and had sexual relations with them. There were also other people living in the home whom the father said he did not trust. Both parents admitted that during one of their many arguments, the mother had chipped or knocked out one of the father's teeth.

During April 1997, the parents also admitted to being under the influence of illegal drugs while watching the children, and CPS learned that the mother had tested positive for cocaine and methamphetamines shortly after M.B.C.'s birth a month earlier in March 1997. When asked about their drug use at trial, both parents said that they used cocaine while the children were at home and in

their care. The mother further admitted to using cocaine within two weeks after giving birth to M.B.C., but she then testified that her children were safe in her care when she was using cocaine because the drug made her "more aware of [her] surroundings" and that they weren't endangered "even a little bit" when both parents were "high on drugs." The father in turn testified that God made cocaine available to him in times of grief and pain and that he was always able to supervise the children in a very caring manner even when he was under the influence of narcotics.

Although CPS knew of the drug use and some of the family violence as early as April 1997, it concluded that removal of the children was not justified because they were not in immediate danger. CPS instead implemented a Child Safety Evaluation and Plan in April 1997. The mother submitted to a psychological exam in compliance with this plan, and based on the results, CPS concluded that she was not "an immediate threat of harm to the children." Because the father refused to submit to a psychological exam, CPS referred the case to what it called "family preservation" in July 1997. The next month, the father did submit to a psychological exam, and based on the results of his and the mother's exam, family preservation recommended counseling.

A Family Service Plan was established in August 1997, five months after the initial instance of child abuse in March of that year. The plan established tasks for each parent, including drug assessments, individual counseling, and marriage counseling. The mother attended three of four scheduled sessions, but the father attended only one before the children were removed in October 1997.

Between April and early October of that year, CPS found no further indication of physical abuse of the children during home

**Page 270**

visits. However, there was evidence of continued and escalating hostility between the parents from April of 1997 until October 22, 1997, when the children were removed from the home. CPS case workers witnessed arguments and hostility and met with each parent separately during home visits in order to be able to communicate with them. Because of the continual arguing between the parents, CPS recommended day care for the children, to which the parents agreed. Day care commenced the first week of October, but a few days later, another incident of physical abuse of A.B.C. occurred. The parents had arrived to pick up A.B.C. at day care, and the child began what the mother described as a "temper tantrum." A heated argument between the parents ensued, and the mother grabbed A.B.C. by the throat and face and shoved him into a car seat. A.B.C. later told a case worker that this hurt his neck, and an investigator subsequently found a mark on A.B.C.'s

forehead and fingernail scratches on his neck. The children's attendance at day care thereafter was sporadic because the parents would not take them, even after CPS offered to provide transportation.

There was testimony at trial from Texas State Technical College police officers about domestic disturbances. Their records indicate that they responded to fourteen reports of violence at the family's home. The mother testified that the police came to their home between ten and fifteen times because she and her husband (the father of the children) were "extremely angry and arguing." Some of the visits by the campus police occurred before the DPRS removed the children and while the children were in the home. One of the officers testified that he had been to the home to respond to domestic disturbances and had seen three children. He always checked the children, and there were no signs of physical harm. He described the parents as "venomous" towards one another, and testified that the children definitely heard their fighting. The officer urged the mother many times to seek counseling, identifying several on- and off-campus sources, and at least once offered "any type of assistance [to the father] to overcome any problems."

On two other occasions, in August and October 1997, just before the children were removed, campus police officers went to the home because of domestic violence disturbances. On both occasions, the parents were upset, arguing loudly, and could not communicate with one another. The children were not at home during the latter incident. About a year and a half earlier, in 1996, campus police had given the mother and two of the children a ride home because the father had left them "on foot." (M.B.C. had not yet been born.)

The day the children were removed from the home (twelve days after the car seat incident), the father called the CPS case worker. The father was "very irate" and was "shouting ... that ... he wasn't going to be responsible for the children" and that he was "getting out of there." While the father was on the phone, the case worker heard an argument between the parents that was escalating. When the phone abruptly went dead, the case worker immediately went to the home. When he arrived, the father had left. The mother was very agitated and highly emotional. She complained about A.B.C., who was almost three years old at this point, saying that he "yelled and screamed all the time," that he "threw fits," that "[n]obody could control him or calm him down," and that she "just didn't know what she was going to do." The case worker took the children to day care, found the father, and brought both parents to his office. The parents did not calm down. CPS concluded that it would be unsafe for the children to go

Page 271

home to the parents in that state and asked the parents if there were relatives who could take the children. The mother gave them the name of one person, who declined to provide care for the children. Neither parent could offer any other names. The children remained with CPS that day, and the parents went home. CPS attempted to contact the parents for several days thereafter without success to arrange a visit with the children.

At this point, the DPRS petitioned the trial court to be appointed as temporary managing conservator of the children. The trial court ultimately entered a series of orders setting forth specific actions that each parent was to take. The orders advised the parents that if they did not comply, their children might not be returned and their parental rights could be terminated. The parents both testified at trial that they understood what the orders required and the consequences of noncompliance. The parents also testified that they did not comply with many provisions of family preservation plans CPS had implemented prior to removal of the children. As detailed in section III below, the parents consciously failed to comply with material provisions of the trial court's orders. Each parent was ordered to pay child support in the amount of $100 per month, not for each child, but for all three. The mother testified that although she could financially afford it, she deliberately chose not to pay child support because she believed that she should not have to. The father gave similar testimony. Both parents refused to attend any parenting classes or to attend individual counseling sessions. The father testified that he continued to use illegal drugs. The mother became pregnant with the couple's fourth child, and although ordered by the trial court to obtain prenatal care, she did not do so for the first six months of her pregnancy.

After the children were removed from the home, violence between the parents continued. Seven days after the children were removed, a Texas State Technical College Police officer was again called to the home after a female's screams had been heard. When the responding officer approached the home, the father would not allow him to enter and insisted that the mother was not there. The father was "violent, screaming, yelling, cussing, belligerent, [and] uncooperative." The officer called the father on the phone, and the father continued to insist that the mother was not at home. It was only after the Waco SWAT team arrived that an agreement was reached by phone with the father. He and the mother then appeared at a picture window to show the officers that had gathered at the scene that the mother was not physically harmed.

On another occasion, campus police responded when the father had locked the mother out of the home during an argument even though she was stark naked. She broke a window with her hand and arm to gain re-entry and was cut and bleeding.

Campus police officers also responded to a call eight months after the children were removed when the father struck an eight-year-old neighbor. The police

ultimately termed it an accidental striking, even though the father had threatened to hit the child right before he accidentally hit her. The father was, however, arrested on this occasion for evading detention. The record does not provide details of all fourteen responses by campus police to the home, but an officer described the father as "angry and explosive" and the mother as "[a]ngry, belligerent, nervous, [and] argumentative" in his dealings with them.

There was considerable expert testimony at trial that related to the children's

**Page 272**

best interest. One expert testified that the physical violence and verbal confrontations in the home had a negative emotional impact on the children. A.B.C. told this licensed counselor that he had seen his parents hit one another and that his father had hit him with a baseball bat. A.B.C.'s play consisted of male characters hitting female and child characters. One CPS worker observed visits between the parents and the children after their removal. She said these visits tended to be "chaotic" and that the children's behavior deteriorated after each visit. And there was testimony that the children displayed no distress at being separated from their parents.

A psychologist with over thirty years experience also evaluated both parents. In addition to taking the history of each parent, a battery of formal tests was conducted. This expert concluded that the mother had "manic tendencies, tendencies toward cycles of explosive behavior followed by periods of calm." He did "not see any real potential for change. I'd have to say her potential is extremely limited." When asked if the mother "is a fit parent or could she be," this expert said, "[t]here are too many concerns about aggression and violence and hostility as well as documented things in the history that are giant red flags in regard to parenting, and I would have to say, no, she doesn't have that capacity." There was extensive, detailed testimony about the mother's responses to various questions and standardized tests that directly related to violence. She also revealed that at some time in the recent past, she had hit a 22-month-old child when she was babysitting.

This same expert testified that during the psychological testing of the father, the father reported an "extensive drug history," including the use of LSD, amphetamines, cocaine, and marijuana. The expert also testified that psychological testing and medical history indicated that the father suffered from a bipolar disorder and that an unmedicated individual with bipolar disorder who was using "street drugs" was "extremely dangerous." The doctor testified that he recommended that the father see a psychiatrist who could prescribe medication, but he testified that he believed the father would not comply in taking the medication because he, like other individuals with bipolar disorder, prefers the excitement of the unmedicated state. The expert concluded that the father

was "a very troubled individual," and the expert was "most concerned about the potential for violence, especially since there were so many areas where family conflict was noted." The expert further testified that the father's responses to items on a standardized test that related to sexual deviance raised concerns about parenting potential.

There was undisputed evidence that does not support a finding that termination was in the children's best interest. About a year after the children were removed from the home, the parents moved to Austin. The mother found work there. The parents' landlord in Austin testified that their home was a "safe environment." The obstetrician who attended the birth of their fourth child described the parents as "an appropriate, courteous, and loving couple." There was also evidence that after this termination case was set for trial, the parents made attempts to comply with some parts of the trial court's order. But in spite of this evidence, a factfinder could reasonably form a firm belief or conviction that termination was in the children's best interest.

**D**

The parents have asserted that the omission of the children's best interest

**Page 273**

from the jury charge violated the due process clause of the United States Constitution [51] and the due course of law provision of the Texas Constitution. [52] That argument was not preserved in the trial court. But assuming, without deciding, that this complaint could be raised for the first time on appeal, the argument has no merit. Applying Rule 279 to deem a finding in support of a judgment in a parental termination case does not violate the due process clause of the United States Constitution or the due course of law provision of the Texas Constitution.

The United States Supreme Court has held in Santosky v. Kramer that "[w]hen the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures." [53] In the termination context, due process "turns on a balancing of ... 'three distinct factors.' " [54] Those factors are: "the private interests affected by the proceeding; the risk of error created by the State's chosen procedure; and the countervailing governmental interest supporting use of the challenged procedure." [55]

In a parental termination case, the private interest affected is the right of a parent to raise his or her child, which is undeniably "an interest far more precious than any property right." [56] The Supreme Court has correctly observed that "[w]hen a State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." [57] The Supreme Court has thus termed the private

interest in a parental termination case "a commanding one." [58]

The second factor identified by the Supreme Court in Santosky is "the risk of error created by the State's chosen procedure." [59] On balance, the risk of error caused by Rule 279 is not substantial. Rule 279 deems a finding on an element of a claim only after a full trial on the merits. Rule 279 does not deem an omitted finding in support of the judgment if the parent has objected to the omission or requested a proper submission. And, more importantly, an omitted finding may be supplied by an express finding of the trial court or a deemed finding only if that finding is supported by evidence. In a parental termination case, that evidence must be clear and convincing. A parent may raise legal and factual sufficiency challenges even after the verdict is rendered, and an appellate court will review those challenges on appeal, including the challenges to the legal and factual sufficiency of the evidence supporting the omitted finding. On appeal, the courts also consider whether the evidence was clear and convincing. [60]

In this case, the parents' motion for new trial asserted that the evidence was factually insufficient to support a finding that the parents had endangered the children or had failed to comply with court orders specifying the actions they were to take in order to have their children returned.

**Page 274**

There was an opportunity to challenge the legal and factual sufficiency of the evidence regarding the best interest of the children, but the parents did not avail themselves of that opportunity in the trial court. Nor have they challenged legal or factual sufficiency regarding the best interest of the children in the court of appeals or this Court.

The third due process factor identified in Santosky is the governmental interest supporting use of the challenged procedure. [61] The government has a substantial interest in preventing retrial of a case when 1) some but not all elements of a termination action have been submitted to and found by a jury based on clear and convincing evidence or have been established as a matter of law, 2) the trial court renders judgment on the jury's verdict, and 3) there is clear and convincing evidence to support a finding of the missing element. Parents and children also have an interest in resolving termination proceedings as expeditiously as reasonably possible. A retrial results in prolonged uncertainty and disruption in the lives of the parents and children who are involved. The government has a legitimate interest in encouraging a parent to object in the trial court if a statutorily prescribed element of a termination action has been omitted from the court's charge rather than challenging the omission for the first time on appeal. A trial court can easily cure an omission in its charge to the jury if that omission is called

to its attention before the case is submitted.

For these reasons, Rule 279 does not deprive the parents of due process or due course of law.

**E**

The dissenting opinions would resolve this case by analyzing whether an omission of an element of a claim in a jury charge is fundamental error. JUSTICE SCHNEIDER'S dissenting opinion urges the Court to do so in order to provide "guidance for practitioners and lower courts." [62] But the importance of an issue asserted by a party cannot justify ignoring applicable rules of procedure that bind this Court.

Rule 279 requires a reviewing court to supply an omitted finding in support of the trial court's judgment where, as here, there was no objection to the omission in the trial court, and some (in this case clear and convincing) evidence supports the omitted finding. This Court must apply the rules of civil procedure unless a constitutional provision or statute requires us to do otherwise. JUSTICE HANKINSON'S dissent incorrectly asserts that we are considering unpreserved error. Appellate courts should not reverse a trial court's judgment in violation of Rule 279 any more than appellate courts should reverse a trial court's judgment for error that was harmless. Rule 279 applies just as Texas Rule of Appellate Procedure 44.1 applies.

JUSTICE HANKINSON'S dissenting opinion seems to reason that since it concludes that the error in omitting an element of a claim was fundamental error, the charge should be reviewed as if an objection had been made. But this reasoning is circular since the fact that no objection was made is precisely why Rule 279 applies. Because of the operation of Rule 279, we have a very narrow question before us regarding "fundamental error." That question is whether the notion of "fundamental error" can be used to circumvent the operation of Rule 279 when a party fails to object to the

**Page 275**

omission of an element of a claim against that party. We answer that question "no." Assuming, without deciding, that the formulation of fundamental error in JUSTICE HANKINSON'S dissenting opinion is correct, deeming an omitted finding in support of a judgment in a parental termination case when that finding is supported by clear and convincing evidence does not adversely affect any "fundamental public policy" found in the Texas Constitution or statutes. [63] Giving full effect to Rule 279 simply means that a court, rather than a jury, has supplied a finding that is supported by clear and convincing evidence on one of the elements of parental termination. Neither the Texas Constitution nor any statute prohibits a bench trial of one or more issues in a termination case when there has been no objection by the

parent.

To put this in perspective, suppose that a parent had requested a jury trial, but then failed to object when the trial court conducted a bench trial instead of empaneling a jury, entered findings of fact and conclusions of law, and rendered judgment terminating the parent-child relationship. Would we say that the parent could argue for the first time on appeal that his or her right to a jury trial had been denied because this was fundamental error? The answer to that question is "no."

JUSTICE HANKINSON'S dissenting opinion concludes that the error in the charge was harmless because "the focus" of the trial was the children's best interest. [64] JUSTICE HANKINSON'S dissent seems to be saying that in spite of what the jury was told in writing by the trial court's charge, the omission of the children's best interest in three of four material parts of the charge was cured because there was so much evidence and argument from counsel about the children's best interest, the jury must (somehow) have understood that it could not find that the parent-child relationships should be terminated unless it concluded that termination was in the children's best interest.

While we agree that there was legally sufficient clear and convincing evidence that termination was in the children's best interest, most of the evidence relevant to the best interest of the children was also relevant to the grounds for termination based on the parents' conduct set forth in the charge. The jury was not told that it had to reach separate, distinct conclusions not only that there were grounds for termination based on the parents' conduct, but also that termination would be in the children's best interest. The jury was specifically instructed that the best interest of the children must be found in connection with only one of the four grounds for terminating based on parental conduct.

### F

The record before us does not require a remand to the court of appeals for a factual sufficiency review of the deemed finding that termination was in the children's best interest. In the absence of a challenge to the factual sufficiency of the evidence, appellate courts must deem an omitted finding in support of a judgment if there is some evidence [65] (in this case clear and convincing evidence) to support the

**Page 276**

omitted finding and the other requirements of Rule 279 have been met.

Rule 279 permits a trial court to make an express finding on an omitted element if there is "factually sufficient evidence to support a finding." [66] If the trial court does not make an express finding, "such omitted element or elements shall be deemed found by the court in such manner as to support the judgment." [67] Rule 279 applies to deemed findings in a jury trial and is a parallel to Rule 299, which applies to deemed findings in a bench trial. Rule 299 provides: "where one or more elements thereof have been found by the trial court, omitted unrequested elements, where supported by evidence, will be supplied by presumption in support of the judgment." [68] The history of the rules that require deemed findings in both jury and bench trials do not indicate that there is to be any difference in the application of these rules in requiring a court to deem a finding. [69] It is only when there has been a factual sufficiency challenge that is preserved in the trial court that a deemed finding must be reviewed for factual sufficiency on appeal. [70]

The parents in this case have not contended in the trial court, the court of appeals, or this Court that the evidence is factually insufficient to support a finding that termination is in the children's best interest. Accordingly, we need not address whether factual sufficiency of evidence may be raised for the first time on appeal in a parental termination case. [71] The inquiry in this appeal is limited to whether there is legally sufficient evidence to support the trial court's express or deemed finding that termination is in the best interest of the children. The trial court's deemed finding that termination is in the best interest of the children is supported by legally sufficient clear and convincing evidence.

**Page 277**

### III

The parents have an additional complaint about the jury charge. There are two predicates to parental termination under section 161.001 of the Texas Family Code. The first is that one or more courses of parental conduct must be established. The second is that termination must be in the best interest of the children. The gravamen of the parents' complaint is that the charge does not require the same ten jurors to agree that a parent engaged in at least one particular course of conduct described by section 161.001(1) and that termination is in the children's best interest. The charge only requires that ten jurors agree that the parent-child relationships should be terminated. [72] They thus contend that this broad-form submission did not satisfy federal due process requirements.

This constitutional challenge was not raised in the trial court. However, even assuming, without deciding, that 1) this argument could be raised for the first time on appeal, and 2) the charge erred in this regard, we do not reach the constitutional challenge because the evidence conclusively establishes that each parent engaged in a course of conduct described by subsection 161.001(1) of the Family Code. Therefore, the alleged error did not cause the rendition of an improper judgment or prevent the parents "from properly presenting the case to the

court of appeals." [73]

Paragraph (O) of subsection 161.001(1) provides that one basis for establishing the parental conduct prong required for termination of parental rights is that a parent "failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the [DPRS] for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child." The State relied on subsection (O) as one of two alternate grounds of parental conduct that could support termination.

It is undisputed that both parents failed to comply with numerous, material provisions of court orders that specifically required their compliance to avoid restriction or termination of their parental rights. During the sixteen-month period between the time the DPRS removed the children and the time of trial, the trial court entered four separate orders. [74] Each order specifically advised the parents that failure to provide a safe environment within a reasonable time could result in restriction or termination of their parental duties and rights or the children not being returned to them. Each order directed each parent to perform specific acts. The mother testified that they knew they had to comply with the orders to obtain the return of the children. But both the mother and the father admitted that they had consciously decided not to comply with many of the requirements imposed by the orders.

There are some provisions of the orders with which the parents partially complied and others for which they offered an excuse for their noncompliance. But even

**Page 278**

giving full credit to their excuses and partial compliance, there were a number of material provisions of the orders with which the parents completely and undisputably failed to comply. Among other things, each of the four orders required the parents to (1) pay $100.00 per month in child support for the children while they were in DPRS custody; [75] (2) obtain an individual psychiatric evaluation; [76] (3) participate and make progress in parenting classes; (4) voluntarily submit to random urinalysis testing; and (5) participate and make progress in anger control classes. While the four orders were in effect, the parents never paid a single dollar of child support even though they admitted they were capable of doing so; never attended a single anger control class; and never attended a single parenting class.

Similarly, at the time of trial, the parents had yet to obtain an individual psychiatric evaluation. At one point, the mother scheduled a psychiatric evaluation and went to the appointment but refused to participate without her husband being present during the examination. Shortly

before trial, the parents made appointments to obtain evaluations during the week after the scheduled trial. But, again, even giving full credit to their last minute efforts to comply, it is undisputed that they were not in compliance at the time of trial and had not complied with that portion of the trial court's orders.

With regard to the urinalysis requirement, the DPRS made no requests for urinalysis under the second order, but the parents admitted and other evidence shows that they refused requests to submit to urinalysis during the time the first order was in effect. And, although they took one requested urinalysis test under the third order, they took only two of the six urinalysis tests requested under the December 15, 1998 order, which were requested in the few weeks before trial.

As noted above, the orders set forth requirements with which the parents partially complied. Prior to April 1998, the mother attended six of thirteen scheduled individual counseling sessions, and the father attended five of eleven. But because the parents missed so many appointments, the therapist expelled them from the program. The orders required the parents to maintain appropriate housing free from abuse, neglect, and safety hazards. As discussed above in section II.C., family violence in the home continued after the removal of the children. And, in June 1998, the parents were evicted from the Texas State Technical College campus. In August or September 1998, about five or six months before trial, the parents moved to Austin. There is some evidence that they had a clean, safe home there. But these sporadic incidents of partial compliance do not alter the undisputed fact that the parents violated many material provisions of the trial court's orders.

The evidence establishes as a matter of law that the parents failed to comply with the court's orders specifying the actions the parents had to take for the DPRS to return the children to the parents. The record also conclusively establishes that

**Page 279**

the children were removed from their parents under Chapter 262 of the Family Code, and it is undisputed that they were in the DPRS's custody for more than nine months after their removal. Accordingly, the parental conduct described in subsection 161.001(1)(O) of the Family Code was established as a matter of law. Any error in failing to submit a specific instruction on juror agreement regarding parental conduct was thus harmless.

**IV**

The parents additionally contend that their counsel's failure to object to error in the charge and other alleged mistakes during trial rendered his assistance ineffective and that they are entitled to a new trial on that basis. The parents argue that the Sixth Amendment to the United States Constitution entitles a parent to effective assistance

of counsel when termination of parental rights is sought. They assert that termination is no less a punishment than imprisonment or even capital punishment.

Several Texas courts of appeals have considered whether the Sixth Amendment or other federal constitutional provisions mandate effective assistance of counsel in termination cases, and they have reached differing conclusions. A number of courts of appeals have concluded that the federal constitution does not grant that right. [77] At least one court of appeals has indicated that it does, [78] although other statements in its opinion indicate that it concluded that the right flows from section 107.013 of the Texas Family Code that requires appointment of counsel in limited circumstances. [79] Another court of appeals has recognized a right to effective counsel because of both section 107.013 and that court's "procedural due process concerns." [80] At least four decisions in other states recognize a right to effective assistance of counsel in termination cases, two of those basing the right on a statute requiring appointment of counsel, one finding that the right emanates from the due process clause of the Fourteenth Amendment, and the fourth apparently basing its conclusion on the Sixth Amendment. [81]

**Page 280**

We believe that it is prudent to defer the resolution of whether a parent in a termination case may seek a new trial based on ineffective assistance of counsel because in this case, even applying the stringent test set forth by the United States Supreme Court for use in criminal cases, assistance of counsel was not ineffective.

In Strickland v. Washington, the United States Supreme Court examined at length the considerations in determining whether counsel in a capital or other criminal case was ineffective. [82] The Supreme Court's observations were extensive. The Supreme Court said at the outset of Strickland that "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." [83] The Court then said there were two components in a criminal case in determining whether assistance of counsel was so defective to require reversal:

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

[84]

With regard to the first component, the Supreme Court said:

· "In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." [85]

· "The purpose [of the Sixth Amendment's effective assistance of counsel guarantee] is simply to ensure that criminal defendants receive a fair trial." [86]

· "Judicial scrutiny of counsel's performance must be highly deferential." [87]

· "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." [88]

· "A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered

**Page 281**

sound trial strategy.' " [89]

· "The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." [90]

· "The court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." [91]

The Supreme Court then said with regard to the second component that even if an error by counsel were professionally unreasonable, that "does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." [92] Elaborating, the Court said:

· "Conflict of interest claims aside, actual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice." [93]

· "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." [94]

· "On the other hand, we believe that a defendant need not show that counsel's deficient conduct more

likely than not altered the outcome in the case." [95]

· "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." [96]

· "A court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law." [97]

· "A verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." [98]

· "Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." [99]

We reiterate that we leave open the question of whether a claim of ineffective assistance of counsel may be asserted as a basis for reversing a judgment in a parental termination case. Even were we to recognize such a claim, the question of whether our harmless error rule must be discarded in such cases is another significant question that would have to be broached.

But even measuring the parents' complaints about their counsel against

**Page 282**

Strickland's standards, assistance of counsel was not ineffective in this case. Although the parents' complaints about their counsel are numerous, they are not well-founded. First, the parents cite the failure of their counsel to object to the omission of the children's best interest in material parts of the charge to the jury. Had there been an objection, then no finding would be deemed under Rule 279. [100] However, in light of the entire record, the parents have not "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " [101]

Counsel for the parents demonstrated in voir dire of the jury that he knew that the parents' rights could not be terminated, regardless of whether the conduct of the parents would otherwise permit termination, unless termination was found by the jury to be in the best interest of the children. He stated:

Now, folks, everyone keeps talking about we are here for a termination of parental rights. Not necessarily true. If the jury votes and says, "We believe that termination of parental rights is in the best interest of the children," then parental rights are terminated, and no longer will these people ever have the opportunity to be parents with their children. If the jury says, "No, it is not in the best interest of these children to have parental rights terminated," that doesn't say that the kids--that my folks go out this afternoon and pick up the kids and go home. What that would say is we all keep working together to try to resolve the situation. Okay? So this isn't like a criminal case where it's guilty or not guilty and you can never be tried again because I've been found innocent. This isn't like a car wreck where my client gets up and says, "We either recover the money or we don't recover the money." In this case it is not that kind of finality. In this case the jury can say, "Wait a minute. I don't believe that these folks had a fair chance to do it," and all you've got to do is say, "No, it's not in the children's best interest to terminate parental rights," and what that says is, "Children's Protective Services, you've got to work with them. We all have to work together." Okay? If you say, "Yes, termination is in the best interest," that's it, it's over. Okay?

Then again, in his opening statement, counsel for the parents stated to the jury:

We're here because the State of Texas is asking this jury to rubber stamp what they did and say, "Looks good to us. Take the kids." We're here because we're saying, ladies and gentlemen, this jury needs to come back and say, "No, it's not in those children's best interest. Do not terminate parental rights," and what that will say, what that will do is then the State of Texas will have to honestly work with [the parents], and that's what we're asking. Thank you.

Subsequently, during the objections to the charge, counsel for the parents demonstrated his ability to compare the language of the charge to the verbatim requirements of the Family Code. Counsel objected to the definition of "clear and convincing evidence" in the charge because it omitted three words that the statutory definition contained. Counsel then affirmatively stated to the court that he had no further objections to the charge. Notably, when it came time for closing arguments, counsel for the parents said nothing about the best interest of the children.

**Page 283**

Based on this record, the parents did not overcome the presumption that their counsel's decision regarding the charge error was based on strategy. There is precedent in criminal cases for raising jury charge error for the first time on appeal. [102] There is also precedent for raising some types of charge error for the first time on appeal in juvenile cases. [103] Counsel may have made the strategic decision not to object and to attempt to raise charge error for the first time on appeal in the event the jury returned an adverse verdict. The diligence exhibited by counsel in other aspects of the trial and what appear to be other tactical decisions, as discussed below, also

indicate that counsel for the parents may well have made a strategic decision not to object to the omission of the children's best interest in material aspects of the charge.

The parents contend that their counsel's failure to object to the broad-form submission of the termination issues also constituted ineffective assistance of counsel. In light of this Court's decision in Texas Department of Human Services v. E.B., [104] which specifically approved broad-form submission in a termination case, it cannot be said that counsel's failure to object was, "in light of all the circumstances, ... outside the wide range of professionally competent assistance." [105] While it would certainly have been within the bounds of professional competency to raise an issue in the trial court so that counsel could ultimately implore this Court to reconsider E.B., it is not outside the bounds of competency to follow a decision of this Court.

The parents also contend that counsel's failure to request an instruction not to consider the parents' religious beliefs constituted ineffective assistance of counsel. There was considerable testimony during the trial about the parents' religious beliefs. At one juncture, the father testified that his conduct toward his children should be judged by God, not by a court. At another, the father testified that it was God who made cocaine available to the parents. Instead of requesting a jury instruction, counsel for the parents cross-examined the DPRS witnesses about the relevancy of the parents' religious beliefs and made arguments to the jury that the parents' religious beliefs were irrelevant to the termination inquiry. Even were it assumed that the trial court should have given an instruction to the jury had counsel so requested, it cannot be said that counsel's decision to address the parents' religious beliefs through argument was anything other than a reasonable exercise of trial strategy.

The parents contend that their counsel should have objected to questions

**Page 284**

they were asked during trial about their sexual conduct with third parties and alleged "sexual deviations." However, their counsel did object, many times, to questions of this nature. The fact that he did not object to each and every question is again within the realm of reasonable trial strategy in light of the record in this case.

At trial, the DPRS called expert witnesses with backgrounds in psychology and social work. The parents contend that their counsel provided ineffective assistance because he did not challenge the reliability of all psychological expert testimony on the ground that there is no scientific basis for predicting future behavior or evaluating individuals. Counsel for the parents did object to the qualifications of one witness, but not to the scientific reliability of this testimony in particular or the

underpinnings of psychology in general. Psychological experts routinely testify in parental termination cases. It was not unreasonable for counsel to fail to take on the reliability of all psychological testimony in this case. More importantly, there is no basis in this record for concluding that had the trial court conducted a hearing on reliability, the evidence would have been shown to be unreliable.

The parents argue that their counsel treated the Family Service Plans developed by CPS as a court order. However, the record reflects that only one Family Service Plan was referenced by a court order in setting forth the tasks that the parents were to perform, and that plan was filed with the court. The other three orders that were in evidence and at issue at trial contained directives to the parents in the orders themselves, wholly apart from any Family Service Plan.

The parents did not receive ineffective assistance of counsel.

V

None of the remaining issues raised by the parents require reversal. The parents asserted in their motion for new trial and in the court of appeals that there was factually insufficient evidence to support any finding by the jury that either parent had endangered the children. Because the evidence conclusively established other parental conduct described in section 161.001(1) of the Family Code, and there is an express or implied finding by the trial court, supported by clear and convincing evidence, that termination is in the children's best interest, it is immaterial whether an alternate submission regarding parental conduct was supported by factually sufficient evidence.

The parents equate parental termination for failure to comply with the court's orders to criminal contempt. They first argue that criminal contempt requires proof beyond a reasonable doubt. As discussed above, the United States Supreme Court held in Santosky that the federal constitution requires a clear and convincing evidence standard of proof in parental termination cases, but not proof beyond a reasonable doubt. [106]

The parents' second contention is that they have been punished with termination of their rights for failing to comply with the trial court's orders delineating what they must do to have their children returned. This punishment amounts to contempt, they argue, and violates the statutory limits on punishment of contempt to six months in jail or a $500 fine. The Legislature has specifically provided in subsection 161.001(1)(O) that failure to comply with court orders like those issued in this case is grounds for termination. That statute, not the contempt statutes, controls.

**Page 285**

The parents contend that the trial court erred in admitting evidence that either the father or the mother brought other men home to have sexual relations with the mother while the father watched. Evidence of other alleged sexual activities was also admitted. However, there was unchallenged testimony from an expert witness that the father "endorse[d]" many of the of items on the Minnesota Multiphasic Personality Inventory test that relate to sexual deviance. This expert concluded, without objection, that the father's responses to this standardized test raised concerns about his parenting potential. It cannot be said, based on the record as a whole, that the trial court abused its discretion in admitting the challenged evidence.

Finally, the parents contend that one witness, Jasmine Khan, gave an expert opinion when she was not qualified to do so. Counsel for the parents objected on this basis. But even if this witness's qualifications were not demonstrated, her testimony was cumulative of other witnesses.

In sum, any errors committed by the trial court did not require reversal.

* * * * *

For the foregoing reasons, we reverse the judgment of the court of appeals and render judgment terminating the parent-child relationships between each of the children, J.F.C., A.B.C., and M.B.C., and their mother and father.

Justice O'NEILL concurred in the judgment only.

Justice HANKINSON filed a dissenting opinion, in which Justice ENOCH joined.

Justice SCHNEIDER filed a dissenting opinion.

Justice HANKINSON dissenting, joined by Justice ENOCH.

The Court states the issue in this case as "whether there is legally sufficient evidence to support the trial court's express or deemed finding that termination is in the best interest of the children." This statement of the issue will come as a surprise to the parties and the court of appeals, as no one has raised, briefed, or addressed this issue at any stage of these proceedings. In this parental-rights-termination case the State asked us to decide whether due process requires a court of appeals to review alleged errors in the charge when the parents did not object to those errors at trial. Instead of answering that question, the Court explains the consequences of the parents' failure to object to the first alleged charge error (omission of a statutory element required for termination) under Texas Rule of Civil Procedure 279. But those consequences are not at issue, and rule 279 does not answer the actual question presented of whether, in light of the constitutional interests at stake, our law requires an

appellate court to consider the parents' complaints as if they did object to the charge, even though they admit they did not. The Court does not even attempt to explain how it can review the parents' second unpreserved claim of charge error (concerning broad-form submission), instead simply concluding that the error, if any, was harmless. Refusing to answer the question presented does a disservice to our courts of appeals by failing to resolve the conflict among them as to whether they may review unpreserved error in termination cases; a disservice to our established jurisprudence, which permits us to review only preserved complaints unless a recognized exception exists; and most importantly, a disservice to the parents and children who are entitled to consistent and efficient appellate review that fairly adjudicates their

**Page 286**

complaints in these time-sensitive and compelling cases.

I therefore dissent and write separately to explain how I would resolve the actual issue presented in this case. Because I conclude that Texas' common-law doctrine of fundamental error permits us to review the alleged charge errors, I would hold that Texas procedures for reviewing unpreserved charge error in parental-rights-termination cases do not violate due process. Having considered the alleged errors, however, I disagree with the court of appeals that the omission in the jury charge was harmful, and I would therefore remand this cause to the court of appeals for it to consider the remaining issues it did not yet address.

The Court relies on rule 279 to affirm the trial court's termination judgment. But rule 279 does not tell us whether charge error in a parental-rights-termination case can be reviewed for the first time on appeal. The purpose of rule 279 is to "salvage" a trial court's judgment when a party failed to object to an omitted element of a ground of recovery in a jury charge. See 4 MCDONALD & CARLSON, TEXAS CIVIL PRACTICE § 22:58, at 500-01 (2d ed.2001). Under rule 279, the court may deem the finding in support of the judgment if there is "some evidence" to support the finding. See *Ramos v. Frito-Lay, Inc.,* 784 S.W.2d 667, 668 (Tex.1990); *Cielo Dorado Dev., Inc. v. Certainteed Corp.,* 744 S.W.2d 10, 11 (Tex.1988). By marshaling the evidence to support a deemed finding against the parents under rule 279, the Court essentially conducts a harmful-error analysis of the charge error. But this approach is circular. The Court determines that applying rule 279 to deem a finding in support of the judgment does not violate due process because it concludes there was no harmful error. But had the error been harmful, the Court could not apply rule 279, and the parents would be left where they started: asking an appellate court to review unpreserved charge error. The Court should address the issue raised in the petition that we granted, and decide whether our law on preservation of error mandates appellate review of the parents' unpreserved

complaints.

The Court's opinion describes how the jury charge in this case failed to track the statutorily required language found in Texas Family Code § 161.001. On appeal, the Coxes argued that the jury charge was erroneous because: (1) it failed to instruct the jury that they must find termination to be in the best interest of the children; and (2) the broad-form questions and disjunctive instructions violated their due process rights under the Fourteenth Amendment of the United States Constitution and Article 1, Sections 3 and 10 of the Texas Constitution. The Coxes acknowledged that they had not preserved these complaints in the trial court. However, they argued that the constitutional dimension of the liberty interests at stake and the quasi-criminal nature of a parental-rights-termination action warranted appellate review of the alleged jury-charge errors.

The court of appeals agreed. Specifically, the court of appeals held that Fourteenth Amendment procedural due process requires review of "core issues" in the jury charge in an involuntary parental-rights-termination case. 57 S.W.3d at 72. The court defined those "core issues" as "(1) the predicate grounds for termination, and (2) whether termination is in the best interest of the child." Id. at 72 n. 5. After reviewing the jury charge in this case, the court concluded that the use of the broad-form question and disjunctive instruction in the jury charge was proper, having been explicitly approved by this Court in Texas Department of Human Services v. E.B., 802 S.W.2d 647 (Tex.1990)

**Page 287**

. 57 S.W.3d at 73. The court also concluded, however, that the omission of the "best interest" instruction as to Tawnya and the placement of the "best interest" instruction as to Paige constituted harmful error, because of the "potential" that the jury could have terminated both parents' rights "without finding that termination was in the best interest of the children." Id. at 74, 75. The court remanded the case to the trial court for a new trial without reviewing the Coxes' other complaints on appeal. Id. at 75. In its petition for review, the Department contends that the court of appeals erred by reviewing the unpreserved jury-charge error.

In effect, the court of appeals held that our state procedural rules violate due process in parental-rights-termination cases because they prohibit review when error is not preserved in the context of "core issues." See id. at 72-73. The analytical starting point for determining whether our procedures violate the Constitution is our law on error preservation for appellate review. As a general rule, no error may be reviewed on appeal that was not raised before the trial court. TEX.R.APP. P. 33.1. Nevertheless, like most other jurisdictions, our civil jurisprudence is well settled that appellate courts may consider unpreserved error that is

"fundamental." See *McCauley v. Consol. Underwriters,* 157 Tex. 475, 304 S.W.2d 265, 266 (1957); *Ramsey v. Dunlop,* 146 Tex. 196, 205 S.W.2d 979, 982 (1947); see also 6 MCDONALD & CARLSON, TEXAS CIVIL PRACTICE § 47:4, at 1201-02 (2d ed.1998) (recognizing fundamental error as an exception to the general rule of preservation); W. James Kronzer, Laying the Foundation for Appellate Review, in APPELLATE PROCEDURE IN TEXAS (State Bar of Texas, 2d ed.1979), § 9.2, at 204-06 (same); Allen Wood, The Bill of Exceptions as Basis for Review, in id. § 11.5, at 248-49 (same). While most jurisdictions recognize some type of fundamental error, they do not define it uniformly. [1] Black's

**Page 288**

Law Dictionary defines the essence of fundamental error as that which is "so obvious and prejudicial that an appellate court should address it despite the parties' failure to raise a proper objection." BLACK'S LAW DICTIONARY 563 (7th ed.1999) (defining also "plain error" and "error apparent of record"). Our own application of fundamental error review has changed throughout the years. Consequently, an analysis of its evolution in our jurisprudence is useful to understanding how and when we should apply it.

We first recognized fundamental error as a principle firmly rooted in the common law. In *Jones v. Black,* 1 Tex. 527 (1846), this Court observed that as a general rule, "the record being silent as to any judicial action either sought or had upon the issues of law, they will be considered as waived, and will not be made the subject of revision here." Id. at 529. Nevertheless, this Court held that " 'if the foundation of the action has manifestly failed, we can not, without shocking the common sense of justice, allow a recovery to stand.' " Id. at 530 (quoting Palmer v. Lorillard, 16 Johnson 343, [348], 1819 WL 1790 (N.Y. 1819)); see also *Siese v. Malsch,* 54 Tex. 355, 357 (1881) (objections that go to merits and foundation of action will be considered though unassigned as error); *Rankert v.*

*Page 289*

Clow, 16 Tex. 9, 13 (1856) (same); *Salinas v. Wright,* 11 Tex. 572, 577 (1854) (same); *Wetmore v. Woodhouse,* 10 Tex. 33, 34 (1853) (same).

Although these early cases considered fundamental error to be a principle of common law, our Legislature had already codified its own version of fundamental-error review. In 1846, the Legislature enacted a statute that provided for supreme court review of "error in law either assigned or apparent on the face of the record." Act approved May 12, 1846, 1st Leg., § 24, 1846 Tex. Gen. Laws 249, 256-57, reprinted in 2 H.P.N. GAMMEL, THE LAWS OF TEXAS 1838-1846, at 1555, 1562-63 (Austin, Gammel Book Co. 1898). But in 1850, the Legislature enacted a statute providing that "[t]he

appellant or plaintiff in error, shall in all cases file with the clerk of the court below, an assignment of errors, distinctly specifying the grounds on which he relies ... and all errors not so distinctly specified, shall be considered by the Supreme Court as waived." Act approved Feb. 11, 1850, 3rd Leg., R.S., ch. 139, § 9, 1850 Tex. Gen. Laws 171, 173-74, reprinted in 3 GAMMEL, LAWS OF TEXAS 1847-1854, at 609, 611-12 (1898). Both statutes were made applicable to the courts of civil appeals when those courts were organized. See Act approved Apr. 13, 1892, 22nd Leg., 1st C.S., ch. 15, §§ 24, 25, 1892 Tex. Gen. Laws 25, 29, reprinted in 10 GAMMEL, LAWS OF TEXAS 1891-1897, at 389, 393 (1898). Although by its terms, the 1850 statute appeared to repeal the 1846 statute, our courts continued to consider fundamental error without acknowledging any effect of the 1850 statute. See Ramsey, 205 S.W.2d at 982. But see *Oar v. Davis,* 105 Tex. 479, 151 S.W. 794, 796 (1912) (holding that the statutes could be harmonized).

In one of the first cases to construe the 1846 statute, *Wilson v. Johnson,* 94 Tex. 272, 60 S.W. 242 (1900), this Court stated that "it is difficult to tell what is meant by this language; but we incline to think it intended to signify a prominent error, either fundamental in character, or one determining a question upon which the very right of the case depends." Id. at 243; see also *Houston Oil Co. of Tex. v. Kimball,* 103 Tex. 94, 122 S.W. 533, 537 (1909) ("Perhaps the best expression is that it must be a fundamental error, such error as being readily seen lies at the base and foundation of the proceeding and affects the judgment necessarily."). Thus, " 'fundamental error' is not a statutory term, but is one coined by the courts in interpreting our [statutes]." Texas & Pac. Ry. Co. v. Lilly, 118 Tex. 644, 23 S.W.2d 697, 698 (1930).

Our decisions from the pre-rules era disclose two policies that informed the application of fundamental-error review. First, as a matter of efficiency and economy, appellate courts were not required to examine the record in order to ascertain whether there was a basis for claiming error. See Wilson, 60 S.W. at 243 ("The purpose of assignments of error is to point out the errors complained of, and not to leave the appellate court to grope through the record to ascertain whether error has been committed or not."); see also Ford & Damon v. Flewellen, 276 S.W. 903, 903-04 (Tex.Com.App.1925, judgm't adopted) ("Any other rule ... would place an almost unbearable burden upon our appellate courts."). Thus, appellate courts considered unpreserved error only when the complaint could be seen on the face of the "record"--defined as "those proceedings which lie at the foundation of the court's power to render the judgment," such as the pleadings, the charge, the verdict, and the judgment itself. Texas & Pac. Ry. Co., 23 S.W.2d at 699; see *Yardley v. Houston Oil Co. of Tex.,* 288 S.W. 861, 868 (Tex.Civ.App.-Beaumont 1926, writ

dism'd) ("[I]n considering fundamental error, the

**Page 290**

Court of Civil Appeals can only read the pleadings of the parties, the charge of the court, the verdict of the jury, and the judgment of the court...."). If determining whether there was error required examining the statement of facts, the courts would not consider it "fundamental." See, e.g., Yardley, 288 S.W. at 868 (trial court's allegedly erroneous construction of deed was not "fundamental" because it would require reviewing the evidence). Second, appellate courts only reviewed unpreserved error when there was "a good and sufficient ground for the court to interfere to prevent injustice being done to one of the parties." Houston Oil Co., 122 S.W. at 537; see also *Hollingsworth v. Holshousen,* 17 Tex. 41, 47-48 (1856) (citing the court's practice to review an erroneous jury charge when there is reason to believe it influenced the verdict to the prejudice of a party); Jones, 1 Tex. at 530 (rejecting a challenge to improper venue as merely a "dilatory" challenge and not a foundational objection).

In 1941, both statutes were repealed by the act vesting the Supreme Court with rulemaking authority. TEX.REV.CIV. STAT. ANN. art. 1731a, §§ 1, 2 (Vernon 1948); see *City of Santa Anna v. Leach,* 173 S.W.2d 193, 197-98 (Tex.Civ.App.-Eastland 1943, writ ref'd w.o.m.). We effectively "re-enacted" the 1850 statute in the form of Texas Rule of Civil Procedure 374, which required that any errors had to be presented in the court below or would be waived. For the few years immediately following the promulgation of the 1941 rules, a few courts of civil appeals held that they could no longer review fundamental error. See *Brown v. O'Meara,* 193 S.W.2d 715, 721 (Tex.Civ.App.-Galveston 1946, writ ref'd n.r.e.); Leach, 173 S.W.2d at 198.

In *Ramsey v. Dunlop,* 146 Tex. 196, 205 S.W.2d 979, 980 (Tex.1947), however, we held that the courts of civil appeals retained the authority to consider fundamental error, notwithstanding the apparent repeal of the statute and the enactment of rule 374. Ramsey involved an election for county commissioner. The candidate who received the fewest number of votes sued the winner on the grounds that the winner was not a resident of the precinct and therefore ineligible to hold office. The parties agreed that the only issues before the trial court were their respective residencies, the location of the precinct lines, and the validity of an order changing those precinct lines. The court of civil appeals, however, reversed the judgment on the ground that Texas Revised Civil Statute article 3032 permitted only the candidate who received the greatest number of votes cast to receive the certificate of election. See id. at 980-81. That issue was neither preserved in the trial court nor assigned as error in the briefs. See id. at 980.

The court of appeals certified to this Court the question of whether it erred in determining a cause on a

point not assigned as error. See id. We held that the court of appeals did not err, because fundamental-error review applied. Id. at 983-84. Citing eighty-nine years of Texas courts reviewing fundamental error, even "in the face of a statute which declared that all [unpreserved] errors ... should be considered as waived," this Court asked, "must we now hold that our courts of civil appeals have no authority to consider such errors because Art. 1837 has again been repealed by the substantial reenactment of Art. 1844 in the form of Rule 374, T.R.C.P.? As to errors that are truly fundamental, we think the answer must be No." Id. at 982-83.

While recognizing that fundamental-error review survived the promulgation of the Rules of Civil Procedure, we acknowledged that the doctrine could not be the

**Page 291**

same as the one codified in the 1846 statute. Declining to create an "all-inclusive" definition of the term, we held that, for purposes of the Ramsey election dispute, "an error which directly and adversely affects the interest of the public generally, as that interest is declared in the statutes or Constitution of this state, is a fundamental error." Id. at 983. We further determined that the alleged trial error would adversely affect the "fundamental public policy" found in the Texas Constitution and statutes that no one can be declared elected to public office unless he or she receives a majority or plurality of legal votes cast. Id.

Ten years later, in *McCauley v. Consolidated Underwriters,* 157 Tex. 475, 304 S.W.2d 265, 266 (Tex.1957), we reaffirmed the survival of the fundamental-error review doctrine, and held that it also applied in our Court. In McCauley, the trial court had set aside and vacated a default judgment. The court of civil appeals affirmed the order, despite the fact that it was a nonappealable interlocutory order. *McCauley v. Consolidated Underwriters,* 301 S.W.2d 181, 185 (Tex.Civ.App.-Beaumont 1957), rev'd, 157 Tex. 475, 304 S.W.2d 265 (Tex.1957). In its response to the plaintiff's writ of error to this Court, the defendant did not raise the jurisdictional defect in the court of appeals. Nevertheless, we held that fundamental error applied, reaffirming the definition from Ramsey. 304 S.W.2d at 265. We expanded on the definition, holding that "[w]hen the record affirmatively and conclusively shows that the court rendering the judgment was without jurisdiction of the subject matter, the error will also be regarded as fundamental." Id. at 266. Accordingly, we held that this Court had the power to reverse the court of appeals' judgment, and we dismissed the appeal on the unassigned jurisdictional error. Id.

Ramsey and McCauley were watershed decisions, establishing that fundamental-error review is not barred by our procedural rules. In the forty years since those decisions, Texas courts have consistently recognized and reaffirmed the existence of the fundamental-error doctrine. Because there is no statute defining the principle, we tend to agree with the commentator who noted that "[t]here is no single satisfactory definition of the phrase, nor can one easily analyze the cases for prognostic purposes." Kronzer, supra, § 9.2, at 205. In reviewing our caselaw, however, we are able to distill two types of error that our courts have consistently recognized are subject to fundamental-error review.

First, and most commonly, we apply fundamental-error review when a jurisdictional defect exists in the case. See, e.g., *Texas Ass'n of Bus. v. Texas Air Control Bd.,* 852 S.W.2d 440, 445-46 (Tex.1993) (holding that standing is a jurisdictional issue that can be raised for the first time on appeal); *New York Underwriters Ins. Co. v. Sanchez,* 799 S.W.2d 677, 678 (Tex.1990) (holding that lack of appellate jurisdiction is fundamental error); McCauley, 304 S.W.2d at 265-66 (applying fundamental-error review because intermediate court lacked jurisdiction). With "jurisdictional-based" fundamental-error review, an appellate court may reverse the judgment of the court below for error--without conducting a review for harm--even if the error is not preserved. See *Baker v. Hansen,* 679 S.W.2d 480, 481 (Tex.1984).

Second, we apply fundamental-error review when an important public interest or public policy is at stake. See, e.g., Ramsey, 205 S.W.2d at 983. "Public-interest-based" fundamental error differs from jurisdiction-based fundamental error in both a procedural and substantive way: As a procedural matter, public-interest-based fundamental-error review does not mandate

**Page 292**

automatic reversal. Instead, after an appellate court determines that it will consider the unpreserved error, the court conducts the next two steps of appellate review and determines whether an error in fact occurred, and whether the error is harmful. See W. Wendell Hall, Standards of Review in Civil Appeals, 24 ST. MARY'S L.J. 1045, 1056 (1993); see, e.g., *In re C.O.S.,* 988 S.W.2d 760, 767 (Tex.1999) (concluding that failure to give statutory admonishments, while fundamental error, was not harmful error requiring reversal); *State v. Santana,* 444 S.W.2d 614, 615 (Tex.1969) (holding that jury charge in juvenile case warranted fundamental-error review and analyzing whether charge violated due process), vacated on other grounds, 397 U.S. 596, 90 S.Ct. 1350, 25 L.Ed.2d 594, on remand, 457 S.W.2d 275 (Tex.1970).

Substantively, public-interest-based fundamental error is rare, implicated only when our most significant state public interests are at stake. The meaning of the "public interest" that is adversely affected must be extremely circumscribed, or the exception would swallow

the rule. Thus, it cannot be enough to allege that an error violates a party's constitutional rights. See Texas Dep't of Protective & Regulatory Servs. v. Sherry, 46 S.W.3d 857, 861 (Tex.2001) (holding that constitutional claim that paternity suit should not be barred by statute of limitations is waived by failing to raise the issue before the trial court) (citing Dreyer v. Greene, 871 S.W.2d 697, 698 (Tex.1993)). In Ramsey, we characterized the type of public interest that must be at stake as one "declared in the statutes or Constitution of this state." Ramsey, 205 S.W.2d at 983. However, we carefully declined to create an "all-inclusive" definition of a public interest that requires fundamental-error review. Id. Subsequent cases have identified statements of public interest based on our constitution and reflected in our caselaw. See, e.g., Santana, 444 S.W.2d at 615 (citing "the constitutional importance of this case to the public generally"); Woodard v. Texas Dep't of Human Res., 573 S.W.2d 596, 597 (Tex.Civ.App.-Amarillo 1978, writ rev'd n.r.e.) (citing Texas Supreme Court precedent for the proposition "that the interest of the public is affected when the custody of a child is at issue").

Since Ramsey, our courts have categorically recognized only one other type of public interest so significant that fundamental-error review applies--the state's interest in the rights and welfare of minors. In particular, our courts have recognized fundamental-error review in the following cases: the failure to give statutory admonishments in a juvenile delinquency proceeding, see In re C.O.S., 988 S.W.2d at 767; a jury charge submitting "preponderance of the evidence" as the burden of proof in a juvenile delinquency case, see Santana, 444 S.W.2d at 615; a jury charge based on an invalid theory of liability in a juvenile delinquency case, see R.A.M. v. State, 599 S.W.2d 841, 846 (Tex.Civ.App.-San Antonio 1980, no writ); the submission of "preponderance of the evidence" as the burden of proof in a parental-rights-termination case, see Woodard, 573 S.W.2d at 597; and an omission in a jury charge in a divorce case that deprived a minor child of the right to support, see Rey v. Rey, 487 S.W.2d 245, 248 (Tex.Civ.App.-El Paso 1972, no writ).

But not all cases involving children trigger fundamental-error review. In one case involving a minor, we rejected fundamental-error review because the error affected only the immediate private litigants and did not impact a matter of more general public concern. See Newman v. King, 433 S.W.2d 420, 422 (Tex.1968) (failure to appoint a guardian ad litem for a minor plaintiff in a change-of-name proceeding

**Page 293**

action does not warrant fundamental-error review because only the rights of the particular minor and litigants are affected). Our courts of appeals have reached the same result in other cases. See Wristen v. Kosel, 742 S.W.2d 868, 870-71 (Tex.App.-Eastland 1987, writ denied) (no fundamental-error review in a custody case

between two fit parents in which "[n]either parent's parental rights have been terminated"); Ingram v. Ingram, 249 S.W.2d 86, 88 (Tex.Civ.App.-Galveston 1952, no writ) (no fundamental-error review in a divorce case in which "the result of the suit can be of consequence to the litigants involved alone and ... no broad question of public interest is involved").

Having reviewed our case law in this area, we are left with two guiding principles for determining whether fundamental-error review should apply to a matter of public interest: (1) the error complained of must implicate a significant public interest or policy of the state, articulated by our statutes, constitution, or caselaw; and (2) the nature of the error must be such that it impacts a truly general public interest, and not solely that of private litigants. To guide our determination in difficult cases, we should apply fundamental-error review to further its underlying policy of promoting judicial economy while avoiding manifest injustice.

With these principles in mind, I would turn to the errors alleged in this case to determine whether the fundamental-error doctrine applies. First, the Coxes allege that the trial court erroneously failed to instruct the jury that it must find termination of the Coxes' rights to be in the best interest of the child. The Coxes admit that they did not object at trial to the errors that they raised on appeal. Because charge error does not implicate the essential jurisdiction of the trial court to act, we should not review the error unless we determine that the public-interest basis for fundamental-error review applies. Applying the principles identified above, I would conclude that this charge error warrants fundamental-error review.

Our first inquiry should be whether the error affects a significant public interest, articulated in our statutes, constitution, or caselaw. See Ramsey, 205 S.W.2d at 983. In the statute governing suits affecting the parent-child relationship, our Legislature has declared that "[t]he public policy of this state is to ... assure that children will have frequent and continuing contact with parents who have shown the ability to act in the best interest of the child." TEX. FAM.CODE § 153.001(a). The statute further provides that "[t]he best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child." Id. § 153.002. And in the Family Code subchapter governing the termination of parent-child relationships, the Legislature has emphasized repeatedly that the "best interest of the child" is the state's foremost priority in determining the welfare of children. See TEX. FAM.CODE §§ 161.001(2) (court must find by clear and convincing evidence that termination is in the best interest of the child), .003(a)(5) (court may order termination based on inability to care for a child if it is in the child's best interest), .004(a)(4) (court may order termination based on a subsequent petition if it is in the child's best interest), .005(a) (court may order termination

when parent is petitioner if in the best interest of the child), .007(3) (court may order termination if pregnancy results from parent's criminal act and if in the best interest of the child), .204 (court may order termination based on affidavit of waiver of interest if it is in the best interest of the child); see also §§ 107.001(b) (court must appoint guardian ad litem to represent best interest of

**Page 294**

the child in a termination suit brought by the government); 153.433 (court shall order access to a grandchild by a grandparent if in the best interest of the child). Here, the charge omits the instruction that the jury must consider the "best interest of the children." Thus, the charge directly affects a statutorily defined public interest.

Further, the charge error directly affects the public policies stated in our caselaw. We presume as a matter of public policy that the best interest of a child is usually served by maintaining the parent-child relationship. See *In re G.M.,* 596 S.W.2d 846, 847 (Tex.1980); *Wiley v. Spratlan,* 543 S.W.2d 349, 352 (Tex.1976). Here, the State's effort to involuntarily terminate the Coxes' rights affects the public interest in maintaining the parent-child relationship. In addition, we employ a higher standard of proof in parental-termination cases than we do in ordinary civil cases, reflecting the particular importance of ensuring a correct judgment in these cases. *In re G.M.,* 596 S.W.2d at 847 (citing *Addington v. State,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979)); see also TEX. FAM.CODE § 161.001 (codifying In re G.M. by establishing "clear and convincing evidence" as the burden of proof). In this case, the charge omits a required finding for termination and therefore directly and adversely impacts the public interest in reaching a correct judgment.

Having determined that the error alleged here affects a significant public interest, we should look to see whether the error impacts the public generally, and not just the immediate litigants. See Newman, 433 S.W.2d at 422. I would hold that an involuntary termination suit impacts the public generally. Parents have primary responsibility for the " 'custody, care and nurture' " of their children. *In re G.M.,* 596 S.W.2d at 846 (quoting *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)). The State has a right and duty to look after the welfare of the children within its borders. See *Wicks v. Cox,* 146 Tex. 489, 208 S.W.2d 876, 878 (1948). Consequently, when the State acts to terminate a parent's rights, the State assumes the responsibility for the children's welfare. The State's responsibility for the support of children is "obviously a matter of public interest" that "transcends the interest of the parties" to the immediate action. Rey, 487 S.W.2d at 248; cf. Wristen, 742 S.W.2d at 870-71 (public interest not affected by the issue of which parent is appointed as managing conservator when both parents are able to take care of the

child). The charge in this case allowed the trial court to terminate Tawnya Cox's and Paige Cox's parental rights without specifically instructing the jury that it must first find termination to be in the best interest of each child. Accordingly, the jury charge in this case had a potentially adverse impact on the Cox children's best interest, which is a matter of public interest in a case that affects the public generally.

Concluding that the jury charge error alleged here is subject to fundamental-error review does not undermine the general policy of judicial economy that underlies our rule for preservation of trial error. In *Pirtle v. Gregory,* 629 S.W.2d 919 (Tex.1982), we explained that one rationale for requiring preservation is to avoid surprise to the opponent on appeal. Id. at 920. Here, the State had the burden of proving all the statutory elements of termination. TEX. FAM.CODE § 161.001. The State can hardly say that it was "surprised" to find that the jury charge did not contain the elements that the statute clearly requires it to prove. Moreover, if the error likely caused an improper verdict, the State's interest would be furthered by appellate review, because the State's overriding concern

**Page 295**

is the children's best interest, not the termination of parental rights.

Accordingly, I would hold that our courts may review unpreserved jury-charge error relating to the required statutory findings in a parental-rights-termination case under our common-law doctrine of fundamental-error review. As a result of this holding, I would conclude that Texas procedures for reviewing unpreserved charge error in parental-rights-termination cases do not violate due process.

Having determined that the complaint in this case can be reviewed, our appellate procedure next requires that we determine whether the jury charge was error. See Hall, supra, at 1056; see, e.g., *In re C.O.S.,* 988 S.W.2d at 767. Here, the proposed charge did not properly state the essential elements for terminating parental rights. Family Code § 161.001 provides that a court can involuntarily terminate a parent's rights only after the court has found by clear and convincing evidence both that: (1) the parent has committed one or more of the enumerated predicate acts or omissions; and (2) termination is in the best interest of the child. See TEX. FAM.CODE § 161.001; see also COMM. ON PATTERN JURY CHARGES, STATE BAR OF TEX., TEXAS PATTERN JURY CHARGES (FAMILY) PJC 218.1 (2000). As to Tawnya, the proposed charge completely omitted the instruction that the jury find termination to be in the best interest of the child. As to Paige, the proposed charge included the "best interest" instruction only in conjunction with the alternative ground for termination that he had failed to

comply with a court-ordered plan. Because a parental-rights-termination lawsuit is founded in statute, the jury charge should track the language of the statute. See *Spencer v. Eagle Star Ins. Co. of Am.,* 876 S.W.2d 154, 157 (Tex.1994). I therefore agree with the court of appeals that because the "charge fails to require all the findings that, under the Family Code, are necessary to terminate parental rights," the charge was error. 57 S.W.3d at 74.

Having determined that the parents' complaint can be reviewed on appeal, and that the trial court erred, I would review next the court of appeals' determination that the error was harmful. See Hall, supra, at 1056; see, e.g., *In re C.O.S.,* 988 S.W.2d at 767. The court of appeals stated that the jury "could very well" have terminated Tawnya's rights and "may very well" have terminated Paige's rights without finding that termination was in the children's best interest. 57 S.W.3d at 74-75. But whether the jury may have improperly terminated the Coxes' parental rights because the charge omitted a statutory element is relevant only to whether there was error in the first instance. The Coxes must still show that the error probably caused rendition of an improper verdict. See TEX.R.APP. P. 44.1(a). The court of appeals summarily stated that the evidence for terminating Tawnya's rights was "not highly persuasive," but it did not discuss that evidence. 57 S.W.3d at 74. And, with respect to Paige, the court of appeals said that the potential for the jury to terminate without finding termination in the children's best interest was increased because there was "less support" in the evidence for the ground that Paige had failed to comply with a court-ordered plan. Id. at 75. But the court of appeals never explained how it reached its conclusion as to either parent that the error probably caused rendition of an improper judgment. We must review the "pleadings of the parties, the evidence presented at trial, and the charge in its entirety" to determine whether the charge in this case probably resulted in an improper judgment. *Island Recreational Dev. v. Republic of Tex. Sav. Ass'n,* 710 S.W.2d 551, 555 (Tex.1986); see

**Page 296**

*Reinhart v. Young,* 906 S.W.2d 471, 473 (Tex.1995).

The Department's evidence overwhelmingly focused on and supported the conclusion that termination was in the best interest of these children. In particular, Tawnya Cox testified that she and her husband used cocaine while the children were at home, and that she believed her children were safe because cocaine made her more aware of her surroundings. The Coxes testified to arguing violently with each other. In one of those arguments, she knocked several teeth out of his mouth, and during another argument, he locked her out of the house while she was naked. Dr. Shinder, a psychologist whose office evaluated the Coxes, opined that neither could be fit parents due to their "aggression and violence

and hostility" and drug use. Jasmine Khan, a licensed professional counselor, testified about the Cox children's extreme, abnormal behavior when they were first removed from their parents' household. Most significantly, she described hostile, aggressive, and violent play by A.B.C. Khan also said that A.B.C. told her he witnessed violence and was a victim of violence in the Cox home. Other Child Protective Services workers reiterated this testimony. Khan also testified that after several months in foster care, the children improved tremendously, and did not display any distress being away from their parents. She testified that the Coxes were unwilling and unmotivated to make productive changes to address the issues placing their children at risk. A police officer described numerous times that he had to investigate domestic-disturbance calls at the Cox household, and described the confrontations as "pretty violent" such that he had concern for the children. A conservatorship worker from Child Protective Services testified that she observed visits between the Coxes and their children. She stated that the visits tended to be "chaotic," and the children's behavior deteriorated after each visit with their parents. The conservatorship worker also described the Coxes' hostility and anger toward each other. Notably, the testimony of Dr. Shinder, Khan, the police officer, and the conservatorship worker all culminated with their opinions that termination of the Coxes' parental rights and adoption would be in the Cox children's best interest. And other witnesses who worked on the Cox case, including a Child Protective Services supervisor and Court Appointed Special Advocate, similarly testified that termination would be in the Cox children's best interest.

The Coxes provided little evidence to contradict the evidence discussed above. However, their case likewise focused significantly on evidence relevant to whether termination was in the children's best interest. For example, the Coxes attempted to explain their efforts--after a trial date was set on the Department's termination petition--to comply with the Family Service Plan and to show their ability to provide the children a loving home. A year after the trial court initially ordered compliance with the Family Service Plan, in the fall of 1988, the Coxes moved to Austin from Waco. The jury heard testimony about a letter the Coxes' attorney wrote to Child Protective Services in Austin, stating that the Coxes wanted to "derail the termination" by working with the Department. Also, Paige Cox testified that he called Child Protective Services in Austin once they moved in an effort to start compliance with the Family Service Plan. The Coxes also presented evidence about the changes in their lives and relationship since moving to Austin to demonstrate that termination would not be in the children's best interest. Tawnya testified about her finding work in Austin. She said that Paige had

**Page 297**

become more open and communicative, and she

described the environment in Austin as "wonderful." The Coxes' obstetrician for the birth of their fourth child--who is not the subject of this suit--described the Coxes as "an appropriate, courteous, and loving couple." And the Coxes' landlord and roommate in Austin testified that their home was a "safe environment." Thus, much of the evidence adduced at trial was probative toward the issue of whether termination was in the children's best interest.

Moreover, the rest of the trial proceedings put this evidence in perspective, centering the jury's attention on the best interest of the children. The Department's pleadings specifically alleged as to each individual parent that "termination of the parent-child relationship [between the parent and each child] is in the best interest of the children, as required by Section 161.001 of the Texas Family Code." The attorneys for all parties repeatedly emphasized throughout the voir dire, examination of the witnesses, opening statements, and closing argument that the jury's focus should be on the children's best interest. (In its opinion, the Court quotes two of the relevant portions of the opening argument and voir dire record in which the Coxes' counsel reiterates that the jury's determination will regard the children's best interest. 96 S.W.3d at 261.) Finally, the jury charge listed factors to be considered in determining the children's best interest, and many of these factors related to the evidence discussed above.

In light of the totality of the circumstances and the consistent and paramount emphasis upon the children's best interest at trial, I would conclude that the failure to submit the "best interest" instruction was not reasonably calculated and did not probably cause the rendition of an improper verdict. See TEX.R.APP. 44.1; Reinhart, 906 S.W.2d at 473; Island Recreational Dev., 710 S.W.2d at 555. I would conclude that the court of appeals therefore erred in reversing the trial court's judgment on the basis that the omitted instruction was harmful error.

The Coxes' second complaint is that the submission of the jury charge in a disjunctive instruction and as a broad-form question violated their constitutional rights to due process and due course of law. Using the analytical framework I have set out above, I would first determine whether the alleged error affects a significant public interest, articulated in our statutes, constitution, or caselaw. The Coxes assert that submission of a broad-form question violates due process because it permits the termination of parental rights without first ensuring that ten jurors agree on each statutory termination ground. If the charge violates due process for the reasons that the Coxes state, that violation would adversely impact the public interest in ensuring that the statutory grounds required for termination are found by clear and convincing evidence. See TEX. FAM.CODE § 161.001. Furthermore, for the same reasons discussed as to the first charge complaint, this second charge complaint relates directly to the public interest in correct judgments and affects the public generally. Finally,

broad-form jury charges are used uniformly in cases like this one, and therefore resolving the issue that this complaint raises would impact many parental-rights-termination cases. Accordingly, I would conclude that our fundamental-error doctrine permits us to review this complaint.

I would hold that the submission of the broad-form question did not violate the Coxes' due process rights, and therefore was not error. In *Texas Department of Human Services v. E.B.,* 802 S.W.2d 647, 649 (Tex.1990), we identified the controlling

**Page 298**

question in a parental-rights-termination case as whether the parent-child relationship between the parent and the children should be terminated. In the Coxes' case, the charge specifically instructed the jury that at least ten jurors must agree on all answers supporting the verdict. See TEX.R. CIV. P. 292. We presume that the jury understood and followed its instructions. See *Gillette Motor Transp. Co. v. Whitfield,* 145 Tex. 571, 200 S.W.2d 624, 626 (1947).

The Coxes argue that our holding in *Crown Life Insurance Co. v. Casteel,* 22 S.W.3d 378 (Tex.2000), alters our analysis in E.B. In Casteel, we held that "[w]hen a single broad-form liability question erroneously commingles valid and invalid liability theories and the appellant's objection is timely and specific, the error is harmful when it cannot be determined whether the improperly submitted theories formed the sole basis for the jury's finding." Id. at 389. Here, the Coxes do not assert that either of the disjunctive grounds for termination were invalid theories as applied to them. See id. And the Coxes raise no new arguments in this case to give us cause to revisit our decision in E.B. Accordingly, the court of appeals correctly held that the trial court did not abuse its discretion in submitting the broad-form jury charge.

For the reasons expressed above, I respectfully dissent to the Court's opinion and judgment in this cause. The Court belabors the consequences of failing to preserve error, instead of deciding whether we can review that unpreserved error. The Court then inexplicably reviews an unpreserved complaint that it decides is harmless. Not only does the Court reach issues not presented by the parties and that are unnecessary to the resolution of the case, it retreats from our error-preservation standards, thereby adding further uncertainty to the already conflicting decisions from the courts of appeals. The only general proposition I can draw from the Court's opinion is that courts of appeals should review error when they can determine from the record that the error is ultimately harmless. But my greatest concern is that the Court abandons its responsibility to ensure that parents and children receive fair, consistent, and expeditious appellate review in these

most difficult cases. Accordingly, I respectfully dissent.

Justice SCHNEIDER, dissenting.

Under the Texas and United States Constitutions, the parent-child relationship is considered a fundamental liberty interest deserving due process protection. Indeed, the relationship is so important that no amount of antisocial behavior directed toward a child or in defiance of a court's order, standing alone, provides enough justification for the State of Texas to terminate the parent-child relationship. Our law requires that, in addition to finding one or more of the legislative-specified laundry list of antisocial conduct by a parent, the fact finder must also find that terminating the parent-child relationship is in the "best interest" of the child.

Today, the Court holds that the "best interest" element can be deemed to support the judgment if, without objection, that element is erroneously omitted from or obfuscated in a jury charge. 96 S.W.3d at 259-260. And, the Court not only deems a best interest finding in this case, but also, to deem the finding, the Court applies a questionable legally sufficient clear and convincing evidence test never requested by the parties or articulated by this Court. Then, the Court holds that the parents' failure to follow the Family Service Plan [1] is conclusively established, so

**Page 299**

that the net effect is the case is reversed and judgment is rendered without a remand to the court of appeals for the requested factual sufficiency review of the termination grounds. 96 S.W.3d at 260.

I respectfully dissent. The question squarely before the Court is whether procedural due process considerations require an appellate court to review unpreserved jury-charge errors in a parental-rights termination case. I would address that issue directly. And, in doing so, I would hold that Texas and the United States constitutional procedural due process considerations do not mandate appellate review of unpreserved jury-charge error. The Texas Legislature has devised, and our courts have applied, a fair and just procedural framework at the trial and appellate levels for handling parental-termination cases. Consequently, I would hold the parents waived their right to appellate review of the alleged jury-charge errors, because the parents failed to object in the trial court about the errors they raise here.

Finally, although I agree the court of appeals' decision should be reversed, I do not agree that this Court, under our Texas Constitution, can obviate the court of appeals' role. See TEX. CONST. art. V, § 6; TEX. GOV'T CODE § 22.225(a). This Court cannot conclusively determine a factual question, namely, whether the parents complied with the Family Service Plan. Thus, even if I agree the Court's "deemed finding"

procedural route is appropriate in this case, I believe the Court should remand this case to the court of appeals for a factual sufficiency review on the termination grounds the parents challenge.

## I. BACKGROUND

Depending upon one's view, the jury charge either (a) omitted a best interest instruction as to one of the parents and one of the grounds for the other parent; or (b) at the very least, positioned the best interest instruction in such a manner that it was unclear to the jury that the instruction applied to all the termination grounds alleged against both parents. In any event, neither party objected to the charge on the basis that it failed to include an instruction that termination under any ground alleged must also be in the child's best interest. The jury returned a verdict terminating parental rights for all three children, and the trial court rendered judgment based on the verdict.

On appeal, the parents argued for the first time that the broad-form submission and disjunctive questions in the charge violated their due process rights. The parents also complained for the first time that the charge failed to instruct the jury that, to terminate under any ground alleged, the jury must also find that termination is in the best interest of the children.

The court of appeals held that, in parental-termination cases, applying Rule 33.1 of the Rules of Appellate Procedure to preclude an appellate court from reviewing an unpreserved complaint about "core issues" in the jury charge does not afford the parent due process. 57 S.W.3d 66, 72. See also TEX.R.APP. P. 33.1(a) (As a prerequisite for appellate review, the record must show the complaint was made to the trial court by a timely request, objection, or motion in compliance with Texas's civil and appellate rules.). The court of appeals then reviewed the alleged errors and held the broad-form jury charge was proper. 57 S.W.3d at 73-74. After determining

**Page 300**

the charge omitting a best interest instruction for all the termination grounds alleged was harmful error, the court of appeals reversed the trial court's judgment and remanded the case for a new trial. 57 S.W.3d at 74-75.

## II. ANALYSIS

The parents contend that their constitutional argument about the best interest instruction in the jury charge involves their substantive--not procedural--due process rights. According to the parents, the Family Code's procedural guarantees, such as the requirement that termination be in the best interest of the children, are meaningless unless appellate review is afforded to ensure the lower court correctly applied these procedures.

In *County of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), the U.S. Supreme Court explained the meaning of procedural and substantive due process.

We have emphasized time and again that "the touchstone of due process is protection of the individual against arbitrary action of government," *Wolff v. McDonnell,* 418 U.S. 539, 558, 94 S.Ct. 2963, 2976, 41 L.Ed.2d 935 (1974), whether the fault lies in a denial of fundamental procedural fairness, see, e.g., *Fuentes v. Shevin,* 407 U.S. 67, 82, 92 S.Ct. 1983, 1995, 32 L.Ed.2d 556 (1972) (the procedural due process guarantee protects against "arbitrary takings"), or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective, see, e.g., Daniels v. Williams, 474 U.S. [327,] at 331, 106 S.Ct. [662] at 664 [(1986)] (the substantive due process guarantee protects against government power arbitrarily and oppressively exercised).

Lewis, 523 U.S. at 845-46, 118 S.Ct. 1708 (citations to Supreme Court Journal omitted and full cite to Daniels provided).

Here, the nature of the parents' due process argument demonstrates that they are in fact making a procedural due process claim. The parents repeatedly rely on the U.S. Supreme Court's analysis for determining whether parents' due process rights have been met in termination cases. See *Lassiter v. Dep't of Soc. Services,* 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981). And the parents consistently claim that the procedure--that is, receiving no appellate review of alleged jury-charge errors because of the failure to preserve error--violated their due process rights. See Daniels, 474 U.S. at 340-41, 106 S.Ct. 662 (Stevens, J., concurring) (explaining that petitioners asserted procedural and not substantive due process violations, because they alleged the state procedures for redressing deprivations of prisoners' property were constitutionally inadequate). However, the parents do not contend that the action by which the State terminates parental rights is arbitrary or oppressive. See Daniels, 474 U.S. at 331, 106 S.Ct. 677 (substantive due process bars certain government actions regardless of the fairness of the procedures used to implement them and prevents the government from using its power for oppression). Indeed, the court of appeals treated the parents' complaint about the refusal to review unpreserved jury-charge error as a procedural due process issue. 57 S.W.3d at 72. And, the court of appeals applied the U.S. Supreme Court's procedural due process analysis to conclude that "[t]o terminate parental rights--a Fourteenth Amendment liberty interest--when there is a fundamentally erroneous charge on a 'core issue,' only because the complaint was not preserved in the trial court, does not adhere to Fourteenth Amendment procedural due process." Id. (emphasis added).

Accordingly, the court of appeals correctly concluded that procedural, not substantive, due process is at issue here. However, for several reasons, the court of appeals' rationale for concluding that such due process requires review of the parents' unpreserved jury-charge errors is flawed. As discussed in detail below, the court of appeals misplaces its reliance on Texas case law, misapplies our strict scrutiny directive from *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex.1985), and conducts an erroneous due process analysis to conclude our error preservation rules deny the parents due process in this case.

## A. WHETHER DUE PROCESS REQUIRES APPELLATE REVIEW OF UNPRESERVED JURY-CHARGE ERRORS

### 1. Reliance on Texas Case Law

In holding that our error preservation rules do not preclude the court from reviewing the parents' jury-charge complaints raised for the first time on appeal, the court of appeals relied on two cases. 57 S.W.3d at 71-72 (discussing *In re A.P., I.P.,* 42 S.W.3d 248 (Tex.App.-Waco 2001, no pet.) and *In re S.R.M.,* 601 S.W.2d 766 (Tex.Civ.App.-Amarillo 1980, no writ)). But these cases do not support the court of appeals' conclusion.

In S.R.M., the evidence conclusively showed the mother's parental rights should not be terminated for the ground alleged. *In re S.R.M.,* 601 S.W.2d at 768-69. However, the trial court rendered a judgment terminating the mother's parental rights based on grounds not pleaded. Id. at 769. The mother argued the court of appeals should reverse the trial court's judgment, because it relied on unpleaded grounds to terminate her parental rights. Id. The paternal grandparents seeking termination argued the mother impliedly consented to a trial on unpleaded grounds, because she did not specially except or object to the introduction of evidence related to the unpleaded grounds. Id. Because the Family Code mandates that the petition set forth the statutory grounds for termination to afford the parents due process, and because the record showed the mother had no notice that the trial court would consider terminating on unpleaded statutory grounds, the court of appeals reversed the trial court's judgment. Id. at 770.

Here, unlike the circumstances in S.R.M. in which the mother had no notice of the trial court's action, the parents knew about the jury charge and had an opportunity to object. See Id. In fact, though the parents' attorney did not object to the omission or placement of the best interest instruction, he did object to the definition of the clear and convincing evidentiary standard in the charge. And, because the trial court considered objections to the charge before the parents rested, their attorney

specifically requested that everyone agree the objection would not be considered waived if he did not urge it again before closing arguments. Their counsel said, "I just don't want at some future time someone to write that I waived that objection." Thus, the parents had notice and an opportunity to object to the charge and acknowledged the consequences if they failed to do so.

In A.P., the court of appeals was asked to review unpreserved factual and legal sufficiency complaints about the grounds for termination and whether termination was in the best interest of the child. 42 S.W.3d at 254-55. The court of appeals cited S.R.M. as precedent for considering unpreserved error and held that terminating parental rights without appellate review of an unpreserved sufficiency complaint is a due process violation. 42 S.W.3d at 255. Then, the court of appeals referred to criminal cases, which have held

**Page 302**

that a defendant does not have to preserve for appellate review a complaint that the evidence is factually or legally sufficient. 42 S.W.3d at 255-56 (citing *Chesnut v. State,* 959 S.W.2d 308, 311 (Tex.App.-El Paso 1997, no pet.); *Davila v. State,* 930 S.W.2d 641, 649 n. 7 (Tex.App.-El Paso 1996, writ ref'd)). Because criminal cases and termination cases both require heightened burdens of proof--"beyond a reasonable doubt" in criminal cases and "clear and convincing" in termination cases--the A.P. court concluded it a "logical extension" to review unpreserved sufficiency issues in termination cases. 42 S.W.3d at 256.

But the A.P. court wholly failed to conduct a due process analysis, as the U.S. Supreme Court requires in parental-termination cases, to determine if the procedure for preserving sufficiency challenges violates parents' due process rights. See Lassiter, 452 U.S. at 27-28, 101 S.Ct. 2153. Instead, the court summarily cited S.R.M., without recognizing its significantly distinguishable facts, to support its conclusion that it could review the unpreserved error. Moreover, the A.P. court improperly relied on criminal cases that only opine about how defendants may raise sufficiency points and, in any event, operate under different procedural rules and jurisprudence. Accordingly, A.P., which should be overruled based on its erroneous analysis and holding, does not support the court of appeals' conclusion here that due process requires appellate courts to consider unpreserved jury-charge errors.

**2. Strict Scrutiny**

The court of appeals further explained that this Court's directive that " 'termination proceedings should be strictly scrutinized' " justified its reviewing the unpreserved jury-charge errors. 57 S.W.3d at 72 (quoting *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex.1985)). However, the strict scrutiny language in Holick only

speaks to the important nature of the interests involved in parental-termination cases and does not support a conclusion that reviewing courts must consider unpreserved jury-charge errors.

In Holick, this Court determined how to construe a particular ground for termination in the Family Code. Holick, 685 S.W.2d at 19-20. Before answering the question, the Court discussed the fundamental constitutional rights involved in parental-termination proceedings. 685 S.W.2d at 20. After recognizing these rights, and the fact that a clear and convincing evidentiary standard applies in these cases, the Court explained that this is why "termination proceedings should be strictly scrutinized...." Id.

Since Holick, courts of appeals have cited the strict scrutiny language when generally discussing the standard of review principles that apply in termination cases. See, e.g., *In re A.V.,* 849 S.W.2d 393, 400 (Tex.App.-Fort Worth 1993, no writ). Further, courts of appeals have relied on the language to support the application of a heightened factual sufficiency review standard. See *In re C.H.,* 89 S.W.3d 17, 25 (Tex.2002) (discussing various courts of appeals decisions attempting to define the factual sufficiency review standard when clear and convincing evidence is required). However, other than the decisions in A.P. and here, no courts of appeals have relied on Holick's strict scrutiny directive to justify review of unpreserved error.

In sum, there is no indication the Court ever intended Holick's strict scrutiny language to support appellate review of unpreserved jury-charge errors. In fact, this Court recently rejected relying on Holick's strict scrutiny language as a basis for reversing a parental-termination judgment based on a parent's due process claim.

**Page 303**

See *In re K.R.,* 63 S.W.3d 796, 800, n. 20 (Tex.2001). In K.R., the Court considered a parent's argument that procedural due process precludes a reviewing court from applying a harmless error analysis to his claim that his being handcuffed throughout the trial improperly prejudiced the jury. Id. at 798. The Court held that, while it agreed "that judgments terminating the parent-child relationship must be carefully scrutinized because of the importance of that relationship, [it could not] conclude that the Fourteenth Amendment requires reversal of the judgment in this case without regard to harm." Id. at 800. The Court explained that, even in criminal cases, the U.S. Supreme Court has rejected the notion that any constitutional error requires automatic reversal. Id. To the contrary, if "trial errors" such as "errors in the charge and in evidentiary rulings" occur, courts may not reverse the judgment unless the error caused harm. Id.

Accordingly, Holick's strict scrutiny language does not dictate procedure. The language simply evidences this Court's recognition of the important interests involved in parental-termination proceedings. See Holick, 685 S.W.2d at 20.

### 3. United States Supreme Court Due Process Analysis

The court of appeals additionally determined that appellate review of the parents' unpreserved jury-charge errors "comports with the requirements in Lassiter." 57 S.W.3d at 72. However, if all the pertinent factors are properly considered and weighed, the Lassiter due process test does not support the court of appeals' conclusion.

In Lassiter, the U.S. Supreme Court held that due process does not require states to provide indigent parents counsel in all termination cases. Lassiter, 452 U.S. at 33-34, 101 S.Ct. 2153. Before answering the due process question, the U.S. Supreme Court explained the nebulous nature of this concept:

"[D]ue process" has never been, and perhaps can never be, precisely defined.... Rather, the phrase [due process] expresses the requirement of "fundamental fairness," a requirement whose meaning can be as opaque as its importance is lofty. Applying the Due Process Clause is therefore an uncertain enterprise which must discover what "fundamental fairness" consists of in a particular situation by first considering any relevant precedents and then by assessing the several interests that are at stake.

Lassiter, 452 U.S. at 24-25, 101 S.Ct. 2153.

The U.S. Supreme Court then held that the nature of the process due in parental-termination proceedings depends upon a balancing of three factors: (1) the private interests at stake; (2) the government's interests; and (3) the risk that the procedures used will lead to an erroneous deprivation. Lassiter, 452 U.S. at 27, 101 S.Ct. 2153 (relying on *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)); see also see also *Santosky v. Kramer,* 455 U.S. 745, 754, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Once these Eldridge factors are weighed against each other, the court must next "set their net weight in the scales against the presumption" that the procedure applied did not violate due process. Id.

Here, the analysis begins with the presumption that our rules governing preservation of jury-charge error comport with due process. Lassiter, 452 U.S. at 27, 101 S.Ct. 2153. But this must be balanced against the net weight of the three Eldridge factors to determine if the presumption is overcome. Santosky, 455 U.S. at 754, 102 S.Ct. 1388; Lassiter, 452 U.S. at 27, 101 S.Ct. 2153; Eldridge, 424 U.S. at 335, 96 S.Ct. 893.

**Page 304**

With respect to the first Eldridge factor--the private interests at stake--this Court has long recognized that the "natural right existing between parents and their children is of constitutional dimensions." Holick, 685 S.W.2d at 20; see also *In re G.M.,* 596 S.W.2d 846, 846 (Tex.1980). A parent's right to the parent-child relationship is " 'essential,' 'a basic civil right of man,' and 'far more precious than property rights.' " Holick, 685 S.W.2d at 20 (quoting *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)). Similarly, the U.S. Supreme Court has noted, "A parent's interest in the accuracy and justice of the decision to terminate his or her parental status is ... a commanding one." Lassiter, 452 U.S. at 27, 101 S.Ct. 2153.

However, the child's interests are also necessarily involved and must be considered in this analysis. The Family Code's entire statutory scheme for protecting children's welfare focuses on the child's best interest. See, e.g., TEX. FAM.CODE §§ 51.11(b); 153.001; 153.002; 161.001(2); 161.101. And, like their parents, children have an interest in an accurate resolution and just decision in termination cases. But children also have a strong interest in a final decision on termination so that adoption to a stable home or return to the parents is not unduly prolonged. In fact, it is this State's express policy to provide a safe, stable, and nonviolent environment for the child. TEX. FAM.CODE § 153.001(a)(2). And, if error is properly preserved, the Legislature has upheld this interest by requiring prompt appellate decisions: "An appeal in a suit in which termination of the parent-child relationship is in issue shall be given precedence over other civil cases and shall be accelerated by the appellate courts." TEX. FAM.CODE § 109.002(a). Similarly, Texas's preservation of error rules promote the child's interest in a final decision and thus placement in a safe and stable home, because they preclude appellate courts from unduly prolonging a decision by appellate review of issues not properly raised in the trial court.

Indeed, the U.S. Supreme Court has recognized that prolonged termination proceedings can have psychological effects on a child of such a magnitude that time is of the essence:

It is undisputed that children require secure, stable, long-term, continuous relationships with their parents or foster parents. There is little that can be as detrimental to a child's sound development as uncertainty over whether he is to remain in his current "home," under the care of his parents or foster parents, especially when such uncertainty is prolonged.

*Lehman v. Lycoming County Children's Services Agency,* 458 U.S. 502, 513-14, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982); see also Lassiter, 452 U.S. at 32, 101 S.Ct. 2153 ("[C]hild-custody litigation must be concluded as rapidly as is consistent with fairness...."). Accordingly, under the first Eldridge factor, the private interests reflect a desire for an accurate and just decision, but one that

does not unduly prolong a final decision about the child's permanent home.

The second factor under Eldridge is the State's interests. See Santosky, 455 U.S. at 754, 102 S.Ct. 1388; Lassiter, 452 U.S. at 27, 101 S.Ct. 2153; Eldridge, 424 U.S. at 335, 96 S.Ct. 893. Undoubtedly, the State shares the parents' and child's interests in an accurate and just decision. See Lassiter, 452 U.S. at 27, 101 S.Ct. 2153. However, the child's best interest is always the State's primary concern in termination proceedings. See TEX. FAM.CODE §§ 161.001(2); 161.101. Thus, the State additionally shares the child's interest in not

**Page 305**

unduly prolonging a final decision about the child's future. See Lehman, 458 U.S. at 513, 102 S.Ct. 3231 ("The State's interest in finality is unusually strong in child-custody disputes."); see also TEX. FAM.CODE §§ 109.002(a) (giving appeals in parental-termination cases precedence over other civil cases); 161.202 (court shall grant motion for a preferential setting for a final termination hearing on the merits if termination would make the child eligible for adoption).

Additionally, the State has an interest in courts consistently and uniformly applying our preservation of error rules. This interest does not merely reflect a fiscal policy. Without uniform application of our error preservation rules, termination proceedings would be conducted and reviewed in an arbitrary manner. "At some point the benefit of an additional safeguard to the individual affected by the administrative action and to society in terms of increased assurance that the action is just, may be outweighed by the cost." Eldridge, 424 U.S. at 348, 96 S.Ct. 893. Here, the cost of disregarding our error preservation rules risks not only unduly prolonging termination proceedings but also losing any predictability for the State, counsel for parents, and guardians for children about how courts will conduct and review these proceedings. Consequently, under the second factor, the State's interests encompass all the private interests, but weigh in favor of conducting termination proceedings under our error preservation rules so that the proceedings are not unduly prolonged or unpredictable.

Finally, the third Eldridge factor to consider is the risk that our rules for preserving error about the jury charge will lead to an erroneous deprivation. See Santosky, 455 U.S. at 754, 102 S.Ct. 1388; Lassiter, 452 U.S. at 27, 101 S.Ct. 2153; Eldridge, 424 U.S. at 335, 96 S.Ct. 893. Texas Rules of Civil Procedure 272-274 establish the procedures for parties to participate in the formulation of the jury charge. TEX.R. CIV. P. 272-274. Rule 272 requires a party to object to the charge, either orally or in writing, before the court reads the charge to the jury. TEX.R. CIV. P. 272. A party objecting to the charge must point out distinctly the objectionable matter and the grounds for the objection. TEX.R. CIV. P. 274. In addition to objecting to the charge, either party may request the trial court to submit certain questions, definitions, and instructions in the charge. TEX.R. CIV. P. 273. If a party fails to timely abide by the rules concerning the jury charge, the party waives any complaint on appeal. TEX.R. CIV. P. 273-74; TEX.R.APP. P. 33.1(a).

This Court has relaxed the jury-charge preservation rules in an effort to determine cases on the merits rather than on slight technical defects. See State Dep't. of Highways & Pub. Transp. v. Payne, 838 S.W.2d 235, 241 (Tex.1992). In Payne, the Court held that, although the State requested an improperly worded jury-charge instruction, it was sufficient to preserve error. Id. at 241. The Court explained that "[t]here should be but one test for determining if a party has preserved error in the jury charge, and that is whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling. The more specific requirements of the rules should be applied, while they remain, to serve rather than defeat this principle." Id.

Accordingly, parties have various opportunities to formulate the jury charge and preserve error about the charge before the trial court reads it to the jury. TEX.R. CIV. P. 273-74. And, after Payne, a party need only timely and plainly make the trial court aware of a complaint to preserve such error. Payne, 838 S.W.2d at 241.

**Page 306**

Consequently, Texas's rules for preserving jury-charge error raise little risk of erroneous deprivations.

To summarize the Eldridge factors, then: (1) the parents' interest is extremely important, but must be balanced with the child's important interests for not only an accurate and just decision but also finality and placement in a stable home; (2) the State shares both the parents' and child's interests in an accurate and just decision, but the State's interest in not unduly prolonging finality and in uniformity and predictability in applying our preservation of error rules is stronger; and (3) the risk of an erroneous deprivation under our rules about preserving error in the jury charge is low, because parties have notice and an opportunity to be heard about issues submitted and omitted from the charge, and error is preserved so long as the party timely and plainly made the trial court aware of the party's complaint. Weighing these factors' net weight against the presumption that our error preservation rules comport with due process, it cannot be said that the parents' were not afforded due process here so that appellate review of their unpreserved jury-charge errors is warranted.

In fact, the record supports the conclusion that the parents' due process rights were not violated. The parents

had an opportunity to be heard and object to the charge. Eldridge, 424 U.S. at 333, 96 S.Ct. 893 ("The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' ") (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)). As previously discussed, the parents' counsel objected to a portion of the charge not challenged on appeal. And, in making this objection, their counsel expressly acknowledged the risk involved in failing to object in a timely manner. For these reasons, under Lassiter analysis, the court of appeals erroneously relied upon due process considerations to review the parents' unpreserved jury-charge errors.

An additional factor further supports the conclusion that due process does not require appellate review of the unpreserved jury-charge errors. Texas's Legislature has established the procedures for terminating parental rights. See TEX. FAM.CODE §§ 161.001-161.211. In doing so, the Legislature has been heedful of the important interests--parents' and children's--at stake. For example, the Family Code expressly requires that a court terminate the parent-child relationship only if the grounds for termination, including whether termination is in the best interest of the child, are proven with "clear and convincing evidence." TEX. FAM.CODE § 161.001. This, of course, is a higher evidentiary standard than in ordinary civil case. See *In re G.M.,* 596 S.W.2d at 847. Moreover, though the U.S. Supreme Court has held that states need not do so in every case, the Family Code requires courts to provide counsel for indigent parents in termination proceedings. TEX. FAM.CODE § 107.013(a)(1); see Lassiter, 452 U.S. at 33-34, 101 S.Ct. 2153.

Neither the Family Code passed by our Legislature nor the procedural and appellate rules promulgated and applied by our courts deny parents fair notice and the right to be heard in parental-termination cases. The U.S. Supreme Court has recognized that, "[i]n assessing what process is due ... substantial weight must be given to the good-faith judgments" of our law makers "that the procedures they have provided assure fair consideration of entitlement claims of individuals." Eldridge, 424 U.S. at 349, 96 S.Ct. 893. Here, our Legislature has carefully constructed a statutory scheme governing how courts

**Page 307**

shall conduct termination proceedings. In that scheme, though the Legislature has expressly provided certain procedures that differ from other civil cases, see TEX. FAM.CODE §§ 107.013(a)(1), 161.001, it has chosen not to preclude application of our procedural and appellate rules in parental-termination cases. Therefore, substantial weight should be given to the Legislature's good-faith judgment when deciding these cases. See Eldridge, 424 U.S. at 349, 96 S.Ct. 893.

**B.    INEFFECTIVE    ASSISTANCE    OF COUNSEL**

As the Court recognizes, the parents complain that their counsel's failure to object to the charge and other alleged mistakes rendered his assistance ineffective. Assuming the parents may raise this contention, and assuming they may do so for the first time on appeal, the Court correctly concludes that the assistance in this case was not ineffective. In fact, even assuming the parents can overcome the strong presumption that their counsel's performance was reasonable, there is no reasonable probability that, but for their counsel's unprofessional errors, the result of this termination proceeding would have been different. See *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Garcia    v.    State,    57    S.W.3d    436,    440* (Tex.Crim.App.2001).

As discussed at length in the Court's opinion, the jury heard abundant evidence that supports a conclusion that termination is in the children's best interest. Further, given the all evidence the jury considered from numerous sources and witnesses, the counsel's alleged mistakes do not raise even "a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S.Ct. 2052. Thus, the assistance of the parents' counsel in this case was not ineffective.

**C. THE COURT'S WRITINGS**

The Court engages in procedural gymnastics to avoid answering the constitutional question in this case. While Rule 279 may indeed resolve the specific alleged problem with the jury charge in this case, the Court refuses to answer the threshold procedural due process question and does not analyze the due process issue under the U.S. Supreme Court's guidelines for ascertaining the process due in termination proceedings. See Santosky, 455 U.S. at 754, 102 S.Ct. 1388; Lassiter, 452 U.S. at 27, 101 S.Ct. 2153. Because the Court does not answer the threshold constitutional question, the Court's writing leaves little guidance for practitioners and lower courts for how to determine if our error preservation rules violate due process when applied to other types of unpreserved errors. Undoubtedly, the Court must eventually resolve this issue, as there will not be a Rule 279 "band-aid" for every unpreserved trial error in parental-termination cases.

JUSTICE HANKINSON'S fundamental error analysis is no more compelling. The fundamental-error analysis disregards that the parents' due process claim here relates to our procedures about preserving error for appeal. And, the U.S. Supreme Court has dictated how courts must determine what process is due a parent. Santosky, 455 U.S. at 754, 102 S.Ct. 1388; Lassiter, 452 U.S. at 27, 101 S.Ct. 2153. However, rather than conduct this analysis, the dissent contends that our common law doctrine of fundamental error applies. But this disregards

the true nature--and danger--of Texas's fundamental error jurisprudence.

Historically, courts have applied fundamental error in civil cases under very limited circumstances. Typically, as the dissent recognizes, the concept of fundamental error is expressed in our jurisprudence

**Page 308**

holding that subject-matter jurisdiction may be raised at any time. See, e.g., *Texas Ass'n of Bus. v. Texas Air Control Bd.,* 852 S.W.2d 440, 445 (Tex.1993). However, the other types of civil cases applying fundamental error--the cases involving "public-interest-based" issues--are rare. Again, as the dissent recognizes, this Court has often declined to apply fundamental-error review, recently doing so in a case in which a child's welfare and constitutional issues were raised. See, e.g., Texas Dep't of Protective & Regulatory Servs. v. Sherry, 46 S.W.3d 857, 861 (Tex.2001).

Perhaps the Court has not applied fundamental-error review in many cases, because the concept is nebulous and imprecise. This Court has held that fundamental error exists if the error "directly and adversely affects the interest of the public generally, as that interest is declared in the statutes or Constitution of this state." *Ramsey v. Dunlop,* 146 Tex. 196, 205 S.W.2d 979, 983 (1947). But under this test, an argument may be made under almost any statute that public policy favors reviewing the unpreserved issue.

Moreover, under the dissent's analysis, if courts can review unpreserved jury-charge errors based on the Family Code expressing a public policy that the child's best interest is of primary concern, then courts can review any unpreserved error in parental-termination cases. In other words, a logical extension of the dissent's applying fundamental-error review here is that appellate courts must review any unpreserved error in a parental-termination case, because any error could affect the public's overarching concern with the child's best interest. Thus, fundamental-error review results in a slippery slope that, for all the reasons under the Eldridge factors adopted in Lassiter and discussed above, would cause more harm than good in termination cases.

**III. CONCLUSION**

The question the Court is asked to answer today is whether due process requires an appellate court to review unpreserved errors in the jury charge. The answer is "no." I cannot join the Court's opinion, because it declines to answer this question and instead relies on a procedural rule that gives no guidance for future cases. Moreover, the parents raised other issues the court of appeals did not consider, including a challenge to the factual sufficiency of the evidence. Accordingly, the court of appeals' judgment should be reversed and remanded to that court

for further proceedings.

---------

Notes:

[1] 57 S.W.3d 66.

[2] See TEX. FAM.CODE § 262.104.

[3] See TEX. FAM.CODE § 262.105.

[4] See TEX. FAM.CODE § 262.201.

[5] 57 S.W.3d at 72.

[6] Id. at 73.

[7] Id.

[8] Id. at 73-74.

[9] 57 S.W.3d at 75-76 (Gray, J., dissenting).

[10] Texas Rule of Civil Procedure 279, embodying these concepts, was promulgated in 1941. It essentially tracked the holding in Wichita Falls & Oklahoma Railway Co. v. Pepper, 134 Tex. 360, 135 S.W.2d 79 (1940).

[11] Rule 279 provides:

Upon appeal all independent grounds of recovery or of defense not conclusively established under the evidence and no element of which is submitted or requested are waived. When a ground of recovery or defense consists of more than one element, if one or more of such elements necessary to sustain such ground of recovery or defense, and necessarily referable thereto, are submitted to and found by the jury, and one or more of such elements are omitted from the charge, without request or objection, and there is factually sufficient evidence to support a finding thereon, the trial court, at the request of either party, may after notice and hearing and at any time before the judgment is rendered, make and file written findings on such omitted element or elements in support of the judgment. If no such written findings are made, such omitted element or elements shall be deemed found by the court in such manner as to support the judgment. A claim that the evidence was legally or factually insufficient to warrant the submission of any question may be made for the first time after verdict, regardless of whether the submission of such question was requested by the complainant.

TEX.R. CIV. P. 279.

[12] See id.

[13] Id.

[14] See Ramos v. Frito-Lay, Inc., 784 S.W.2d 667, 668 (Tex.1990) (holding that "[i]f the omitted element ... is

supported by some evidence, we must deem it found against Frito-Lay under Rule 279") (citing Payne v. Snyder, 661 S.W.2d 134, 142 (Tex.App.-Amarillo 1983, writ ref'd n.r.e.) and Freedom Homes of Texas, Inc. v. Dickinson, 598 S.W.2d 714, 717 (Tex.Civ.App.-Corpus Christi 1980, writ ref'd n.r.e.)).

[15] Santosky v. Kramer, 455 U.S. 745, 769, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); In re G.M., 596 S.W.2d 846, 847 (Tex.1980).

[16] See, e.g., State v. Addington, 588 S.W.2d 569, 570 (Tex.1979) (following Addington v. Texas, 441 U.S. 418, 431-32, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979)) (defining the standard in a case in which involuntary commitment of an individual to a state mental hospital was sought); Bentley v. Bunton, 94 S.W.3d 561, 597 (Tex.2002) (defining "clear and convincing evidence" in a defamation case); Huckabee v. Time Warner Entm't Co., 19 S.W.3d 413, 422 (Tex.2000) (same).

[17] See Act of June 14, 1983, 68th Leg., R.S., ch. 298, § 2, 1983 Tex. Gen. Laws 1554, 1555 (former TEX. FAM.CODE § 11.15) recodified by Act of April 20, 1995, 74th Leg., R.S., ch. 20, § 1, 1995 Tex. Gen. Laws 113, 212 (current version at TEX. FAM.CODE §§ 161.001(1), (2)).

[18] TEX. FAM.CODE § 101.007; In re C.H., 89 S.W.3d 17, 25 (Tex.2002) (discussing this Court's and the Legislature's use of the same definition of "clear and convincing evidence"); see also Bentley v. Bunton, 94 S.W.3d at 597 (defining "clear and convincing evidence" in a defamation case) (citing Huckabee v. Time Warner Entertainment Co., 19 S.W.3d at 422); State v. Addington, 588 S.W.2d at 570 (defining the standard in a case in which involuntary commitment of an individual to a state mental hospital was sought).

[19] See In re C.H., 89 S.W.3d at 25 n. 1; see also Bentley v. Bunton, 94 S.W.3d at 577.

[20] In re C.H., 89 S.W.3d at 25.

[21] Id.

[22] Id. at 26.

[23] Id. at 25.

[24] Id. (citations omitted).

[25] Formosa Plastics Corp. U.S.A. v. Presidio Eng'rs & Contractors, Inc., 960 S.W.2d 41, 48 (Tex.1998) (citing Continental Coffee Products Co. v. Cazarez, 937 S.W.2d 444, 450 (Tex.1996) and Browning-Ferris, Inc. v. Reyna, 865 S.W.2d 925, 928 (Tex.1993)).

[26] 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

[27] 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960).

[28] Jackson, 443 U.S. at 320, 99 S.Ct. 2781 (quoting Jacobellis v. Ohio, 378 U.S. 184, 202, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964) (Warren, C.J., dissenting)).

[29] Id.

[30] Id.

[31] Id. at 320 n. 14 (citations omitted).

[32] See generally Stewart v. Coalter, 48 F.3d 610, 613-14 (1st Cir.1995).

[33] This standard is similar, but not identical, to the formulation used by federal courts in criminal cases to determine whether the defendant is entitled to a directed verdict of acquittal under the reasonable doubt standard of proof. See generally Curley v. United States, 160 F.2d 229, 232-33 (D.C.Cir.1947); United States v. Taylor, 464 F.2d 240, 243 (2nd Cir.1972); see also 2A WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 467 (3rd ed.2000).

[34] See Southwest Key Program, Inc. v. Gil-Perez, 81 S.W.3d 269, 270 (Tex.2002) (rendering judgment against the plaintiff in a negligence case when there was legally insufficient evidence of proximate cause); Vista Chevrolet, Inc. v. Lewis, 709 S.W.2d 176, 176-77 (Tex.1986) (holding that rendition is proper when a no evidence point is sustained); see also In re D.T., 34 S.W.3d 625, 642 (Tex.App.-Fort Worth 2000, pet. denied) (partially rendering judgment for the parents in a termination case because the evidence was legally insufficient to support findings on two statutory grounds for termination).

[35] In re C.H., 89 S.W.3d 17, 25 (Tex.2002).

[36] Id.

[37] The parameters of legal and factual sufficiency that we have set forth for parental termination cases differ to some degree from those adopted by the Texas Court of Criminal Appeals for criminal cases. See, e.g., Vasquez v. State, 67 S.W.3d 229, 236 (Tex.Crim.App.2002).

[38] 89 S.W.3d 17 (Tex.2002).

[39] See W.B. v. Tex. Dep't of Protective & Regulatory Servs., 82 S.W.3d 739, 741 (Tex.App.-Corpus Christi 2002, no pet.); In re J.M.M., 80 S.W.3d 232, 240 (Tex.App.-Fort Worth 2002, pet. denied); In re A.L.S., 74 S.W.3d 173, 178 (Tex.App.-El Paso 2002, no pet.); In re R.G., 61 S.W.3d 661, 667 (Tex.App.-Waco 2001, no pet.); In re I.V., 61 S.W.3d 789, 794 (Tex.App.-Corpus Christi 2001, no pet.); In re L.S.R., 60 S.W.3d 376, 378 (Tex.App.-Fort Worth 2001, pet. denied); In re A.V., 57 S.W.3d 51, 61-62 (Tex.App.-Waco 2001, pet. granted); In re J.O.C., 47 S.W.3d 108, 113 (Tex.App.-Waco 2001, no pet.); In re A.P., 42 S.W.3d 248, 256 (Tex.App.-Waco 2001, no pet.); In re V.R.W., 41 S.W.3d 183, 190

(Tex.App.-Houston [14th Dist.] 2001, no pet.); In re J.M.T., 39 S.W.3d 234, 238 (Tex.App.-Waco 1999, no pet.); Leal v. Tex. Dep't of Protective & Regulatory Servs., 25 S.W.3d 315, 321 (Tex.App.-Austin 2000, no pet.) (stating that a heightened standard applies, but actually applying "more than a scintilla" standard); In re P.R., 994 S.W.2d 411, 415 (Tex.App.-Fort Worth 1999, pet. dism'd w.o.j.); In re J.N.R., 982 S.W.2d 137, 142 (Tex.App.-Houston [1st Dist.] 1998, no pet.); In re W.A.B., 979 S.W.2d 804, 806 (Tex.App.-Houston [14th Dist.] 1998, pet. denied); Hann v. Tex. Dep't of Protective & Regulatory Servs., 969 S.W.2d 77, 82 (Tex.App.-El Paso 1998, pet. denied); In re D.L.N., 958 S.W.2d 934, 936 (Tex.App.-Waco 1997, pet. denied); In re B.R., 950 S.W.2d 113, 119 (Tex.App.-El Paso 1997, no writ); Lucas v. Tex. Dep't of Protective & Regulatory Servs., 949 S.W.2d 500, 502 (Tex.App.-Waco 1997, writ denied); Edwards v. Tex. Dep't of Protective & Regulatory Servs., 946 S.W.2d 130, 137 (Tex.App.-El Paso 1997, no writ); Spurlock v. Tex. Dep't of Protective & Regulatory Servs., 904 S.W.2d 152, 155-56 (Tex.App.-Austin 1995, writ denied); In re J.F., 888 S.W.2d 140, 141 (Tex.App.-Tyler 1994, no writ); In re A.D.E., 880 S.W.2d 241, 245 (Tex.App.-Corpus Christi 1994, no writ); D.O. v. Tex. Dep't of Human Servs., 851 S.W.2d 351, 353 (Tex.App.-Austin 1993, no writ); In re L.R.M., 763 S.W.2d 64, 67 (Tex.App.-Fort Worth 1989, no writ).

[40] In re C.D.B., 94 S.W.3d 306, 308-09 (Tex.App.-Corpus Christi 2002, no pet. h.); In re W.C., 56 S.W.3d 863, 867-68 (Tex.App.-Houston [14th Dist.] 2001, no pet.); Rodriguez v. Tex. Dep't of Human Servs., 737 S.W.2d 25, 26-27 (Tex.App.-El Paso 1987, no writ); Subia v. Tex. Dep't of Human Servs., 750 S.W.2d 827, 831 (Tex.App.-El Paso 1988, no writ); Neiswander v. Bailey, 645 S.W.2d 835, 836 (Tex.App.-Dallas 1982, no writ).

[41] 89 S.W.3d at 25.

[42] Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 685-86, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989); Bose Corp. v. Consumers Union, 466 U.S. 485, 515-16, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984).

[43] Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 436, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001).

[44] 491 U.S. at 685-86, 109 S.Ct. 2678.

[45] 466 U.S. at 515-16, 104 S.Ct. 1949.

[46] 768 S.W.2d 273 (Tex.1989).

[47] 764 S.W.2d 220, 223 (Tex.1988).

[48] Garza, 768 S.W.2d at 275-76.

[49] Brown, 764 S.W.2d at 223.

[50] Garza, 768 S.W.2d at 276.

[51] U.S. CONST. amend. XIV, § 1.

[52] TEX. CONST. art. I, § 19.

[53] 455 U.S. 745, 753-54, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).

[54] Id. at 754, 102 S.Ct. 1388 (quoting Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)).

[55] Id.

[56] Id. at 758-59, 102 S.Ct. 1388.

[57] Id. at 759, 102 S.Ct. 1388.

[58] Id.

[59] Id. at 754, 102 S.Ct. 1388.

[60] In re C.H., 89 S.W.3d 17, 25 (Tex.2002).

[61] 455 U.S. at 754, 102 S.Ct. 1388.

[62] See 96 S.W.3d at 307 (SCHNEIDER, J., dissenting).

[63] See id. at 291 (HANKINSON, J., dissenting).

[64] See id. at 298 (HANKINSON, J., dissenting).

[65] See Ramos v. Frito-Lay, Inc., 784 S.W.2d 667, 668 (Tex.1990) (holding that "[i]f the omitted element ... is supported by some evidence, we must deem it found against Frito-Lay under Rule 279") (citing Payne v. Snyder, 661 S.W.2d 134, 142 (Tex.App.-Amarillo 1983, writ ref'd n.r.e.) and Freedom Homes of Texas, Inc. v. Dickinson, 598 S.W.2d 714, 717 (Tex.Civ.App.-Corpus Christi 1980, writ ref'd n.r.e.)).

[66] TEX.R. CIV. P. 279.

[67] Id.

[68] TEX.R. CIV. P. 299; see also Wisdom v. Smith, 146 Tex. 420, 209 S.W.2d 164, 166-67 (1948); Page v. Cent. Bank & Trust Co., 548 S.W.2d 802, 804 (Tex.Civ.App.-Eastland 1977, no writ); Gulf States Theatres of Tex. v. Hayes, 534 S.W.2d 406, 407 (Tex.Civ.App.-Beaumont 1976, writ ref'd n.r.e.); Go Int'l, Inc. v. Big-Tex Crude Oil Co., 531 S.W.2d 208, 210 (Tex.Civ.App.-Eastland 1975, no writ); Ives v. Watson, 521 S.W.2d 930, 934 (Tex.Civ.App.-Beaumont 1975, writ ref'd n.r.e.).

[69] From 1941 until 1988, Rule 279 provided that if "there is evidence to support a finding," omitted findings would be "deemed as found by the court in such manner as to support the judgment." When that rule was amended

in 1988, there was no indication in the record of the rules proceedings that revised Rule 279 was to meant to change the prerequisite of "evidence," which was maintained in Rule 299, to "factually sufficient" evidence with respect to deemed findings. But see Kilgarlin, Practicing Law in the "New Age": The 1988 Amendments to the Texas Rules of Civil Procedure, 19 TEX. TECH. L.REV. 881, 916 (1988).

[70] See TEX.R.APP. P. 33.1; see also TEX.R. CIV. P. 279.

[71] We express no opinion with regard to the holdings on this issue in the courts of appeals. See In re M.S., 73 S.W.3d 537, 542 (Tex.App.-Beaumont 2002, pet. granted) (holding that a sufficiency challenge must be preserved in the trial court in a parental termination case to be reviewed on appeal); In re G.C., 66 S.W.3d 517, 527 (Tex.App.-Fort Worth 2002, no pet. h.) (same); In re I.V., 61 S.W.3d 789, 794 (Tex.App.-Corpus Christi 2001, no pet.) (same); In re J.M.S., 43 S.W.3d 60, 62 (Tex.App.-Houston [1st Dist.] 2001, no pet.) (same); In re C.E.M., 64 S.W.3d 425, 428 (Tex.App.-Houston [1st Dist.] 2000, no pet.) (same); In re A.P., 42 S.W.3d 248, 256 (Tex.App.-Waco 2001, no pet.) (holding that a factual sufficiency complaint in a parental termination case may be reviewed even though it was not preserved in the trial court); In re A.V., 57 S.W.3d 51, 56 (Tex.App.-Waco 2001, pet. granted) (same).

[72] The jury was instructed only that "[t]he same ten or more of you must agree upon all of the answers made and to the entire verdict." As can be seen from the charge, quoted in Section II, supra, the only questions to be answered were whether the parent-child relationships should be terminated.

[73] TEX.R.APP. P. 44.1(a).

[74] The first order, a status hearing order, was signed on December 23, 1997. The next three orders, all permanency hearing orders, were signed on April 28, 1998, August 18, 1998, and December 15, 1998.

[75] The first order (signed in December 1997) did not order the mother to pay any child support, but ordered the father to pay $100. The remaining three orders directed each parent to pay $100.

[76] The parents had undergone individual psychological testing in 1997, before the children were removed, pursuant to the initial Child Safety Evaluation and Plan that CPS had implemented in April 1997. The psychiatric evaluations ordered after removal were to be new, additional evaluations that were distinct from the previous psychological testing.

[77] In re A.R.R., 61 S.W.3d 691, 695 (Tex.App.-Fort Worth 2001, pet. denied) (Sixth Amendment); In re B.B., 971 S.W.2d 160, 172 (Tex.App.-Beaumont 1998, pet. denied) (holding that the Sixth Amendment right does not extend to parental termination cases, although the parent contended the right to effective counsel stemmed from TEX. FAM.CODE § 107.013); Arteaga v. Tex. Dep't of Protective & Regulatory Servs., 924 S.W.2d 756, 762 (Tex.App.-Austin 1996, writ denied) (Sixth Amendment); In re J.F., 888 S.W.2d 140, 143 (Tex.App.-Tyler 1994, no writ) (Sixth Amendment); Krasniqi v. Dallas County Child Protective Servs. Unit of Tex. Dep't of Human Servs., 809 S.W.2d 927, 931 (Tex.App.-Dallas 1991, writ denied) (Due process and equal protection under the Fourteenth Amendment); Posner v. Dallas County Child Welfare Unit of the Tex. Dep't of Human Servs., 784 S.W.2d 585, 588 (Tex.App.-Eastland 1990, writ denied) (holding that "the constitutional right to effective assistance of counsel" does not extend to parental termination proceedings without identifying any specific constitutional provision); Howell v. Dallas County Child Welfare Unit, 710 S.W.2d 729, 734-35 (Tex.App.-Dallas 1986, writ ref'd n.r.e.).

[78] In re J.M.S., 43 S.W.3d 60, 62-63 (Tex.App.-Houston [1st Dist.] 2001, no pet.).

[79] TEX. FAM.CODE § 107.103.

[80] In re B.L.D., 56 S.W.3d 203, 211-12 (Tex.App.-Waco 2001, pet. granted).

[81] In re Oghenekevebe, 123 N.C.App. 434, 473 S.E.2d 393, 396 (Ct.App.1996) (basing right on a statute); In re A.R.S., 480 N.W.2d 888, 891 (Iowa 1992) (holding that the test for ineffective assistance of counsel in termination cases is generally the same as in criminal proceedings); In re Adoption of T.M.F., 392 Pa.Super. 598, 573 A.2d 1035, 1041 (1990) (holding that "[t]he constitutional rights in a termination proceeding ... are derived from the due process clause of the fourteenth amendment of the United States Constitution and not the sixth amendment"); In re Simon, 171 Mich.App. 443, 431 N.W.2d 71, 74 (Ct.App.1988) (basing right on a statute).

[82] 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

[83] Id. at 686, 104 S.Ct. 2052.

[84] Id. at 687, 104 S.Ct. 2052.

[85] Id. at 688, 104 S.Ct. 2052.

[86] Id. at 689, 104 S.Ct. 2052 (alteration in original).

[87] Id.

[88] Id.

[89] Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).

[90] Id. at 690, 104 S.Ct. 2052.

[91] Id.

[92] Id. at 691, 104 S.Ct. 2052.

[93] Id. at 693, 104 S.Ct. 2052.

[94] Id.

[95] Id.

[96] Id. at 694, 104 S.Ct. 2052.

[97] Id.

[98] Id. at 696, 104 S.Ct. 2052.

[99] Id.

[100] See TEX.R. CIV. P. 279.

[101] Strickland, 466 U.S. at 699, 104 S.Ct. 2052 (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).

[102] See United States v. Olano, 507 U.S. 725, 731-32, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (holding that under Federal Rule of Appellate Procedure 52(b), "plain error" in a jury charge may be considered by an appellate court although it was not brought to the attention of the trial court); Pondexter v. State, 942 S.W.2d 577, 588 (Tex.Crim.App.1996); Green v. State, 934 S.W.2d 92, 108 (Tex.Crim.App.1996); Ransom v. State, 920 S.W.2d 288, 303 (Tex.Crim.App.1994); Jackson v. State, 898 S.W.2d 896, 899 (Tex.Crim.App.1995).

[103] See State v. Santana, 444 S.W.2d 614, 615 (Tex.1969) (holding that a jury charge submitting preponderance of the evidence as the burden of proof was error that could be raised for the first time on appeal), vacated on other grounds, 397 U.S. 596, 90 S.Ct. 1350, 25 L.Ed.2d 594 (1970); R.A.M. v. State, 599 S.W.2d 841, 844-45 (Tex.Civ.App.-San Antonio 1980, no writ).

[104] 802 S.W.2d 647 (Tex.1990).

[105] Strickland, 466 U.S. at 690, 104 S.Ct. 2052.

[106] 455 U.S. 745, 769, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).

[1] See, e.g., Hill v. Sherwood, 488 So.2d 1357, 1359 (Ala.1986) (court may consider unpreserved error in closing argument only when so grossly improper and highly prejudicial so as to be beyond corrective action by trial court); Holiday Inns of Am., Inc. v. Peck, 520 P.2d 87, 90 (Alaska 1974) (court will consider " 'plain error' that is likely to result in a miscarriage of justice"); Hale v. Morgan, 22 Cal.3d 388, 149 Cal.Rptr. 375, 584 P.2d 512, 516 (1978) (consideration of points not raised below permitted for important matters of public policy in which pure question of law is presented); Scheer v. Cromwell, 158 Colo. 427, 407 P.2d 344, 345 (1965) (in rare cases, court will notice manifest error); Collins v. Colonial Penn Ins. Co., 257 Conn. 718, 778 A.2d 899, 906 n. 14 (2001) (court will consider plain error when it is in the interest of the public welfare or justice between the parties); Wolhar v. General Motors Corp., 734 A.2d 161, 161, 1999 WL 485435 (Del.1999) (plain error is that which jeopardizes the fairness and integrity of the trial process); Newell v. District of Columbia, 741 A.2d 28, 34 (D.C.1999) (reversal for plain error when apparent from the face of the record that a miscarriage of justice has occurred); Murphy v. International Robotic Sys., 766 So.2d 1010, 1027 (Fla.2000) (court can consider unobjected-to, improper closing argument only when raised in a motion for new trial although rules require objection at trial); Foskey v. Foskey, 257 Ga. 736, 363 S.E.2d 547, 548 (1988) (listing types of cases in which court will reverse judgment based on unpreserved jury-charge error); Trucking Co. v. Board of Water Supply, 97 Hawai'i 450, 40 P.3d 73, 81 (2002) (appellate court has discretion to notice plain error in civil cases when justice requires); Hecla Mining Co. v. Star-Morning Mining Co., 122 Idaho 778, 839 P.2d 1192, 1197 (1992) (recognizing plain or fundamental error); Gillespie v. Chrysler Motors Corp., 135 Ill.2d 363, 142 Ill.Dec. 777, 553 N.E.2d 291, 297 (1990) (plain error considered when litigant cannot receive a fair trial and judicial process would deteriorate); Manns v. Skolnik, 666 N.E.2d 1236, 1241 (Ind.Ct.App.1996) (court will consider error that is substantial blatant violation of principles rendering the trial unfair); Berg v. Zummo, 786 So.2d 708, 716 n. 5 (La.2001) (court will consider "plain and fundamental error" in jury instructions); Reno v. Townsend, 704 A.2d 309, 311 (Me.1997) (obvious error affects fairness of proceedings); Squibb v. R.M. Bradley & Co., 40 Mass.App.Ct. 914, 661 N.E.2d 1352, 1353 (1996) (plain error is that which results in manifest injustice); Napier v. Jacobs, 429 Mich. 222, 414 N.W.2d 862, 871 (1987) (plain error is that which results in manifest miscarriage of justice); Alpha Gulf Coast, Inc. v. Jackson, 801 So.2d 709, 727 (Miss.2001) (to reverse for plain error, court must find error and harm); Stanziale v. Musick, 370 S.W.2d 261, 269 (Mo.1963) (court will reverse for manifest injustice or miscarriage of justice); State ex. rel State Comp. Mut. Ins. Fund v. Berg, 279 Mont. 161, 927 P.2d 975, 982 (1996) (plain-error doctrine permits review of error that results in substantial injustice); Barks v. Cosgriff Co., 247 Neb. 660, 529 N.W.2d 749, 754 (1995) (court will reach the merits of plain error in jury charge); Sunrise Manor Town Protective Ass'n v. City of N. Las Vegas, 91 Nev. 713, 541 P.2d 1102, 1104 (1975) (plain error is so substantial as to result in injustice); Fertile ex. rel. Fertile v. St. Michael's Med. Ctr., 169 N.J. 481, 779 A.2d 1078, 1085 (2001) (the standard for plain error is whether error had clear capacity for producing unjust result); Chavez v. Board of County Comm'rs., 130 N.M. 753, 31 P.3d 1027, 1039 (Ct.App.2001) (fundamental error applies, for example, when there is no jurisdiction or issue is a matter of public interest affecting large number of people); Elezaj v. P.J. Carlin Constr. Co., 89 N.Y.2d 992, 657 N.Y.S.2d 399, 679 N.E.2d 638, 638

(1997) (only intermediate appellate court has discretion to review unpreserved error); Rau v. Kirschenman, 208 N.W.2d 1, 9 (N.D.1973)(recognizing exception to preservation rules for fundamental error that is highly prejudicial) (on petition for rehearing); Goldfuss v. Davidson, 79 Ohio St.3d 116, 679 N.E.2d 1099, 1103 (1997) (reversing plain error when, if uncorrected, it would undermine public confidence in judiciary); Sullivan v. Forty-Second West Corp., 961 P.2d 801, 803 (Okla.1998) (fundamental error has a substantial effect on rights of one or more of the parties); Hotelling v. Walther, 174 Or. 381, 148 P.2d 933, 934 (1944) (plain error is error apparent on the record); Wuest ex. rel. Carver v. McKennan Hosp., 619 N.W.2d 682, 691 (S.D.2000) (errors must be obvious and substantial); Salt Lake City v. Ohms, 881 P.2d 844, 847 (Utah 1994) (court can review unpreserved error when exceptional circumstances exist); In re Maher, 132 Vt. 560, 326 A.2d 142, 144 (1974) (court will review errors so grave and serious as to strike to the heart of constitutional rights); Conner v. Universal Utils., 105 Wash.2d 168, 712 P.2d 849, 851 (1986) (court may review unpreserved issue regarding denial of procedural due process on appeal); Sheetz, Inc. v. Bowles Rice McDavid Graff & Love, PLLC, 209 W.Va. 318, 547 S.E.2d 256, 273 (2001) (error must be plain, affect substantial rights, and seriously affect fairness of judicial proceedings); Hatch v. State Farm Fire & Cas. Co., 930 P.2d 382, 391 (Wyo.1997) (court must be able to discern error from record that affects substantial rights).

[1] The Family Service Plan is the trial court's order specifying the actions the parents had to take for the Department to return the children to their custody. See TEX. FAM.CODE § 161.001(1)( o).

---------

EXHIBIT E

Page 76

261 S.W.3d 76 (Tex.App.-Houston [14 Dist.] 2008)

In the Interest of A.S., D.S., and L.A.S.

No. 14-07-00140-CV.

Court of Appeals of Texas, Fourteenth District, Houston.

March 4, 2008

Rehearing Overruled Aug. 26, 2008.

Page 77

[Copyrighted Material Omitted]

Page 78

[Copyrighted Material Omitted]

Page 79

Vangie Deleon, El Campo, William M. Thursland, William B. Connolly, Houston, for appellant.

Sandra D. Hachem, Houston, for appellee.

Panel consists of Justices YATES, FOWLER, and GUZMAN.

## OPINION

WANDA McKEE FOWLER, Justice.

This is an appeal from a judgment terminating appellants' parental rights to their minor children. In five issues each, appellants challenge the legal and factual sufficiency of the evidence underlying the findings in the termination order and the appointment of appellee Department of Family & Protective Services (" the Department" ) as sole managing conservator. We reverse and render in part, and reverse and remand in part.

### I. Factual and Procedural Background

Veronica is the mother of A.S., D.S., and L.A.S.[1] Alan is the father of A.S. and D.S.[2] On March 10, 2006, a day after the

Page 80

birth of L.A.S., the Department received information that Veronica and L.A.S. had tested positive for marijuana. The hospital social worker who reported L.A.S.'s positive test result for marijuana to the Department stated that L.A.S. " was doing fine and not showing any signs of health problems." On March 13, 2006, the trial court

named the Department as emergency temporary managing conservator of A.S., D.S., and L.A.S. At this time, A.S. was 3 years old, D.S. was 2 years old, and L.A.S. was 3 days old.

Veronica's childhood was traumatic due to domestic violence and her parents' alcohol and drug use. She became pregnant with L.P. when she was 13 years old.[3] After L.P. was born, Veronica met and married Martin De Leon (" De Leon" ). Veronica remained married to De Leon for approximately one year during which time De Leon physically abused her. When De Leon tried to harm L.P., Veronica left with L.P. and went to her mother's home. In 2001, she spent three months at a women's shelter where she obtained domestic violence counseling.

In January 2002, Veronica began a relationship with Alan. In October 2002, Veronica gave birth to their son, A.S. In October 2003, their second son, D.S., was born. From 2002 to 2005, Veronica, Alan, L.P., A.S., and D.S. lived together in Beaumont. During this time, three referrals were made to Child Protective Services (" CPS" ).[4] In April 2003, CPS received a referral alleging neglectful supervision of L.P. by Veronica and Alan. The report, however, was apparently never validated because the family moved. In July 2004, Alan spanked L.P., who was four years old at the time, for wetting his pants. Though the spanking left no marks or bruises, Veronica went to a shelter with L.P. where she spoke with a police officer and a CPS officer. After this incident, Veronica spoke with Alan about the spanking. Their relationship was not abusive at that time and Alan had never inappropriately disciplined A.S. or D.S.

In 2005, after Veronica and Alan's home in Beaumont was destroyed by Hurricane Rita, the family moved to Houston and stayed with Alan's mother. According to the 4 C's report, Veronica filed a police complaint that Alan had again over-disciplined L.P. The Department investigated the complaint and advised Veronica to move into a shelter. Veronica stayed in a shelter for two or three weeks and only returned home after Alan convinced her that he would never again harm L.P. or any of their children.[5] Veronica later decided to send L.P. to live with his great-aunt in El Campo because the aunt loved L.P. and wanted to care for him, not because she feared that Alan would harm him. During this time, Veronica was pregnant with L.A.S. She saw a gynecologist in Beaumont while pregnant with L.A.S. but was unable to obtain pre-natal care once the family relocated to Houston.[6]

Page 81

Veronica testified that Alan pushed her and pulled her hair on two occasions early in their relationship, but she denied that he ever struck her. While it is unclear when these incidents occurred, the record indicates that

the children did not witness them. On occasion, she and Alan raised their voices while arguing, and she said it is possible that the children overheard these arguments. The only other evidence of domestic violence was from the Department's case worker, Kateika Bonner (" Bonner" ), who testified that Veronica told her that she and Alan had " got[ten] into it one night."

In April 2006, following removal of the children from the family home, the Department prepared a family service plan (" the plan" ) with a long-term goal of family reunification. Bonner met with Veronica to discuss the steps that she needed to complete to be reunified with her children.[7] Veronica began immediately working toward completion of the requirements. She visited A.S. and D.S. every two weeks and L.A.S. weekly. Bonner testified that the visits went well and that Veronica bonded with all three children during these visits. Veronica wrote often to " her child with whom she had contact." [8] Alan visited his children once but Bonner was unable to observe the visit because she was in a training class at the time.

In June 2006, Veronica and Alan were indicted on charges of aggravated robbery. The Department subsequently placed the children in foster homes.[9] Bonner spoke with several of Veronica and Alan's relatives regarding placement of the children, including Veronica's mother (" Ms. Pena" ) and Alan's mother. According to Bonner, her supervisor told her that placing the children with Ms. Pena would be problematic because of her criminal history.[10] Placement of the children with the paternal grandmother was not an option because the grandmother's boyfriend did not have a social security number. However, the Department did not conduct a home study on either grandmother to determine whether placement of the children would be otherwise appropriate.

A bench trial was held on January 18, 2007.[11] At the time of trial, the children remained in foster care and no prospective adoptive homes had been identified. In closing arguments, both Veronica's attorney and the guardian ad litem requested that the trial court order the Department to complete a home study on Ms. Pena. The guardian ad litem informed the trial

**Page 82**

court that she did not believe the Department had met its evidentiary burden supporting termination of Veronica and Alan's parental rights. Upon recessing the proceedings for one week, the trial court directed the Department to conduct a home study on Ms. Pena. However, no home study was ever conducted. On January 25, 2007, the trial court terminated Veronica's parental rights to A.S., D.S., and L.A.S., and Alan's rights to A.S. and D.S. The court also appointed the Department as sole managing conservator of the children.

**II. Standard of Review**

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex.1985). Due to the severity and permanency of the termination of parental rights, the burden of proof at trial is heightened to the clear and convincing standard. *See* TEX. FAM.CODE § 161.001; *In re J.F.C.,* 96 S.W.3d 256, 263 (Tex.2002). " ' Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM.CODE § 101.007; *In re J.F.C.,* 96 S.W.3d at 264.

When reviewing factual findings required to be made by clear and convincing evidence, we apply a standard of review that reflects this burden of proof. *In re S.M.L.,* 171 S.W.3d 472, 476 (Tex.App.-Houston [14th Dist.] 2005, no pet.). When reviewing the legal sufficiency of the evidence, we consider all of the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *Id.* (citing *In re J.F.C.,* 96 S.W.3d at 266). In doing so, we assume the factfinder resolved disputed facts in favor of the finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* However, because of the heightened standard, we must also be mindful of any *undisputed* evidence contrary to the finding and consider that evidence in our analysis. *In re J.F.C.,* 96 S.W.3d at 266 (" Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence." ).

Under a factual sufficiency review, we also must determine whether a factfinder could reasonably form a firm belief or conviction about the truth of the allegations. *In re S.M.L.,* 171 S.W.3d at 476. When reviewing a factual sufficiency challenge, the analysis is somewhat different in that we must consider all of the evidence equally, both disputed and undisputed. *In re J.F.C.,* 96 S.W.3d at 266. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not have reasonably formed a firm belief or conviction, then the evidence is factually insufficient. *In re S.M.L.,* 171 S.W.3d at 476 (citing *In re J.F.C.,* 96 S.W.3d at 266).

**III. Analysis**

In order to terminate parental rights in Texas, the State bears the burden to prove the following: (1) the parent committed one or more acts specifically listed in section 161.001(1) of the Texas Family Code as grounds for termination; and (2) termination is in the child's best interest. *See* TEX. FAM.CODE § 161.001; *In re J.L.,* 163 S.W.3d 79, 84 (Tex.2005); *In re U.P.,* 105 S.W.3d 222, 229 (Tex.App.-Houston [14th Dist.] 2003, pet. denied).

Here, the trial court found that termination was warranted under three separate statutory grounds

Page 83

and that termination would be in the children's best interest. The trial court also appointed the Department as sole managing conservator of appellants' children. In their first three issues, Veronica and Alan challenge the legal and factual sufficiency of the evidence of the statutory grounds for termination. In their fourth issue, they challenge the legal and factual sufficiency of the evidence that termination is in the children's best interest. In their fifth issue, Veronica and Alan challenge the appointment of the Department as sole managing conservator of their children.

### A. Statutory Grounds for Termination

The Department sought to terminate appellants' parental rights under subsections (D), (E), and (N) of section 161.001 of the Family Code, which provide for termination if the trial court finds by clear and convincing evidence that the parent has done the following:

(D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;

(E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child; [or]

....

(N) constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services or an authorized agency for not less than six months, and:

(i) the department or authorized agency has made reasonable efforts to return the child to the parent;

(ii) the parent has not regularly visited or maintained significant contact with the child; and

(iii) the parent has demonstrated an inability to provide the child with a safe environment.

TEX. FAM.CODE § 161.001(1)(D), (E) & (N).

Subsections (D) and (E) both focus on endangerment, but they differ with regard to the source and proof of endangerment. *In re S.M.L.*, 171 S.W.3d at 477. Subsection (D) concerns the child's living environment, rather than the parent's conduct, though parental conduct is certainly relevant to the child's environment. *Id; In re J.T.G.*, 121 S.W.3d 117, 125 (Tex.App.-Fort Worth 2003, no pet.). Although the parent need not have certain knowledge that an actual injury is occurring, the parent must at least be aware of the potential for danger to the child in such an environment

and must have disregarded that risk. *In re C.L.C.*, 119 S.W.3d 382, 392 (Tex.App.-Tyler 2003, no pet.). Living conditions that are merely "less-than-ideal" do not support a finding under this section. *Texas Dep't of Human Svcs. v. Boyd*, 727 S.W.2d 531, 533 (Tex.1987). Under subsection (E), the cause of the endangerment must be the direct result of the parent's conduct and must be the result of a conscious course of conduct rather than a single act or omission. *In re J.T.G.*, 121 S.W.3d at 125. Endangerment can be exhibited by both actions and failures to act. *In re U.P.*, 105 S.W.3d at 233. We look first at subsection (D).

### 1. Subsection (D)

#### (a) Veronica

In her first issue, Veronica argues that the evidence is legally and factually insufficient to terminate her parental rights under subsection (D) because (1) the Department offered no evidence of the environment in which A.S. and D.S. lived; (2)

Page 84

she never had custody of L.A.S. and, therefore, could not have exposed him to an environment that endangered his physical or emotional well-being; and (3) the evidence of domestic violence was insufficient to show that she knowingly placed her children in an endangering environment.

The Department introduced no evidence of the actual physical surroundings or conditions of the children's environment. It is also undisputed that the Department took L.A.S. into custody shortly after he was born because he tested positive for marijuana. However, the Department argues that termination is supported by the following evidence: (1) prior to her relationship with Alan, Veronica lived with an abusive husband, thereby exposing her son, L.P., to an abusive environment; (2) Alan pushed Veronica and pulled her hair on two occasions; (3) Alan over-disciplined L.P. twice; and (4) Veronica engaged in criminal activity after the Department took her children into custody.

First, the evidence of domestic violence committed by Veronica's first husband toward Veronica and L.P. does not support the termination of Veronica's parental rights to A.S., D.S., and L.A.S. under subsection (D). The abuse directed toward Veronica and L.P. by her first husband, with whom she no longer lived, occurred before A.S., D.S., and L.A.S. were born, and in a living environment to which they were never exposed.

The Department next contends that evidence that Alan pushed Veronica and pulled her hair on two occasions, and over-disciplined L.P. twice, demonstrates that Veronica provided an unsafe home environment. Abusive or violent conduct by a parent or other resident of a child's home may produce an environment that

endangers the physical or emotional well-being of a child. *In re D.C.,* 128 S.W.3d 707, 715 (Tex.App.-Fort Worth 2004, no pet.); *In re C.L.C.,* 119 S.W.3d at 392-93. With regard to Alan's conduct toward Veronica, the evidence was undisputed that the incidents did not occur when the children were around and that the children never witnessed Alan's anger toward her. Regarding the occasions when Alan disciplined L.P., the first instance involved spanking the child after he wet his pants. Veronica testified that the spanking left no marks. The second instance occurred when Alan over-disciplined L.P. due to stress over losing the family home during Hurricane Rita. The record is silent, however, as to how Alan disciplined him or whether A.S. and D.S. witnessed the discipline. Veronica went to a shelter after the first incident and later spoke to Alan about the spanking. Following the second incident, Veronica stayed in a shelter for several weeks and only returned home after Alan assured her that he would never again harm L.P. or any of their children. There is no evidence that any subsequent incidents occurred. Therefore, even assuming Alan's behavior was abusive and occurred in front of the children, Veronica took responsive action to protect A.S. and D.S. by taking them out of the environment.

Third, the Department also asserts that Veronica's actual and alleged criminal activity after her children were taken into custody demonstrates that she placed them in an endangering environment. Specifically, the Department refers to one week in April 2006 during which Veronica was incarcerated for hindering the apprehension of a felon, and to her indictment for aggravated robbery and subsequent incarceration in June 2006.

Imprisonment of a parent, standing alone, does not constitute endangerment of a child's emotional or physical well-being.

**Page 85**

*In re S.M.L.,* 171 S.W.3d at 478. Nonetheless, imprisonment is a factor the trial court may consider. *See Boyd,* 727 S.W.2d at 533; *In re S.M.L.,* 171 S.W.3d at 478. As for her indictment, Veronica had not been convicted of any crime at the time of trial and, therefore, what confinement she might serve, if any, is speculative. *See In re D.T.,* 34 S.W.3d 625, 638-39 (Tex.App.-Fort Worth 2000, pet. denied) (finding appellant's pending charges in other states amounted only to " possibilities" as to her future incarceration).

We find the evidence legally and factually insufficient to support terminating Veronica's parental rights under section 161.001(1)(D) of the Family Code. Accordingly, Veronica's first point of error is sustained.

**(b) Alan**

In his first issue, Alan contends that the evidence is legally and factually insufficient to support termination of

his parental rights under subsection (D) because the record is silent as to (1) the physical environment in which A.S. and D.S. lived prior to being taken into custody; (2) how the children's environment caused their physical and emotional well-being to be endangered; and (3) his acts or omissions which allegedly placed the children in a dangerous environment.

As previously noted, the Department did not present any evidence of the actual physical surroundings of the children's environment prior to their being taken into custody. In support of a finding under subsection (D), the Department proffered evidence that Alan pushed Veronica and pulled her hair on two occasions and over-disciplined L.P. twice. However, as discussed above, no evidence showed that A.S. and D.S. witnessed any of these events. We do not find such evidence to be of a clear and convincing nature so as to support a finding of endangerment under subsection (D).

The Department also contends that Alan's criminal activity before and after the births of his children supports termination of his parental rights under subsection (D). Specifically, the Department refers to his probationary status for a burglary offense committed in September 2001 and his indictment on charges of aggravated robbery in June 2006. Several Texas courts have recognized that the possibility of a parent's incarceration can negatively impact a child's living environment and well-being and may be sufficient to show endangerment. *In re S.M.L.,* 171 S.W.3d at 479 (" When parents are incarcerated, they are absent from the child's daily life and are unable to provide support, and when parents like appellant repeatedly commit criminal acts that subject them to the possibility of incarceration, that can negatively impact a child's living environment and emotional well-being." ); *In re C.L.C.,* 119 S.W.3d at 393; *In re S.D.,* 980 S.W.2d 758, 763 (Tex.App.-San Antonio 1998, pet. denied). Alan's criminal acts, however, do not support a finding under subsection (D) for several reasons. First, Alan was given probation for his burglary conviction, not imprisonment. Second, as to his indictment on charges of aggravated robbery, although he was incarcerated while awaiting trial on that charge, there was no conviction at the time of the termination hearing and, thus, the length of imprisonment, if any, was speculative. *See In re D.T.,* 34 S.W.3d at 638-39. In the absence of other endangering conduct, Alan's incarceration while awaiting trial is insufficient to support termination under subsection (D). *In re S.M.L.,* 171 S.W.3d at 478 (noting imprisonment, alone, does not suffice to support termination under subsection (D)).

**Page 86**

We find the evidence legally insufficient to support the termination of Alan's parental rights under section 161.001(1)(D) of the Family Code. Accordingly, his first

issue is sustained.

### 2. Subsection (E)

#### (a) Veronica

In her second issue, Veronica argues that the evidence is legally and factually insufficient to terminate her parental rights under subsection (E) because (1) the evidence of domestic violence is insufficient to demonstrate that she engaged in conduct that endangered her children's well-being; and (2) her use of marijuana while pregnant with L.A.S. does not constitute the requisite continuing course of conduct.

The Department argues that evidence of Veronica's abuse at the hands of her former husband and Alan, in addition to her criminal activity after her children were taken into custody, support termination under subsection (E). Our previous discussion of this evidence under subsection (D) is applicable here. First, the abuse directed toward Veronica and L.P. by her former husband occurred before A.S., D.S., and L.A.S. were born and, therefore, does not demonstrate that Veronica knowingly placed her children with someone whose conduct endangered their well-being. Second, as to the evidence that Alan pushed her and pulled her hair on two occasions, it is uncontroverted that the children did not witness this conduct. Moreover, we do not find that these two incidents, as reflected in this record, constitute the type of continuing course of conduct contemplated by the statute. Finally, Veronica's incarceration while awaiting trial, standing alone, is insufficient to support termination of parental rights. *In re S.M.L.,* 171 S.W.3d at 478.

The Department also contends that Veronica's use of marijuana during her pregnancy with L.A.S. endangered him as well as her older children because her conduct could have impaired her judgment and exposed her to incarceration. The use of illegal drugs during pregnancy may be considered endangering conduct that supports terminating parental rights. *In re J.T.G.,* 121 S.W.3d at 125. Veronica asserts, however, that a single use of marijuana does not constitute a " voluntary, deliberate, and conscious course of conduct" sufficient to support a termination finding under subsection (E).[12] We agree.

While unquestionably, an exercise of poor judgment, Veronica's use of marijuana on a single occasion, standing alone, does not rise to the level of a conscious course of conduct. *See Ruiz v. Texas Dep't of Family and Protective Svcs.,* 212 S.W.3d 804, 818 (Tex.App.-Houston [1st Dist.] 2006, no pet.)(noting termination under subsection (E) must be based on more than single act or omission); *In re S.M.L.,* 171 S.W.3d at 477 (same); *In re J.T.G.,* 121 S.W.3d at 125 (same). According to the 4 C's report, the hospital social worker who first reported L.A.S.'s positive test result for marijuana to the Department also stated that L.A.S. " was

doing fine and not showing any signs of health problems." Further, Veronica testified

that she smoked marijuana only in an attempt to alleviate severe back pain and after her friend assured her that it would not harm her unborn child, and that she regretted it afterwards.[13] While the trial court could have chosen to disbelieve this testimony, we are mindful that under a factual sufficiency review we must consider all of the evidence equally. *See In re J.F.C.,* 96 S.W.3d at 266. Moreover, the undisputed evidence that Veronica took pre-natal vitamins during her pregnancy undermines the argument that she consciously engaged in a course of conduct that endangered her children's well-being.

We find the evidence both legally and factually insufficient to support termination of Veronica's parental rights under section 161.001(1)(E) of the Family Code. Accordingly, her second issue is also sustained.

#### (b) Alan

In his second issue, Alan argues that the evidence is legally and factually insufficient to support termination under subsection (E) because (1) spanking L.P. does not constitute endangering conduct; and (2) he had no knowledge of Veronica's use of marijuana during her pregnancy and, therefore, did not knowingly place his child with someone who engaged in endangering conduct.[14] In support of termination under subsection (E), the Department argues that Alan's physical abuse of Veronica and L.P. as well as his criminal activity constitute evidence of a course of conduct that endangered the physical and emotional well-being of his children.

As discussed above, we do not find that Alan's conduct toward Veronica, as reflected in this record, constitutes the type of continuing course of conduct required under this section. Furthermore, the undisputed evidence reflects that the children did not witness Alan's conduct. The Department also urges us to consider Bonner's testimony that Veronica told her that she and Alan had " got[ten] into it one night." This conduct, however, does not demonstrate that Alan engaged in conduct that endangered his children's well-being. Bonner admitted on cross-examination that she did not know how Veronica and Alan " got into it," or whether the incident involved a physical altercation. Moreover, this single incident does not demonstrate the type of conduct contemplated by the statute.

The Department also contends that the two occasions when Alan over-disciplined L.P. support the trial court's finding of termination under subsection (E). The Department does not contend, nor does the record reflect, that Alan inappropriately

disciplined A.S. or D.S. Rather, it is the Department's position that by excessively disciplining L.P., Alan engaged in conduct that endangered A.S. and D.S.'s well-being. The first incident occurred in 2004 when Alan spanked L.P. after the child wet his pants. Veronica testified that the spanking left no marks and no criminal complaint appears to have been filed. This court has held that infrequent spankings of a child that leave " marks" or visible bruises 24 hours after the spanking do not constitute sufficient evidence to demonstrate that a parent has engaged in conduct that endangered a child's physical or emotional well-being. *In re J.A.J.,* 225 S.W.3d 621, 629-31 (Tex.App.-Houston [14th Dist.] 2006), *aff'd in part, rev'd in part on other grounds,* 243 S.W.3d 611 (Tex.2007). Here, the record shows that Alan spanked L.P. on one occasion, and Veronica testified that the spanking did not leave any marks or bruises. If the spanking would be insufficient evidence of endangering conduct toward L.P., it is similarly insufficient, if not more so, as to A.S. or D.S.

According to the 4 C's report, the second incident occurred in 2005 when Alan over-disciplined L.P. due to his stress over losing the family home during Hurricane Rita. There is, however, no evidence as to how Alan disciplined him. We also find no evidence to indicate whether A.S. or D.S. witnessed the discipline. Although the decision to terminate the parent-child relationship under subsection (E) does not require that the conduct be directed toward the child, it does require that it be committed in the presence of the child. *See Ziegler v. Tarrant Co. Child Welfare Unit,* 680 S.W.2d 674, 678 (Tex.App.-Fort Worth 1984, writ ref'd n.r.e.); *see also In re U.P.,* 105 S.W.3d at 233 (noting that parent's conduct need not be directed at child or that child actually be injured to support finding of endangerment).

The Department also argues that Alan's probationary status in 2001 and his indictment on charges of aggravated robbery in 2006 constitute conduct sufficient to support termination under this section. We disagree for several reasons. First, Alan was given probation for his burglary conviction, not incarceration. Second, he was indicted on charges of aggravated robbery, not convicted, and, thus, confinement, if any, is speculative. *See In re D.T.,* 34 S.W.3d at 638-39. Third, absent other evidence of endangering conduct, mere imprisonment will not constitute conduct which endangers the emotional or physical well-being of a child. *See Boyd,* 727 S.W.2d at 534.

Finally, we also reject the Department's argument that, by engaging in conduct he knew could result in his imprisonment and separation from his children, Alan engaged in a voluntary, deliberate, and conscious course of conduct that endangered his children. To accept such a premise would effectively nullify the longstanding rule against terminating the parental relationship based solely on imprisonment. *See In re D.T.,* 34 S.W.3d at 635.

We find the evidence legally and factually insufficient to support termination of Alan's parental rights under section 161.001(1)(E). Accordingly, his second issue is sustained.

### 3. Subsection (N)

In their third issue, Veronica and Alan contend that the evidence is legally and factually insufficient to support the termination of parental rights under section 161.001(1)(N) of the Family Code. Under this ground, the Department must prove that (1) the parent has constructively abandoned the child who has been in the permanent or temporary managing conservatorship

of the Department or an authorized agency for not less than six months; (2) the department or authorized agency has made reasonable efforts to return the child to the parent; (3) the parent has not regularly visited or maintained significant contact with the child; and (4) the parent has demonstrated an inability to provide the child with a safe environment. TEX. FAM. CODE § 161.001(1)(N). If there is legally insufficient evidence of any of the four elements, the complaint will be sustained. *See In re D.T.,* 34 S.W.3d at 633. Veronica and Alan argue that the Department has failed to satisfy the third and fourth elements of subsection (N). To determine whether termination was warranted under this provision, we turn to the record before us.

#### (a) Veronica

After the Department took her children into custody, Veronica visited A.S. and D.S. every two weeks and L.A.S. weekly until she was jailed in June 2006. Bonner testified that the visits went well and that Veronica was bonding with all three of them during their visits. After she was incarcerated, however, she was no longer able to visit them due to the seriousness of the offense with which she was charged. Veronica testified that she wrote often to her child with whom she had contact. Bonner testified that Veronica did not contact her during her incarceration, and there is no evidence that she had any contact with A.S., D.S., or L.A.S. during the six-month period preceding trial. Veronica provided the Department with a list of her sisters who could care for her children during her incarceration. She also asked that her mother be permitted to care for her children, but the Department would not approve the placement due to Ms. Pena's criminal history. At the conclusion of the proceedings on January 18, 2007, the trial court instructed the Department to perform a home study on the maternal grandmother, but it never conducted one.

In light of the entire record, we do not believe that the Department has satisfied its burden under subsection (N) as to Veronica. We find the evidence factually

insufficient to enable a reasonable factfinder to form a firm belief or conviction that Veronica did not regularly visit or maintain significant contact with her children. We also find the evidence to be factually insufficient to show that Veronica demonstrated an inability to provide her children with a safe environment. Although the Department may have been justifiably concerned at the outset as to whether Ms. Pena would prove an appropriate care provider for her grandchildren in light of her criminal history, it conducted no home study on her, even after being directed to do so by the trial court. The record is also silent as to why no home study was performed on the maternal aunts other than the one with whom A.S. and D.S. spent one month. *In re D.S.A.,* 113 S.W.3d 567, 573 (Tex.App.-Amarillo 2003, no pet.)(noting that incarcerated parent can provide safe environment for child through identification of friend, relative, or spouse as care provider). The Department had the burden to satisfy all of the elements under subsection (N) by clear and convincing evidence. We conclude that it has not done so. Accordingly, Veronica's third issue is sustained.

### (b) Alan

Regarding Alan, the record reflects that during the three-month period between the time the Department took custody of his children in March 2006 until he was incarcerated in June 2006, Alan visited his children only once. Bonner testified that she was in a training session during this one visit and was unable to observe Alan's interaction with his children. She also testified that Alan's brother came often to visit the children. No

**Page 90**

evidence indicates whether Alan made any attempts to communicate with his children after he was incarcerated. Bonner testified that she spoke with Alan's mother and sister regarding alternative placement of the children. The Department ruled out Alan's mother after she was unable to provide a social security number for her boyfriend, and it did not conduct a home study on her. The record is silent as to whether Alan's sister or brother were considered for placement.

We find the evidence sufficient to support the trial court's finding that Alan did not attempt to visit his children regularly or maintain significant contact with them. Other than one visit during the three-month period after they were placed in the Department's custody and before he was incarcerated, the record does not reflect any other attempt by Alan to contact them. We find that the Department has satisfied its burden with regard to the third element.

However, we do not believe the Department has met its burden for the fourth element-that the parent has demonstrated an inability to provide the child with a safe environment. Although Bonner spoke with Alan's sister about placing the children with her, the record does not

reflect whether the Department rejected her as a potential placement and, if so, why. There is also no mention whether the Department considered Alan's brother as a relative placement. Further, although the Department initially ruled out the paternal grandmother because she did not provide the Department with a social security number for her boyfriend, no follow-up or home study appears to have been done to determine whether she was an otherwise appropriate relative to care for the children. The Department asserts that Alan " did not suggest that he could do anything to provide the children with a safe environment." However, as the party seeking the termination of parental rights, the Department bears the burden of proof under section 161.001(1)(N) to show that he was unable to do so. *See In re D.T.,* 34 S.W.3d at 641 (noting caseworker's statement at trial that appellant had not shown she could provide safe, stable home for child improperly reversed burden of proof).

We find the evidence factually insufficient to support termination of Alan's parental rights under section 161.001(1)(N) of the Family Code. Accordingly, Alan's third issue is sustained.[15]

### B. Sole Managing Conservatorship

In their fifth issue, Veronica and Alan contend that, if we reverse that portion of the trial court's order terminating their parental rights, we must also reverse the portion appointing the Department as sole managing conservator of the children. This is so, they argue, because the trial court's conservatorship appointment was a direct consequence of the termination of their parental rights, and, therefore, reversal of the termination of their parental rights necessitates reversal of the appointment of the Department as sole managing conservator. The Department, however, contends that we are precluded from considering this issue because appellants did not include it in their statement of appellate points presented to the trial court pursuant to Texas Family Code section 263.405. *See* TEX. FAM. CODE § 263.405(b). In the alternative, the Department argues that the trial court's conservatorship appointment was based on a ground independent from its decision to terminate appellants' parental rights and, therefore, should be upheld.

**Page 91**

The Texas Supreme Court recently issued two decisions that bear directly on our disposition of this issue. In *In re J.A.J.,* 243 S.W.3d 611 (Tex.2007), the Court resolved a split among appellate courts regarding whether it is necessary to specifically assign error to the Department's appointment as conservator when a judgment terminating parental rights is reversed. *Id.* at 613-14.In that case, the Department sought termination of the mother's parental rights to her child and requested conservatorship pursuant to sections 153.005 and 153.131. *Id.* at 612-13.[16]The trial court terminated the mother's parental rights and appointed the Department the

child's sole managing conservator. *Id.*

On appeal, the mother claimed that the evidence was insufficient to support the termination decision, but she did not assign error to the conservatorship appointment. *Id.* The court of appeals determined that the evidence was insufficient to support termination under Texas Family Code section 161.001(1)(D) and (E) and reversed the trial court's judgment, including that portion appointing the Department as the child's conservator. *Id.*

In its petition for review, the Department challenged only the portion of the court of appeals' judgment that reversed its appointment as the child's managing conservator. *Id.* at 613-14 In its analysis, the Court noted that the trial court found that (1) appointment of the parent as conservator would not be in the child's best interest because it would significantly impair his physical health or emotional development, and (2) appointment of the Department as managing conservator was in the child's best interest. *Id.* at 614-15. The Court concluded that " [t]hese findings satisfy not only the fundamental requirement that the court consider the best interest of the child, ... but also the more specific findings necessary to justify the Department's appointment under section 153.131." *Id.* In light of the differing elements and standards of review applied to conservatorship and termination orders, the Court concluded that a challenge to the Department's appointment as the child's conservator was not subsumed in the appellant's challenge to the termination order. *Id.* In the absence of assigned error, the Court reversed the portion of the court of appeals' judgment that reversed appointment of the Department as the child's sole managing conservator. *Id.* at 617.

In *In re D.N.C.*, 252 S.W.3d 317, (Tex.2008) (per curiam), the Court considered a similar challenge to a court of appeals' reversal of a trial court's conservatorship order. In the case reviewed in *D.N.C.*, styled below as *Colbert v. Department of Family & Protective Services,* the Department sought termination of the mother's parental rights to her seven children. *See* 227 S.W.3d 799, 802 (Tex.App.-Houston [1st Dist.] 2006), *pet. denied, In re D.N.C.*, 252 S.W.3d 317 (Tex.2008). The trial court found that the mother had endangered her children and terminated her parental rights under section 161.001(1)(D). *Id.* at 807. Without making any additional findings, the trial court appointed the Department as the children's managing conservator. *Id.*

On appeal, the mother challenged the sufficiency of the evidence supporting the

**Page 92**

termination order, but she did not separately challenge the appointment of the Department as the children's managing conservator. *Id.* The court of appeals reversed the termination order on factual insufficiency grounds

and reversed the conservatorship appointment. *Id.* at 816. Reasoning that no findings had been made under Family Code section 153.131 that would independently support the conservatorship order, the appeals court concluded that the Department's appointment was solely the consequence of the trial court's termination decision under section 161.207 and had to be reversed as well. *Id.* [17]

In a per curiam decision, the Court addressed the Department's argument that reversal of the conservatorship order was erroneous in light of its recent decision in *J.A.J.In re D.N.C.*, 252 S.W.3d at 318. The Court emphasized that while the Department in *J.A.J.* had requested conservatorship pursuant to Family Code section 153.131 and the trial court had made the specific findings the statute requires- *i.e.*, that appointment of a parent as managing conservator would not be in the child's best interest because it would significantly impair his physical health or emotional development, and that appointment of the Department was in the child's best interest-the only available statutory mechanism for the Department's appointment in the instant case was as a consequence of the termination pursuant to Family Code section 161.207. *Id.* at 318. It therefore concluded that *J.A.J.* did not apply, and that the mother's challenge to the conservatorship appointment was subsumed in her appeal of the termination order. *Id.* With these guidelines in mind, we consider Veronica and Alan's challenge to the appointment of the Department as sole managing conservator of A.S., D.S., and L.A.S.

On March 13, 2006, the Department filed its " Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship." In section 13 of the complaint, the Department requested that it be appointed the children's sole managing conservator " [p]ursuant to § § 153.005 and 263.404." It further stated that " [a]s grounds for appointment of the Department ... as Managing Conservator, the Department alleges pursuant to § 153.131 of the Texas Family Code that the appointment of the parent or parents would not be in the best interest of the children because the appointment of the parent or parents would significantly impair the children's physical health or emotional development." In its Final Decree for Termination, under the section entitled " Conservatorship of the Children," the trial court ordered that the Department be appointed sole managing conservator of A.S., D.S., and L.A.S. and found " this appointment to be in the best interest of the children." No additional findings were made.

Because the trial court made no findings under section 153.131 that would independently support the conservatorship order, we conclude that the Department's appointment was solely the consequence of the trial court's termination decision under Family Code section 161.001(1).[18] In accordance with *D.N.C.*, we conclude that Veronica and Alan's challenge to the conservatorship

appointment was subsumed in their appeal of the termination order. Because we reverse the portion of the trial court's order terminating Veronica and Alan's parental rights under

**Page 93**

section 161.001(1), we also reverse the portion of the order that appointed the Department as the sole managing conservator. We sustain appellants' fifth issue.

### IV. Conclusion

Accordingly, we reverse that portion of the trial court's decree terminating Veronica's parental rights to A.S., D.S., and L.A.S., and render judgment denying the Department's request to terminate Veronica's rights to A.S., D.S., and L.A.S. We reverse that portion of the decree terminating Alan's parental rights to A.S. and D.S., and render judgment denying the Department's request to terminate Alan's rights to A.S. and D.S. In addition, because it was not supported by findings separate and apart from the findings supporting the termination, we also reverse that portion of the decree appointing the Department as the sole managing conservator of A.S., D.S., and L.A.S., and remand the case to the trial court for the limited purpose of rendering an order, consistent with Family Code section 161.205.[19]

---------

Notes:

[1] To protect the privacy of the parties in this case, we identify the parents by fictitious names, and we identify the children by their initials. *See* TEX. FAM. CODE § 109.002(d).

[2] A paternity test revealed that Alan is not the biological father of L.A.S. In its final order, the trial court also terminated the parental rights of L.A.S.'s unknown father.

[3] L.P. is not a subject of this suit.

[4] This evidence was presented through a family evaluation report prepared by the Children's Crisis Care Center on April 24, 2006 (" 4 C's report" ).

[5] The 4 C's report also reflects that, in February 2006, CPS received a referral alleging physical abuse and neglectful supervision of A.S., D.S., and L.P. by Veronica and Alan. However, the word " Unknown" appears under the box entitled " Validated?," and the Department does not discuss this incident in its brief.

[6] The evidence is conflicting as to why Veronica was unable to obtain pre-natal care for L.A.S. in Houston. The 4 C's report reflects that she was unable to get her medical records from Beaumont. However, at trial she

testified that no physician was willing to take her as a new patient because of her advanced pregnancy. Notwithstanding, she continued to take pre-natal vitamins throughout her pregnancy.

[7] Veronica's plan required that she complete parenting classes, participate in therapy, submit to drug assessments, maintain stable housing and employment, and attend court hearings. Alan's plan required that he submit to paternity testing, inform the case worker of his intentions and desires with respect to permanency of the children, provide documentation demonstrating stable housing and employment, allow access to his home for home study, participate in individual counseling, cease criminal activity, and attend court hearings.

[8] We presume that she was referring to her oldest child, L.P., who was being cared for by his great-aunt.

[9] During Veronica's incarceration, one of her sisters cared for A.S. and D.S. for approximately one month. However, her sister was unable to continue caring for them because it was creating problems in her marriage.

[10] Ms. Pena testified that she had been convicted of forgery in 1978, making a terroristic threat in 1985, and theft by check in or around 1999.

[11] Although awaiting trial in the Harris County jail on charges of aggravated robbery, both Veronica and Alan appeared and testified at the termination hearing.

[12] The 4 C's report states that Veronica admitted " to trying marijuana a few times in her life," although it is unclear when those occasions occurred. Moreover, Alan's uncontroverted testimony that he had no knowledge that Veronica had used drugs and that he had never smelled the substance on her suggests that her prior usage occurred before the birth of her children. In any case, there is no direct evidence that Veronica had an ongoing narcotics problem that would support a finding under this section. *See Ruiz v. Texas Dep't of Family and Protective Svcs.,* 212 S.W.3d 804, 818 (Tex.App.-Houston [1st Dist.] 2006, no pet.).

[13] We are unaware of any cases in which a single use of marijuana-or any drug-during pregnancy has, alone, been held sufficient to constitute a " course of conduct" to support termination under subsection (E). *Cf. In re M.D.V.,* No. 14-04-00463-CV, 2005 WL 2787006, at *5 (Tex.App.-Houston [14th Dist.] Oct. 27, 2005, no pet.)(mem.op.) (finding appellant engaged in course of conduct that endangered child in light of her extensive drug use for ten years, particularly while pregnant and while caring for her children, her inability or unwillingness to abstain from drug use after child was born marijuana positive, and her relapse after children were returned to her); *In re S.M.L.D.,* 150 S.W.3d 754, 757-58 (Tex.App.-Amarillo 2004, no pet.)(holding mother's drug use during pregnancy and after child was removed from her care, in face of random drug testing

that placed her relationship with child at risk, was legally and factually sufficient evidence that she engaged in course of conduct which endangered her child).

[14] The Department does not attempt to argue that Veronica's use of marijuana during her pregnancy is evidence that Alan knowingly placed his children with someone who engaged in endangering conduct. Thus, we need not address this argument.

[15] Having found the evidence insufficient under section 161.001(1)(D), (E), and (N), we need not address appellants' fourth issue challenging the trial court's conclusion that termination was in the children's best interest.

[16] Section 153.005 provides generally that in a suit affecting the parent-child relationship, " the court may appoint a sole managing conservator or may appoint joint managing conservators." TEX. FAM. CODE § 153.005. Section 153.131 creates a rebuttable presumption that a parent should be appointed the child's managing conservator " unless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development." *Id.* § 153.131(a).

[17] Section 161.207 provides that the court shall appoint a suitable managing conservator " [i]f the court terminates the parent-child relationship with respect to both parents or to the only living parent." TEX. FAM. CODE § 161.207(a).

[18] We note that while the Department in *D.N.C.* did not request conservatorship under section 153.131, the Department in this case did make such a request. The Department relies on this fact to argue that although the trial court did not specify the statutory basis on which it relied to appoint the Department as conservator, or issue any findings of fact, we may nonetheless infer that the court made the necessary findings to support the conservatorship appointment under section 153.131. We disagree. In *J.A.J.,* the Court emphasized that the trial court's specific finding that appointment of a parent as the child's conservator would not be in his best interest because it would significantly impair his health or emotional development was necessary to justify the Department's appointment under section 153.131. 243 S.W.3d at 614-15.In the absence of such a finding by the trial court here, we will not infer one.

[19] When reversing the trial court's judgment or appealable order, we ordinarily render the judgment or order that the trial court should have rendered. *See* TEX. R. APP. P. 43.3; *Colbert,* 227 S.W.3d at 816. However, in a case involving the involuntary termination of parental rights, if the trial court does not order termination of the parent-child relationship (which becomes the case here because we have reversed the trial court order and have rendered judgment that appellants' parental rights are not terminated), Family Code section 161.205 requires that the trial court either (1) deny the petition for termination, or (2) render any order in the best interest of the child. *See* TEX. FAM. CODE § 161.205. As an appellate court, we are not in a position to determine whether to simply deny the petition for termination or to render some other order in the best interest of the child. *Colbert,* 227 S.W.3d at 816. Circumstances concerning the child or parent may have changed since the trial court rendered its final order, a matter that requires a factfinder. *Id.* We are therefore unable to render a judgment that disposes of all remaining issues in the case and must remand the case in part to the trial court for further proceedings under section 161.205. *See id.* & n. 15 (" [S]ection 161.205 becomes applicable on remand because we have reversed the trial court order and have rendered judgment that appellant's parental rights are not terminated. Section 161.205 is the controlling authority for how the trial court must proceed on remand." ).

---------

EXHIBIT F

75 S.W.3d 73 (Tex.App. —San Antonio 2002)

In the Interest of M.A.N.M., a Child.

No. 04-01-00295-CV.

Court of Appeals of Texas, Fourth District, San Antonio

February 6, 2002

Page 74

[Copyrighted Material Omitted]

Page 75

Rogelio Lopez, The Law Office of Rogelio Lopez, San Antonio, for Appellant.

Denise Martinez, Law Offices of Denise Martinez, P.C., Michael D. Robbins, Attorney At Law, Rudolph F. Jass, Jr. (ADL), Attorney At Law, San Antonio, for Appellee.

Sitting: CATHERINE STONE, Justice, SARAH B. DUNCAN, Justice KAREN ANGELINI, Justice.

Opinion by KAREN ANGELINI, Justice.

The trial court terminated John Ramirez's parental rights to M.A.N.M. Ramirez appeals the judgment in three issues. We affirm the trial court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Anthony Medina and Tammy Sells were married at the time of trial. When they married, Sells was pregnant; Medina, however, is not the biological father of the child. John Ramirez is the child's biological father. M.A.N.M. was born in January of 1999 with cocaine in her system. Medina knew Sells was using drugs and drinking heavily, at times, during her pregnancy. Child Protective Services intervened and implemented a safety plan, allowing Medina and Sells to reside with M.A.N.M. at Medina's mother's home. Approximately one month after M.A.N.M.'s birth, Sells moved out of Medina's mother's home. Sells' parental rights to M.A.N.M. were later terminated. M.A.N.M., however, remained with Medina at his mother's home. The child refers to Medina as "Dada" and to Medina's mother as "Mamau." At the time of trial, Medina had applied for insurance for M.A.N.M. and, while he and his mother are at work, M.A.N.M. is in daycare. Medina's mother believes it is in M.A.N.M.'s best interests to terminate Ramirez's parental rights and allow the child to remain with the "only family that she knows, the family that's been there from the very beginning." Medina also believed it was in M.A.N.M.'s best interests for Ramirez's parental rights to be terminated.

Before M.A.N.M.'s birth, Ramirez provided some financial support to Sells, with the understanding that the money was for the unborn child. Ramirez was employed "off and on" and earned eight dollars an

Page 76

hour. After M.A.N.M. was born, Ramirez offered to pay Medina money, conditioned on being able to see the child. Ramirez, however, did not provide any support to Medina.

Ramirez contacted C.P.S. on February 5, 1999, and again on March 27, 1999, expressing his intent to pursue his legal rights as M.A.N.M.'s father and leaving a number where he could be contacted. C.P.S. did not consider Ramirez as a "participating family member" because Sells was married to Medina at the time of M.A.N.M.'s birth. C.P.S. advised him to seek legal assistance to establish paternity. Until he did so, Ramirez had no right to visit the child, absent cooperation from Sells.

Because Ramirez did not have the financial ability to hire an attorney, he sought the assistance of Legal Aid. Legal Aid referred him to the Attorney General's Office. Because Ramirez did not have M.A.N.M.'s name or social security number, the Attorney General was unable to provide him with assistance. Ramirez then hired his own attorney.

Ramirez was made aware of the petition to terminate his parental rights in May of 2000. The parties agreed to a paternity test, which identified him as M.A.N.M.'s biological father. Ramirez also agreed to submit to a drug test. Ramirez tested positive for cocaine and marijuana use. Ramirez first started to use drugs recreationally as a teenager. Occasionally, Ramirez bought drugs. Ramirez admitted that he spent at least $2,000 on drugs during the two years preceding trial and that he could have used that money to hire a lawyer to assist him in protecting his rights as M.A.N.M.'s biological father. Within the month before trial, Ramirez began attending Narcotics Anonymous meetings twice a week. He plans to continue attending the meetings. Ramirez's parents have expressed an interest in helping him recover from his addiction. Ramirez admitted that he should have stopped using drugs once he learned his child had been born dependent upon them.

Ramirez pays $200 in rent to live with his parents. He has lived with them his entire life. His mother testified that Ramirez is capable of earning and saving money. At the time of trial, Ramirez was working forty

hours a week and earning ten dollars an hour. Ramirez's parents support him "100 percent" regarding obtaining custody of M.A.N.M. Ramirez testified he was ready to take on the responsibility of a two-year-old child, particularly with the help of his family.

Wendelyn Thornton, a Child Protective Services Program Administrator, testified about M.A.N.M.'s family's history. She also testified that Sells had indicated to her that Ramirez was abusive. Medina's mother also testified that Sells told her a restraining order was in place against Ramirez because, during her pregnancy, Sells and Ramirez were involved in an altercation. Thornton testified that it is very difficult for a child to form any significant attachment to a parent, when that child has not been exposed to the parent during the child's first two years of life.

Ramirez believes that he and his child have "a bond." According to Ramirez, M.A.N.M. recognizes him and is, at times, loving to him. Ramirez agreed that he could work with Medina to take care of M.A.N.M., but that, eventually, he intends to seek and gain full custody of the child.

The ad litem also believes that a relationship has started between M.A.N.M. and Ramirez and would like to see it continue. And, although he recognized that it would be difficult emotionally to remove the child from Medina, termination of Ramirez's parental rights was not in her best

**Page 77**

interests. The ad litem testified that he has seen Ramirez interact with M.A.N.M. According to the ad litem, Ramirez interacted well with and was patient with the child. Medina's mother, however, testified that although M.A.N.M. is somewhat more restrained than she normally is when she's with Ramirez, she does not perceive Ramirez as a threat to the child.

Based on the evidence adduced at trial, the trial court terminated Ramirez's parental rights. Specifically, the court found based upon clear and convincing evidence that Ramirez "failed to support the child in accordance with his ability during a period of one year ending within six months of the date of the filing of this petition." The court also found termination was in M.A.N.M.'s best interests.

Ramirez appeals the termination. He challenges the legal and factual sufficiency of the evidence supporting the trial court's findings. He further maintains that the trial court abused its discretion in denying his motion for new trial.

## SUFFICIENCY OF THE EVIDENCE

A. Standard of Review

Involuntary termination of parental rights is a drastic remedy. In the Interest of G.M., 596 S.W.2d 846, 847 (Tex.1980). Termination involves fundamental constitutional rights, and the proceeding must be strictly scrutinized. Id. at 846. There is a strong presumption that the best interests of a child are usually served by retaining custody in the natural parents, and the termination of parental rights cannot be justified without the most solid and substantial reasons. *Wiley v. Spratlan,* 543 S.W.2d 349, 352 (Tex.1976). However, the need for permanence is the paramount consideration for the child's present and future physical and emotional needs. Dupree v. Texas Dep't of Protective & Regulatory Servs., 907 S.W.2d 81, 87 (Tex.App.-Dallas 1995, no writ). The goal of establishing a stable, permanent home for a child is a compelling government interest. Id.

The Texas Family Code, in order to protect the relationship between a parent and child, requires a showing by clear and convincing evidence that the parent in question behaved in some manner that was detrimental to the child. TEX. FAM.CODE ANN. § 161.001 (Vernon Supp.2001). This intermediate standard colors our review of the factual sufficiency of the evidence in a termination case. See *In re B.T.,* 954 S.W.2d 44, 46 (Tex.App.-San Antonio 1997, writ denied). Applying this standard to our review of a trial judge's findings, we review all of the record evidence and ask whether sufficient evidence was presented to produce in the mind of a rational fact finder a "firm belief or conviction as to the truth of the allegations sought to be established." TEX FAM.CODE ANN. § 101.007 (Vernon Supp.2001); *In re G.M.,* 596 S.W.2d 846, 847 (Tex.1980). The trial court's judgment will be set aside only if the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. Djeto v. Texas Dep't of Protective & Regulatory Servs., 928 S.W.2d 96, 97 (Tex.App.-San Antonio 1996, no writ).

In deciding a legal sufficiency issue, we consider only the evidence tending to support the finding and disregard all evidence to the contrary. *Southwestern Bell Mobile Sys., Inc. v. Franco,* 971 S.W.2d 52, 54 (Tex.1998); *In re R.D.,* 955 S.W.2d 364, 368 (Tex.App.-San Antonio 1997, pet. denied). If more than a scintilla of evidence supports the trial court's findings, the appealing parent cannot prevail on a legal sufficiency point. *In re R.D.,* 955 S.W.2d at 368.

**Page 78**

B. Failure to Support

The trial court found that Ramirez failed to support M.A.N.M. "in accordance with his ability during a period of one year ending within six months of the date of this filing of this petition." TEX. FAM.CODE. ANN. § 161.001(1)(F) (Vernon Supp.2001). To terminate parental rights on non-support grounds, the evidence must establish that the parent failed to support the child for

twelve consecutive months and had the ability to contribute to the support of the child for twelve consecutive months. *In re D.L.B.,* 943 S.W.2d 175, 177 (Tex.App.-San Antonio 1997, no writ); *In re Guillory,* 618 S.W.2d 948, 951 (Tex.App.-Houston [1st Dist.] 1981, no writ). One court of appeals has found there was legally and factually sufficient evidence of nonsupport, when the parent admitted that he could have earned enough money to meaningfully contribute to his daughter's support, but did not. *Phillips v. Texas Dep't of Protective and Regulatory Servs.,* 25 S.W.3d 348, 357-58 (Tex.App.-Austin 2000, no pet.).

It is undisputed here that Ramirez did not provide support to M.A.N.M. Ramirez contends, however, that Medina failed to meet his burden of proving that Ramirez had the ability to pay support for twelve consecutive months. Ramirez relies on *Jimenez, ex rel. Little v. Garza,* 787 S.W.2d 601 (Tex.App.-El Paso 1990, no writ) for his assertion.

In Jimenez, the appeals court reversed a termination based on nonsupport on legal sufficiency grounds. Id. at 604. The father testified that, at first, he offered no money to support the child, but that later he offered to give money for support. Id. at 603-04. The father further explained that once he began visitation with the child, he provided the child with food, bedding, furniture, and toys. Id. at 603. The evidence showed the father's annual income and monthly bills. The court held, in light of the constitutional precautions involved in termination cases, that

"[t]here is no firm evidence as to the amounts of salary paid for any given month of the twelve month period to determine an ability to pay that particular month or to establish a pattern over a series of months. There is money spent by the father, but again without any reference to times or amounts."

Id.

In this case, there is likewise no "firm" evidence of Ramirez's salary during the twelve month period before trial. Ramirez testified that he was working "off and on" with temporary agencies and that he never had full-time employment. He further testified that, at the time of trial, he was working forty hours a week, earning ten dollars an hour. However, Ramirez testified that had Medina allowed him visitation with the child, he would have provided support for her. Ramirez also admitted that he spent a significant amount of money on drugs over the past two years. Further, Ramirez's mother testified that he was able to earn and save money and had done so in the past. Essentially then, Ramirez could have contributed to the support of his child, but did not. Phillips, 25 S.W.3d at 357-58.

Viewing the evidence in a light favorable to the judgment, we hold there is legally sufficient evidence to support the trial court's non-support finding. Furthermore, we hold factually sufficient evidence was presented to produce in the mind of the trial judge a "firm belief or conviction" that Ramirez had the ability to provide support to M.A.N.M. Ramirez's first issue is overruled.

C. Best Interests

Ramirez also challenges the sufficiency of the evidence supporting the trial

**Page 79**

court's finding that termination of the parent-child relationship was in his child's best interest. Accordingly, we examine the evidence in light of the following factors:

(A) the desires of the child; (B) the emotional and physical needs of the child now and in the future; (C) the emotional and physical danger to the child now and in the future; (D) the parental abilities of the individuals seeking custody; (E) the programs available to assist these individuals to promote the best interest of the child; (F) the plans for the child by these individuals or by the agency seeking custody; (G) the stability of the home or proposed placement; (H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (I) any excuse for the acts or omissions of the parent.

*Holley v. Adams,* 544 S.W.2d 367, 371-372 (Tex.1976); *In re D.G.,* 5 S.W.3d 769, 772 (Tex.App.-San Antonio 1999, no pet.).

Quite often, the best interest of the child is infused with the statutory offensive behavior. While there are instances where the offending behavior will demand termination of parental rights, there are also those cases where the best interest determination must have a firm basis in facts standing apart from the offending behavior. Although such behavior may reasonably suggest that a child would be better off with a new family, the best interest standard does not permit termination merely because a child might be better off living elsewhere.

*In re D.M., B.W., and J.C.W.,* 58 S.W.3d 801, 814 (Tex.App.-Fort Worth 2001, no pet. h.). This case is one where Ramirez's "offending behavior" is not egregious enough, on its own, to warrant a finding that termination is in the child's best interests. Accordingly, we must look to other, independent facts to support the trial court's best interests finding.

M.A.N.M. is two years old. She was born addicted to cocaine and is currently on medication. Over the course of six visits, M.A.N.M. and Ramirez have developed a "bond," even though M.A.N.M. appears more reserved than normal in Ramirez's presence. There was no evidence presented that Ramirez would present any danger to M.A.N.M., now or in the future. In fact, the ad litem testified that Ramirez interacted well with

M.A.N.M. and Medina's mother testified that she did not perceive Ramirez to be a threat to the child. Medina and Ramirez are both young men, who live with their parents. The parents of both men have attested that they are willing to help raise M.A.N.M. We note, however, that M.A.N.M. has lived with Medina's family throughout her life. M.A.N.M. attends daycare while Medina and his mother are at work. And, Medina plans to move out of his mother's home in the future. The evidence shows that it is very difficult for a child to form any significant attachment to a parent, when that child and the parent have had no relationship during the child's first two years of life. No evidence was presented about possible programs to assist Ramirez. Furthermore, there is no evidence that Medina has ever used drugs; Ramirez admits he used drugs in the past and currently attends Narcotics Anonymous meetings.

We hold the evidence is legally sufficient to support the trial court's finding that termination of Ramirez's parental rights is in M.A.N.M.'s best interest. In addition, we hold the evidence is factually sufficient to support the trial court's finding, particularly in light of the State's interest in providing a child with a stable, permanent home. Ramirez's second issue is overruled.

**Page 80**

**MOTION FOR NEW TRIAL**

In his third issue, Ramirez argues the trial judge abused its discretion in denying Ramirez's motion for new trial in light of newly discovered evidence. The newly discovered evidence consists of facts showing Medina attempted suicide a month before M.A.N.M.'s birth.

A. Standard of Review

A party seeking a new trial on the ground of newly discovered evidence must show that: 1) the evidence came to his knowledge since the trial; 2) it was not owing to want of due diligence that the evidence had not come to his attention sooner; 3) the evidence is not cumulative; and 4) the evidence is so material that it would probably produce a different result if a new trial were granted. *Jackson v. Van Winkle,* 660 S.W.2d 807, 809 (Tex.1983); *In re J.M.,* 955 S.W.2d 405, 408 (Tex.App.-San Antonio 1997, no pet.). Whether to grant or deny a motion for new trial lies within the sound discretion of the trial court, and the court's decision will not be disturbed absent a clear abuse of discretion. Jackson, 660 S.W.2d at 809; *In re J.M.,* 955 S.W.2d at 408. When a trial court refuses to grant a new trial based on newly discovered evidence, every reasonable presumption is to be made in favor of the trial court's decision. Jackson, 660 S.W.2d at 809-10; *In re J.M.,* 955 S.W.2d at 408.

B. Application

Ramirez testified, at the hearing on his motion for new trial, that following the trial he received information that raised a concern about Medina's ability to care for M.A.N.M. Medina also testified at the hearing. Medina and Sells, the child's mother, were married in December of 1998. Their relationship ended in February of 1999. Approximately two months before Medina and Sells broke up, Medina attempted to commit suicide. According to Medina, the reason he attempted suicide was because he and Sells were having problems and he "couldn't deal with her." Medina went to the hospital for treatment of his wounds, but did not seek psychological counseling. Medina has not had any depressed feelings since then. He further testified that these events have in no way affected his ability to care for M.A.N.M.

It is undisputed that this evidence came to Ramirez's attention since the trial. Ramirez contends that he could not have known about these facts before trial because he did not have any relationship with Medina or his family. However, Ramirez would have been able to draw out these facts from Medina in discovery. The record does not reflect that Ramirez sought through discovery any information on Medina's medical and psychological history. And, Ramirez made no attempt at trial to question Medina about any medical or psychological problems he may have experienced. Ramirez has failed to make the requisite showing that the evidence did not come to his attention sooner for lack of due diligence. Because Ramirez has not met the second requirement for granting a new trial based on newly discovered evidence, we need not reach the remaining two factors. Ramirez's third issue is overruled.

**CONCLUSION**

The evidence is legally and factually sufficient to support the trial court's finding that Ramirez failed to support M.A.N.M. for twelve consecutive months during the eighteen-month period preceding the petition's filing. Furthermore, the evidence is legally and factually sufficient to support the trial court's finding that termination of Ramirez's parental rights to M.A.N.M. is in her best interests. Finally, the trial

**Page 81**

court did not abuse its discretion in denying Ramirez's motion for new trial based on newly discovered evidence. Accordingly, we affirm the trial court's judgment.

Dissenting Opinion by CATHERINE STONE, Justice.

The natural rights existing between a parent and child are constitutionally-protected interests "far more precious than any property right." *Santosky v. Kramer,* 455 U.S. 745, 758-59, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). These natural rights are "essential basic civil right[s] of man." *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). In recognition of the importance of the rights between parents and their

children, courts presume that retention of the parent-child relationship is in the best interest of the child. *Wiley v. Spratlan,* 543 S.W.2d 349, 352 (Tex.1976). Consequently, involuntary termination of parental rights is a "drastic remedy" of such weight and gravity that due process requires termination be justified by clear and convincing evidence. See *In re G.M.,* 596 S.W.2d 846, 847 (Tex.1980). These statements are not mere form language to be included in appellate decisions--they are statements of principles of great constitutional and human dimension. In my opinion, these principles have not been honored in this case.

No doubt motivated by the best of intentions, the actions of Child Protective Services set in motion the instant litigation, which proceeded with minimum regard for the constitutionally-protected parental rights of John Ramirez, the biological father of M.A.N.M. The trial court compounded the disregard of constitutional safeguards by rendering a judgment based on evidence that is, at best, perfunctory. Accordingly, I respectfully dissent.

## GROUNDS FOR TERMINATION

To terminate John Ramirez's parental rights, the trial court was required to find by clear and convincing evidence that Ramirez engaged in offensive conduct as set forth in TEX. FAM.CODE ANN. § 161.001 (Vernon Supp.2002). Although Medina sought termination on the sole basis that Ramirez failed to legitimate the child within a one year period, this basis was not proven at trial, nor did the trial court make a finding on this element. Rather, Medina produced evidence regarding Ramirez's failure to support the child for a one year period and the trial court rendered its judgment of termination on this statutory ground. When issues not raised by the pleadings are tried by implied consent of the parties, they are treated in all respects as if they had been raised in the pleadings. TEX.R. CIV. P. 67. Because Ramirez failed to object to the disparity between the pleadings and the proof, we may conclude that the issue of non-support was tried by consent. See *Sage St. Assocs. v. Northdale Constr. Co.,* 863 S.W.2d 438, 445 (Tex.1993) (determining issues had been tried by consent because both sides advanced their positions at trial).

Although he was never judicially ordered to provide child support, Ramirez gave the child's mother money during her pregnancy and offered to provide support to Medina if he could visit with his daughter. It seems disingenuous, at best, to rebuff a party's claim of paternity, deny him visitation until paternity is legally established, yet use the absence of support as grounds for termination. Moreover, the only evidence the trial court could have relied upon to determine Ramirez had the ability to pay, but did not, was Ramirez's admission that he had spent money on drugs. There was no testimony as to the source of the money for drugs nor any indication of what other basic necessities Ramirez may have foregone to purchase

drugs. The court simply assumed that Ramirez could have supported the child instead of buying drugs. Without evidence of Ramirez's educational level, employment history, earning potential, actual income, or financial needs and expenses, I do not agree that Medina met his burden to show Ramirez had the ability to pay.

The issue is further complicated by other factors relating to the question of where and to whom Ramirez was to provide financial support. Ramirez knew that his daughter was not with her mother, and for a certain period of time he did not even know where the child was. His request for information and assistance from Child Protective Services was rejected. His request for assistance from Legal Aid was rejected. Finally, he sought assistance from the Attorney General's office, and after a delay of more than six months, he was told that the Attorney General's office could not help him. The record before us simply does not contain evidence sufficient to produce a firm belief or conviction that Ramirez failed to support M.A.N.M. "in accordance with his ability during a period of one year ending within six months of the date of the filing of the petition." See TEX. FAM.CODE ANN.§ 161.001(1)(F) (Vernon Supp.2002).

## BEST INTEREST OF THE CHILD

Even if we assume the evidence is legally and factually sufficient to support termination on the basis of non-support, I do not believe there is sufficient evidence that termination is in the best interest of the child. Indeed, the evidence is to the contrary.

Termination of parental rights cannot be sustained unless such a drastic action is in the best interest of the child. *In re G.M.,* 596 S.W.2d at 847. Although the majority correctly recites this standard, I do not believe it has correctly reviewed the evidence in light of the Holley factors. See *Holley v. Adams,* 544 S.W.2d 367, 371-72 (Tex.1976) (setting forth various factors to be considered by trial court in determining whether termination of parental rights serves best interest of child). An examination of these factors reveals that severing the parental rights of Ramirez and his daughter is not in her best interest.

Emotional and Physical Needs of Child

Courts presume that it is emotionally best for a child to retain ties with the child's biological parents. Wiley, 543 S.W.2d at 352. Ramirez professed his desire to maintain a relationship with his daughter. He expressed his willingness to assume parental responsibilities, and his conduct since the child's birth confirmed his expressed desire. Ramirez has the support of his family in this endeavor. His mother expressed her willingness to help, and she provides a stable home that

all agreed was not a threat to the child.

### Parental Abilities Parent Seeking Custody

Ramirez, like Medina, is admittedly young, but because he has had limited access to his daughter, he is less experienced in parenting than Medina. Nonetheless, the reports from Kids Exchange regarding Ramirez's supervised visitation indicate appropriate interaction and bonding between Ramirez and his daughter.

### Programs Available to Assist the Parent

As noted, evidence presented at trial indicates that Ramirez's mother is willing to assist her son in his parenting of M.A.N.M. There is no evidence that Ramirez planned to take any formal parenting classes, but he did acknowledge a prior drug problem and was actively participating in Narcotics Anonymous.

### Plans for the Child and Stability of the Home

Ramirez has extended family support in his effort to parent his daughter. He also

**Page 83**

has a stable non-threatening home to share with her. Ramirez stated his desire to ultimately seek full custody of his daughter, and this factor clearly weighed heavily in the trial court's determination. However, custody is not at issue in this termination proceeding.

### Acts or Omissions Indicating Parent-Child Relationship is Not Proper

The only acts or omissions that can be referred to are the lack of support and the failure to complete the legitimization process within a year. But these omissions cannot be viewed in a vacuum. Indeed, the final Holley factor requires that these omissions be judged in light of any justifying excuse.

### Excuse for the Acts or Omissions

At this point, M.A.N.M. has lived with the Medina family for three years--they are the only family she has known. Any caring person would hesitate to disrupt that relationship. Yet Ramirez's lack of participation is not for lack of trying. He began his quest to have contact with his daughter one month after her birth. Every governmental agency that he contacted essentially closed the door in his face. When suit was filed to terminate Ramirez's parental rights, he was cited by publication despite his having left a phone number with Child Protective Services; Ramirez discovered the pending suit by accident. Ramirez made repeated attempts to establish his role as a father to his child, yet each attempt was rebuffed. In addition, while the caseworker ignored Ramirez's overtures, she encouraged Medina to take legal action to ensure the child would remain in his home. Even when the child's

mother expressed her desire for M.A.N.M. to live with her birth father instead of Medina, the caseworker chose not to respond after she missed an appointment to discuss the matter. Ramirez's meetings with attorneys at Legal Aid and the Attorney General's office were also fruitless.

To now rely on the lapse of time since the child's birth and the possibility of disruption of the child's routine as grounds for terminating Ramirez's parental rights is, in my view, nothing short of unconscionable.

I am also concerned because I believe that in this case the "best interest of the child" has become the functional equivalent of the "better circumstances for the child." The El Paso Court of Appeals has cogently expressed the difficulties inherent in applying the best interest standard:

[T]he nuances and complexity of human situations make the development and application of the axiom--best interests of the child--incredibly difficult. It is all the more difficult because, unlike other legal standards which rely on the basic assumption that reasonable people applying the standard can come to an agreement, it is not always clear that reasonable people can agree on what is best for a child. Our only hope is to try to follow determinable standards that avoid any more chaos and pain.

\* \* \* \* \* \* \* \* \*

While [a parent's] bad acts or omissions might reasonably suggest that a child would be better off with a new family, the evidence may still be insufficient to satisfy the clear and convincing standard. The best interest standard does not permit parental termination merely because a child might be better off living elsewhere. Otherwise, the termination statute might be used for a massive reallocation of children to better and more prosperous parents.

*In re C.H.,* 25 S.W.3d 38, 52-53 (Tex.App.-El Paso 2000, pet. granted).

**Page 84**

The tragedy here for both father and daughter is that if Ramirez's attempts to be the child's father had not been thwarted--had he instead been helped to connect with his daughter--none of this would have transpired. Medina's counsel argued, and the trial court evidently agreed, that if Ramirez's parental rights were not terminated, Medina would incur further court battles and legal expenses. It is evident from the record that the most significant factor guiding the trial court's decision was the length of time M.A.N.M. had been living with Medina and his family, and the high price the child would pay if she were removed from that home. Ramirez's expressed desire to obtain sole custody of his daughter undoubtedly strengthened the trial court's resolve. Removal from Medina's home, however, is not at issue. Less drastic

means were available to ensure continuity for the child without terminating Ramirez's parental rights and severing the budding relationship between father and daughter. The trial court could have awarded permanent managing conservatorship to Medina while granting possessory conservatorship to Ramirez, or could have arranged other means of visitation. The child's need for continuity of care and caretaker would have been met, and she could also have enjoyed a relationship with her biological father.

The solution to this cauldron of emotionally-charged issues need not be all or nothing. Indeed, the ad litem appointed to represent the child and protect her best interest offered a solution--let this child know the joys of two loving fathers. This solution, fully supported by the law and the evidence, was erroneously rejected by the trial court. Accordingly, I dissent.

EXHIBIT G

440 S.W.3d 54 (Tex.App.-Waco 2010)

IN THE INTEREST OF M.V.G., A CHILD

No. 10-09-00054-CV

Court of Appeals of Texas, Tenth District, Waco

March 3, 2010

Page 55

[Copyrighted Material Omitted]

Page 56

From the 413th District Court, Johnson County, Texas. Trial Court No. D200706344.

Before Chief Justice Gray, Justice Reyna, and Justice Davis.

### OPINION

FELIPE REYNA, Justice

Page 57

The mother and father of the child the subject of this suit have each perfected an appeal from the order terminating their parental rights. The mother contends in her sole issue that the evidence is legally and factually insufficient to support any of the predicate grounds for termination or the court's finding that termination is in the best interest of the child. The father contends in five points that: (1) the court erred by denying his request for a jury trial; (2) the court erred by rendering a default judgment against him; (3) the evidence is insufficient to support the termination order; (4) this appeal is not frivolous; and (5) section 263.405 of the Family Code is unconstitutional. We will affirm.

### BACKGROUND

The mother " Patricia" [1] gave birth to M.V.G. in a Galveston hospital while she was incarcerated for a state jail felony. The father " Joel" lived in Cleburne. The day after M.V.G.'s birth, Patricia gave Joel's contact information to CPS caseworker Linda Lawrence and told her that he was making arrangements for M.V.G. to live with him. Two days later, CPS supervisor Marty Samaniego talked to Joel and tried to arrange a meeting. Joel said that he could not talk at the moment because of work, so Samaniego advised him that the Department was taking emergency custody of M.V.G. and there would be an emergency removal hearing. Joel told Samaniego that Patricia and he wanted custody of M.V.G. and planned to move to Puerto Rico where his family lives.

During the next eleven months, the usual hearings were conducted. The Department essentially did not provide services to Patricia for eleven months because of her incarceration. She was released from custody just over ten months after M.V.G.'s birth and returned to Cleburne. The court extended the statutory dismissal date for ninety days. Patricia visited M.V.G. about fourteen times after her release, but she never completed any of the tasks required by the family service plan. At the last hearing before trial, Patricia testified about various difficulties in obtaining these services.

For his part, Joel visited M.V.G. regularly during the first eight months of the Department's involvement but never completed any of the required tasks. He disagreed with the Department's efforts to pursue drug screening by a hair follicle test, stating his preference for urinalysis. He filed a motion for visitation which the court heard shortly after M.V.G.'s first birthday. The court denied the motion

Page 58

after Joel informed the court that he would not submit to the hair follicle test.

Joel did not appear for trial. Patricia announced that she was waiving her right to jury trial. The court ruled that Joel waived his right to jury trial under Rule of Civil Procedure 220 by failing to appear. *See* TEX. R. CIV. P. 220. The court also pronounced its rendition of " a post answer default judgment" against him. At the conclusion of a three-day bench trial, the court rendered judgment terminating Patricia's parental rights. The court signed its Order of Termination almost three weeks later.

### PATRICIA'S APPEAL

In her sole issue, Patricia contends that the evidence is legally and factually insufficient to support any of the predicate grounds for termination or the finding that termination is in the best interest of the child.

In a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible.

*In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); *In re T.N.F.*, 205 S.W.3d 625, 630 (Tex.App.--Waco 2006, pet. denied).

In conducting a factual sufficiency review, " a court of appeals must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *Id.*

[T]he inquiry must be " whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." A court of appeals should consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient.

*J.F.C.*, 96 S.W.3d at 266 (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)) (footnotes omitted); *T.N.F.*, 205 S.W.3d at 630.

CPS alleged and the trial court found four predicate grounds for termination, namely, that Patricia: (1) knowingly placed or allowed M.V.G. to remain in dangerous conditions or surroundings; (2) engaged in conduct or knowingly placed M.V.G. with persons who engaged in conduct which endangered her; (3) constructively abandoned M.V.G.; and (4) failed to comply with a court order that established the actions necessary for the return of M.V.G. *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E), (N), (O) (Vernon Supp. 2009). We may affirm if the evidence is sufficient with respect to any one of these predicate grounds. *T.N.F.*, 205 S.W.3d at 629.

**Constructive Abandonment**

A parent constructively abandons a child when (1) the child has been in the permanent or temporary managing conservatorship

**Page 59**

of the State or an authorized agency for not less than six months, (2) the State or the authorized agency has made reasonable efforts to return the child to the parent, (3) the parent has not regularly visited or maintained significant contact with the child, and (4) the parent has demonstrated an inability to provide the child with a safe environment.

*In re M.R.J.M.*, 280 S.W.3d 494, 505 (Tex.App.--Fort Worth 2009, no pet.); *accord Earvin v. Dep't of Family & Protective Servs.*, 229 S.W.3d 345, 348 (Tex.App.--Houston [1st Dist.] 2007, no pet.); *see* TEX. FAM. CODE ANN. § 161.001(1)(N).

*( 1) Purposeful Abandonment*

With regard to the first element, Patricia concedes that M.V.G. was in foster care for at least six months but disputes that M.V.G. was in foster care because of any purposeful abandonment on Patricia's part. *See Earvin*, 229 S.W.3d at 349 (no evidence parent " purposefully had little interaction with S.M.E." ). Patricia refers to evidence that Joel and she planned for him to get M.V.G. from the hospital and take her to Puerto Rico where they would live with their extended family. Patricia argues that they never had a chance to carry out their plans because the Department did not contact Joel before removing M.V.G. even though she had given his contact information to CPS caseworker Lawrence at the hospital. CPS investigator Tina Herrera confirmed in her testimony that she did not contact Joel until after taking custody of M.V.G. However, she arranged for Joel to visit M.V.G. a few days after she was brought to Cleburne.

Joel attended the emergency removal hearing the next day. He told the court of his plans to leave for Puerto Rico thirteen days later and asked if he could take M.V.G. with him if he had a " clean" drug test. The court advised that another hearing would need to be held and, if Joel had " some clean drug tests," then the court would consider his request. Joel did not take a drug test and left for Puerto Rico. He did not appear in court again until six months later. He submitted to only one drug test (by oral swab) during the fourteen months the case was pending, refused to submit to urinalysis or hair follicle drug tests ordered by the court, and wholly failed to comply with his service plan.

Imprisonment, standing alone, does not constitute constructive abandonment. *In re D.T.*, 34 S.W.3d 625, 633 (Tex.App.--Fort Worth 2000, pet. denied); *see In re N.S.G.*, 235 S.W.3d 358, 367 (Tex.App.--Texarkana 2007, no pet.).

[But] it is simply a " cop-out" (in the vernacular of the 70's) for anyone to conclude that prison *ipso facto* prevents (or relieves) the parent from providing the child a safe environment. Again, the incarcerated parent may be able to work through surrogates, such as relatives, spouses, or friends, to fulfill that obligation. And, if he so arranges and those surrogates agree to the arrangement, it is hard to deny that the parent has taken steps to provide or effectively provided a safe environment. To suggest otherwise would be to suggest that military personnel cannot provide for their children because they may be assigned overseas to combat duty. In that situation, family is often available to step in and help. The same can be no less true when a parent is incarcerated.

*In re D.S.A.*, 113 S.W.3d 567, 573-74 (Tex.App.--Amarillo 2003, no pet.).

Here, Patricia made arrangements for Joel to take

custody of M.V.G. during her incarceration, but he failed to take the necessary actions to gain custody. Patricia also informed the Department that relatives in Puerto Rico might be able to care

**Page 60**

for M.V.G. However, CASA volunteer Gloria Johnson testified that she talked to one of those relatives and was convinced from that conversation that there was no appropriate or safe environment available for M.V.G. in Puerto Rico. [2]

Considering all the evidence in a neutral light, we hold that the evidence is such that the court " could reasonably form a firm belief or conviction" that Patricia constructively abandoned M.V.G. by leaving her in Department custody for at least six months without providing an alternative, safe, and appropriate custody arrangement for her. *See D.S.A.*, 113 S.W.3d at 572 (evidence factually sufficient where incarcerated parent's mother testified that a relative would take the children but it never happened). Thus, the evidence is factually sufficient on this element, and because the evidence is factually sufficient, it is necessarily legally sufficient. *Id.* at 573.

### ( 2) Reasonable Efforts to Return the Child

The second element is whether the Department " made reasonable efforts to return the child." TEX. FAM. CODE ANN. § 161.001(1)(N)(i). Patricia contends that the Department failed to make reasonable efforts because: (1) it did not formally serve her with citation until three months after taking M.V.G.; (2) it did not provide services for her while she was incarcerated; (3) the assigned caseworker sent letters to her in English even though she speaks Spanish; (4) the Department contacted only one other family member for alternative placement; and (5) it failed to arrange transportation for her to obtain counseling and other required services.

" The State's preparation and administration of a service plan for the parent constitutes evidence that the State made reasonable efforts to return the child to the parent." *M.R.J.M.*, 280 S.W.3d at 505; *accord M.C. v. Tex. Dep't of Family & Protective Servs.*, 300 S.W.3d 305, 309-10 (Tex.App.--El Paso 2009, pet. denied); *Liu v. Dep't of Family & Protective Servs.*, 273 S.W.3d 785, 795 (Tex.App.--Houston [1st Dist.] 2008, no pet.).

We first observe that Patricia relies in part on testimony from various pretrial hearings to show that the Department had failed to promptly conduct a home study of Joel's mother's home in Puerto Rico, had been given the names of " more than one" relative to contact but only contacted one, [3] and had assured the court that it would provide services to Patricia while she was incarcerated. She also relies on her own testimony from a December permanency hearing to show that the Department had notice that she did not have reliable transportation to

drive to Dallas or Fort Worth for Spanish counseling and other services. However, this testimony was not admitted at trial. *See In re C.L.*, No. 10-09-00117-CV, 304 S.W.3d 512, 2009 Tex.App. LEXIS 7994, 2009 WL 3319932, at *4-5 (Tex.App.--Waco Oct. 14, 2009, no pet.) (evidence legally insufficient to support termination where trial court did not take judicial notice of prior orders or hearings).

Nevertheless, the testimony at trial established that the Department provided no services to Patricia while she was incarcerated, but CPS caseworker Tonya Gilley testified that the Department had no contract services available at the state jail

**Page 61**

where she was located. Upon Patricia's release, a visit with M.V.G. was arranged for her within a week. She received her first service plan about two weeks later on October 15. She had more than three months to work on the tasks set out in the service plan but failed to do any of them.

Patricia testified that she does not understand the English language and could not read the letters sent to her by caseworkers, but Gilley testified that Patricia had communicated in the past with limited English. In any event, once Patricia was released, a Spanish translator was provided whenever she met with the caseworker, and Spanish language services were made available to her as well.

Regarding transportation, Patricia testified that she asked the Department for help with transportation, but CPS Diann Ames testified that she did not know until Patricia testified at trial that her van did not have a current registration. She had seen Patricia driving the van to visits and assumed it was roadworthy. She did recall that Patricia testified at the December permanency hearing that the van did not have a current inspection sticker.

There is conflicting testimony on this element, and there probably are things the Department could have done differently, but the issue is whether the Department made " *reasonable* efforts" not ideal efforts.

Considering all the evidence in a neutral light, we hold that the evidence is such that the court " could reasonably form a firm belief or conviction" that the Department made reasonable efforts to return M.V.G. Thus, the evidence is factually sufficient on this element, and because the evidence is factually sufficient, it is necessarily legally sufficient. *See D.S.A.*, 113 S.W.3d at 573.

### ( 3) Regular Visits

The third element is whether Patricia has " regularly visited or maintained significant contact with

[M.V.G.]" TEX. FAM. CODE ANN. § 161.001(1)(N)(ii). On this issue, Patricia refers to letters she mailed to the caseworker while she was incarcerated, and the fourteen visits she had with M.V.G. from October to December. However, Gilley testified that the Department received only two letters from Patricia during the eleven months she was incarcerated. Also, Patricia refused to submit to a drug test in early December, missed a scheduled visit one week later, and did not have a single visit with M.V.G. for more than a month and a half before trial.

There is conflicting testimony on this element as well. But the court could have been persuaded more by Patricia's lack of effort to maintain contact with M.V.G. during the first eleven months of her life and the lack of visits during the two months before trial than by the frequent visits she had between October and December.

Considering all the evidence in a neutral light, we hold that the evidence is such that the court " could reasonably form a firm belief or conviction" that Patricia failed to regularly visit or maintain significant contact with M.V.G. Thus, the evidence is factually sufficient on this element, and because the evidence is factually sufficient, it is necessarily legally sufficient. *See D.S.A.*, 113 S.W.3d at 573.

### ( 4) Safe Environment

The final element is whether Patricia " demonstrated an inability to provide [M.V.G.] with a safe environment." *Id.* § 161.001(1)(N)(iii). Here, Patricia refers to the Department's failure to explore placement alternatives in Puerto Rico and the failure to re-visit her home after an initial visit in early October. However, Ames testified that she went to Patricia's

**Page 62**

home three times after the initial visit but no one answered the door even though the van was in the driveway. Johnson testified that she visited later and it did appear that Patricia had been cleaning the house and had obtained a baby bed for M.V.G., but Johnson also testified that she was aware of " no facts to prove that [Patricia and Joel] are capable of providing the environment that [M.V.G.] requires." In addition, Johnson testified that she made several phone calls to Puerto Rico and was convinced that there was no appropriate or safe environment available for M.V.G. in Puerto Rico.

Considering all the evidence in a neutral light, we hold that the evidence is such that the court " could reasonably form a firm belief or conviction" that Patricia " demonstrated an inability to provide [M.V.G.] with a safe environment." Thus, the evidence is factually sufficient on this element, and because the evidence is factually sufficient, it is necessarily legally sufficient. *See D.S.A.*, 113 S.W.3d at 573.

### *Summary*

There is conflicting evidence in the record, but we conclude that the evidence is legally and factually sufficient to support the court's finding of constructive abandonment under section 161.001(1)(N).

### Best Interest of Child

Patricia also challenges the sufficiency of the evidence to support the best interest finding.

The primary factors to consider when evaluating whether termination is in the best interest of the child are the familiar *Holley* factors, which include:

(1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976); *T.N.F.*, 205 S.W.3d at 632.

### *Desires of the Child*:

Because of M.V.G.'s age, there is no evidence relevant to this factor. *See In re S.N.*, 272 S.W.3d 45, 51-52 (Tex.App.--Waco 2008, no pet.).

### *Child's Emotional and Physical Needs*:

M.V.G. has the usual emotional and physical needs of a toddler. The foster parents are currently meeting her needs in a safe and secure environment. There is limited evidence with regard to whether Patricia can adequately provide for her needs because they have had so little interaction outside of the scheduled visits. However, the record does contain evidence giving rise to a concern about Patricia's ability to provide for M.V.G.'s needs because she: (1) has not provided information regarding her family income and expenses; (2) apparently does not have reliable transportation; (3) has not allowed a follow-up visit inside her home; (4) declined to submit to drug testing; and (5) did not work on her service plan. In addition, some testimony was presented at trial raising a possibility that Patricia had moved out of the house she shared with Joel, but she was not asked about this during her own testimony. Thus, the record contains conflicting evidence on this issue.

### *Emotional and Physical Danger to Child*:

The primary evidence relevant to

**Page 63**

this factor is Patricia's refusal to submit to a drug test and her failure to allow a follow-up visit inside her home. This evidence supports a finding that Patricia poses a present or future risk of danger to M.V.G. *Id*. at 52-53.

### *Parental Abilities*:

Patricia interacted appropriately with M.V.G. during her visits. She did not participate in parenting classes and other services which would have potentially enhanced her parental abilities. Thus, the record contains conflicting evidence on this issue. *Id*. at 53.

### *Available Programs*:

Patricia did not participate in the programs that were made available to her. There is no evidence that this would change in the future. Thus, the evidence relevant to this factor supports the best-interest finding. *Cf. id*.

### *Plans for the Child*:

Patricia planned to take M.V.G. to Puerto Rico to be reunited with her siblings. She was consistent with her plans for M.V.G. from her birth. Thus, the evidence relevant to this factor does not support the best-interest finding. *Id*.

### *Stability of the Home*:

We have already discussed at length the evidence relevant to the stability of Patricia's home. The evidence relevant to this factor supports the best-interest finding. *See id*. at 53.

### *Patricia's Acts and Omissions (and Excuses)*:

Patricia established a good pattern of visitation with M.V.G. after her release from custody. She also indicated that she was working to clean up her home to provide a safe environment for M.V.G. However, she did not perform any of the services ordered by the court and of particular concern refused to submit to a drug test. In addition, she never allowed Ames to have a follow-up visit inside her home to confirm her progress, though Ames attempted to do so at least three times. Although Patricia testified that a lack of reliable transportation was the reason she was unable to perform the services, Ames and Johnson testified that she gave other excuses to them including issues with paperwork, language barriers, and not wanting to use her cell phone minutes waiting on hold when trying to make appointments with providers. Here again the record contains conflicting evidence regarding these factors.

### *Summary*:

To the extent there is conflicting evidence in the

record regarding the best-interest factors, it was within the court's discretion as finder of fact to resolve those conflicts against Patricia. *See In re A.M.C*., 2 S.W.3d 707, 717 (Tex.App.--Waco 1999, no pet.). Considering all the evidence in a neutral light, we hold that the evidence is such that the court " could reasonably form a firm belief or conviction" that termination of Patricia's parental rights would be in M.V.G.'s best interest. Thus, the evidence is factually sufficient on this element, and because the evidence is factually sufficient, it is necessarily legally sufficient. *See D.S.A*., 113 S.W.3d at 573.

We overrule Patricia's sole issue.

## JOEL'S APPEAL

Joel contends in five points that: (1) the court erred by denying his request for a jury trial; (2) the court erred by rendering a default judgment against him; (3) the evidence is insufficient to support the termination order; (4) this appeal is not frivolous; and (5) section 263.405 of the Family Code is unconstitutional.

### Frivolousness Determination

Joel's fourth point challenges the court's finding that his appeal is frivolous

**Page 64**

but provides no argument or authority. [4] Nevertheless, he has briefed the four other points noted on their merits. " [S]ection 263.405(g) clearly limits this Court's review at this juncture to the issue of whether [Joel's] appeal is frivolous." *In re S.T*., 242 S.W.3d 923, 926 (Tex.App.--Waco, order) (per curiam), *disp. on merits*, 263 S.W.3d 394 (Tex.App.--Waco 2008, pet. denied); *see In re K.D*., 202 S.W.3d 860, 865 (Tex.App.--Fort Worth 2006, no pet.); TEX. FAM. CODE ANN. § 263.405(g) (Vernon 2008). Therefore, we construe Joel's appellate points as challenging the trial court's determination that the issues discussed are frivolous. *See, e.g., In re M.L.J*., No. 02-07-00178-CV, 2008 Tex.App. LEXIS 3218, 2008 WL 1932076, at *3 (Tex.App.--Fort Worth May 1, 2008, pet. denied) (mem. op.).

We review the court's decision under an abuse-of-discretion standard. *S.T*., 263 S.W.3d at 398; *K.D*., 202 S.W.3d at 866. " An appeal is frivolous when it lacks an arguable basis in law or in fact." *S.T*., 263 S.W.3d at 398 (quoting *In re M.N.V*., 216 S.W.3d 833, 834 (Tex.App.--San Antonio 2006, no pet.); *accord K.D*., 202 S.W.3d at 866. For the reasons which follow, we conclude that Joel's appeal is not frivolous and the trial court abused its discretion by concluding otherwise. *See In re A.S*., 241 S.W.3d 661, 666 (Tex.App.--Texarkana 2007, no pet.) (appeal not frivolous where trial court improperly denied jury request).

**Right to Jury Trial**

Joel contends in his first point that the court abused its discretion by denying his request for a jury trial. [5]

Joel filed a jury demand and tendered the requisite fee. *See* TEX. R. CIV. P. 216. When Joel failed to personally appear for trial, the court advised his counsel that Joel had waived his right to a jury under Rule of Civil Procedure 220. *Id.* 220.

Rule 220 provides in pertinent part, "Failure of a party to appear for trial shall be deemed a waiver by him of the right to trial by jury." *Id.* "[F]or purposes of Rule 220, a party, although not personally present, appears for trial when his attorney is present." *In re W.B.W.*, 2 S.W.3d 421, 422 (Tex.App.--San Antonio 1999, no pet.) (quoting *Rainwater v. Haddox*, 544 S.W.2d 729, 732 (Tex.Civ.App.--Amarillo 1976, no writ)). Thus, the court abused its discretion by removing Joel's case from the jury docket. *Id.* Such error requires reversal "when the case contains material fact questions." *Mercedes-Benz Credit Corp. v. Rhyne*, 925 S.W.2d 664, 667 (Tex. 1996); *accord Hollywood Park Humane Soc'y v. Town of Hollywood Park*, 261 S.W.3d 135, 139 (Tex.App.--San Antonio 2008, no pet.); *A.S.*, 241 S.W.3d at 666.

CPS alleged and the trial court found three predicate grounds for termination, namely, that Joel: (1) knowingly placed or allowed M.V.G. to remain in dangerous conditions or surroundings; (2) engaged in conduct or knowingly placed M.V.G. with persons who engaged in conduct which endangered her; and (3) failed to comply with a court order that established the actions necessary for the return of M.V.G. *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E), (O).

**Page 65**

As noted, Joel's third point challenges the sufficiency of the evidence to support the termination order. He does not, however, clearly specify which of the predicate grounds for termination he is challenging. Instead, he challenges the findings that: (1) he "engaged in any act to endanger or abandon the child or leave her at places or with persons that would either"; (2) "engaged in any of the acts found by the trial court"; or (3) actively or constructively abandoned the child. Because Joel's third point challenges the court's findings regarding his conduct, we construe it as challenging the second and third predicate grounds for termination (abuse and failure to comply with court order) but not the first (neglect).

A finding under (D) that a parent has knowingly placed or allowed a child to remain in dangerous conditions or surroundings is based on the child's "conditions and surroundings" rather than the parent's conduct. *S.N.*, 272 S.W.3d at 61; *see In re S.K.*, 198 S.W.3d 899, 902 (Tex.App.--Dallas 2006, pet. denied); *In re D.J.J.*, 178 S.W.3d 424, 429 (Tex.App.--Fort Worth 2005, no pet.). Because Joel does not challenge this

finding on appeal, he cannot (and does not) [6] contend that a material fact question exists on this predicate ground for termination. Thus, he cannot show that the error in denying his jury request requires reversal. *See Hollywood Park Humane Soc'y*, 261 S.W.3d at 139.

We overrule Joel's first point.

**Default Judgment**

Joel contends in his second point that the court abused its discretion by rendering a post-answer default judgment against him.

There is no default when a party fails to appear for trial but counsel appears on the party's behalf. *Le Blanc v. Le Blanc*, 778 S.W.2d 865, 865 (Tex. 1989) (per curiam); *In re K.C.*, 88 S.W.3d 277, 279 (Tex.App.--San Antonio 2002, pet. denied). Thus the court abused its discretion by rendering a default judgment against Joel.

Joel contends that he was harmed because the court refused to permit his counsel to call witnesses, present evidence, or present argument on Joel's behalf. At the beginning of trial, Joel's counsel asked whether he would be permitted to cross-examine witnesses or call witnesses in view of the court's oral rendition of a default judgment. The trial court advised counsel that he could cross-examine witnesses and, if he desired to call a witness, the court would examine the matter at that point to determine whether he would be permitted to do so. The court also permitted counsel to make an opening statement on Joel's behalf.

Joel's counsel actively participated in virtually the entire trial, making objections which the court ruled on, cross-examining witnesses, and offering exhibits which were admitted in evidence. Counsel never attempted to call a witness on Joel's behalf. At the conclusion of trial, the court overruled Joel's motion for directed verdict. The court confirmed its prior ruling that counsel was not permitted to offer evidence or call witnesses, yet counsel had in fact offered evidence which was admitted and counsel never attempted to call a witness to testify and never identified any witnesses whom counsel wanted to call. Counsel was not permitted to make a final argument on Joel's behalf.

**Page 66**

To the extent counsel was not permitted to present witnesses on Joel's behalf, he did not identify a single witness to the trial court (either during the trial or the hearing on his motion for new trial) whom he wished to call nor the substance of such witness's testimony. Neither has he done so in his appellate brief. Thus, it cannot be said that he was harmed by the trial court's erroneous rendering of a default judgment. *See Hughes v. Grogan-Lamm Lumber Co.*, 331 S.W.2d 799, 803 (Tex.Civ.App.--Dallas 1960, writ ref'd n.r.e.) ("no showing was made on the motion for new trial that

McCollough would probably be present at another trial, or what his testimony would be, nor how or in what manner it would probably cause the rendition of a different verdict" ); *Clark v. Brown*, 234 S.W.2d 1013, 1014 (Tex.Civ.App.--San Antonio 1950, no writ); *cf. Harrison v. State*, 187 S.W.3d 429, 435 (Tex.Crim.App. 2005) (" If an appellant seeks a new trial based on the denial of a motion for continuance for an absent witness, he must file a sworn motion for new trial, stating the testimony that the missing witness would have provided." ).

We overrule Joel's second point.

**Sufficiency of the Evidence**

Joel challenges the legal and factual sufficiency of the evidence to support the termination order in his third point. However, he does not challenge the sufficiency of the evidence to support the affirmative finding on the predicate ground for termination under (D) that a parent has knowingly placed or allowed a child to remain in dangerous conditions or surroundings. Nor does he challenge the sufficiency of the evidence to support the best interest finding. *See S.N.*, 272 S.W.3d at 49 (" to mount a successful challenge on appeal based on evidentiary insufficiency, a party must challenge each affirmative finding of a predicate ground for termination or at minimum challenge the best interest finding" ).

We overrule Joel's third point.

**Constitutionality of Section 263.405**

Joel contends in his fifth point that section 263.405 of the Family Code is unconstitutional because it: (1) interferes with the jurisdiction of the appellate court; (2) " attempts to deny the right to counsel to an appealing litigant" ; (3) " interferes with the due process and orderly jurisprudence in this Court and its jurisdiction over an appeal" ; and (4) " further attempts to limit the jurisdiction of this Court by requiring a statement of points for appeal and limits the manner and type of claims that can be preserved in a motion for new trial."

We construe Joel's complaint to present in essence two constitutional claims: (1) section 263.405 unconstitutionally limits the appellate issues which may be considered; and (2) section 263.405 unconstitutionally permits a trial court to deny the right to counsel to an indigent appellant.

With regard to his first complaint, he has not identified any issue which he has been prevented by the statute from presenting to this Court for review. *See M.C.*, 300 S.W.3d at 314; *In re S.N.*, 292 S.W.3d 807, 811-12 (Tex.App.--Eastland 2009, no pet.); *In re E.A.W.S.*, No. 02-06-00031-CV, 2006 Tex.App. LEXIS 10515, 2006 WL 3525367, at *18 (Tex.App.--Fort Worth Dec. 7, 2006, pet. denied) (mem. op.).

With regard to the second complaint, the trial court advised counsel at the new trial hearing that the court would not pay for appointed counsel to represent Joel on appeal after finding that the appeal was frivolous and noting that Joel had failed to appear for trial and had not recently communicated with counsel. Nevertheless,

**Page 67**

this Court by order dated April 10, 2009 advised the parties that " an indigent person has a statutory right to appointed counsel to represent him in an appeal challenging a court's determination under section 263.405(d) that his appeal is frivolous." *In re M.V.G.*, 285 S.W.3d 573, 576 n.2 (Tex.App.--Waco 2009, order) (quoting *In re S.T.*, 239 S.W.3d 452, 457 (Tex.App.--Waco 2007, order) (per curiam), *disp. on merits*, 263 S.W.3d 394 (Tex.App.--Waco 2008, pet. denied)). Joel's counsel has actively represented him on appeal.

Joel's fifth point is overruled.

The termination order with regard to both Patricia and Joel is affirmed.

Affirmed

---------

Notes:

[1]To protect the identity of the child who is the subject of this suit, we shall refer hereinafter to the parents by pseudonyms. *See* TEX. FAM. CODE ANN. § 109.002(d) (Vernon 2008); TEX. R. APP. P. 9.8(b)(2).

[2]Joel's mother lives in Puerto Rico and currently has custody of eight of Patricia's and his other children.

[3]In fact, the caseworker testified, " The only relatives [sic] available that I've been given [who] are in Puerto Rico is [sic] the grandmother that had received the previous children."

[4]Instead, Joel has briefed this point together with his fifth point challenging the constitutionality of section 263.405 " [f]or purposes of brevity and convenience." He states in conclusory fashion, " Appellant asserts for all of the reasons set forth in this Brief that his appeal is not frivolous."

[5]Joel refers in his brief to Patricia's jury demand, but the clerk's record indicates that Joel's attorney filed a written jury demand on his behalf.

[6]In fact, Joel does not even attempt to explain in his brief how he was harmed by the court's erroneous denial of his request for a jury trial other than to say he was " adversely affected" because the judgment " was rendered herein by the Judge."